Sheriff Vernon Betts

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


JOHN N. CASTELLANO, III,          )
                                  )
Plaintiff,                        )
                                  )
                                  )
vs.                               )  Case 4:19-CV-02304-SRC
                                  )
                                  )
VERNON BETTS, et al.,             )
                                  )
Defendants.                       )


ZOOM DEPOSITION OF SHERIFF VERNON BETTS


Taken on behalf of Plaintiff

September 3, 2020


Jo Ann Sturm, CSR, CCR
REGISTERED PROFESSIONAL REPORTER
ILLINOIS CSR NUMBER: 084-002267
MISSOURI CCR NUMBER: 716


STURM REPORTING SERVICES, INC.
2144 Gray Avenue
St. Louis, Missouri  63117
(314) 780-2816

EXHIBIT
I

Sheriff Vernon Betts

1
2    I N D E X   O F   E X A M I N A T I O N
3
4    DEPONENT SHERIFF VERNON BETTS
5       Direct Examination By Ms. Petruska ............7
6
7
        I N D E X   O F   E X H I B I T S
8
9    Exhibit 1 ............................................23
         Charge of Discrimination, 6/2017
10
     Exhibit 2 ............................................26
11       Charge of Discrimination, 8/7/2017
12   Exhibit 3 ............................................27
         Charge of Discrimination, 11/26/18
13
     Exhibit 4 ............................................32
14       Position Statement, 4/9/19
15   Exhibit 5 ............................................35
         Response to Charge of
16       Discrimination, 6/19/19
17   Exhibit 8 ............................................38
         Post-Dispatch article
18
     Exhibit 27 ..........................................56
19       Second Amended Complaint
20   Exhibit 6 ............................................62
         1/3/17 Manual
21
     Exhibit 7 ............................................63
22       Manual, 3/16/18
23   Exhibit 9 ............................................85
         Consent Judgment
24
25

1    Exhibit 12 ........................................159
         1/12/17 memo
2
     Exhibit 13 ........................................160
3        4/19/17 Promotion/Demotion List
4    Exhibit 16 ........................................165
         Cannon Performance Evaluation
5
     Exhibit 17 ........................................176
6        12/11/14 Memo
7    Exhibit 26 ........................................188
         Letters of interest in promotion
8
     Exhibit 22 ........................................269
9        Deputies for Promotional
         Consideration
10
     Exhibit 23 ........................................273
11       Considerations for Sergeant
12       The original exhibits were retained by
     counsel.
13
14
15
16
17
18
19
20
21
22
23
24
25

1        IN THE UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF MISSOURI
2                 EASTERN DIVISION
3
4    JOHN N. CASTELLANO, III,     )
5                                 )
     Plaintiff,                   )
6                                 )
7    vs.                          ) Case 4:19-CV-02304-SRC
                                  )
8                                 )
     VERNON BETTS, et al.,        )
9                                 )
     Defendants.                  )
10
11
12
13       ZOOM DEPOSITION OF SHERIFF VERNON BETTS,
     produced, sworn, and examined on behalf of the
14   Plaintiff, on  September 3, 2020, between the hours of
     9:57 a.m. and 5:46 p.m. on that day before JO ANN
15   STURM, a Registered Professional Reporter, an Illinois
     Certified Shorthand Reporter and a Certified Court
16   Reporter within and for the County of St. Louis, State
     of Missouri.
17
18
19
20
21
22
23
24
25

1
2        A P P E A R A N C E S
3        The Plaintiff, JOHN N. CASTELLANO, III,
     was represented by Ms. Lynette M. Petruska of the law
4    firm of Pleban & Petruska, LLC, 2010 South Big Bend
     Boulevard, St. Louis, Missouri 63117.
5        The Defendants, VERNON BETTS, et al.,
     were represented by Ms. Korey Lewis of the City
6    Counselor's Office, 314 City Hall, St. Louis, Missouri
     63103.
7
8
9
         Also Present:  Mr. John Castellano, III
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Sturm Reporting Services, Inc.
314.780.2816

Sheriff Vernon Betts

## Page 22

1   head gestures.  Korey and I don't want to be fighting
2   after the deposition is over whether an uh-huh was a
3   yes or a no.  So if you say that clearly, we can avoid
4   those issues.
5           I'm assuming all of those little rules for a
6   deposition are agreeable to you?
7       A   Yes.
8       Q   I had a police chief once tell me I wasn't
9   going to tell him what to do, and he walked out after
10  I did that.  So I'm glad to see we don't have to deal
11  with that today.
12          Let me ask you first.  Does the sheriff's
13  department have any kind of a rule about whether an
14  employee can work for it when it has an outstanding
15  tax obligation, whether that be local, state or
16  federal?
17      A   We do not.
18      Q   And some public employers, right, if you owe
19  a public entity money, they'll give you a notice and
20  then if you don't take care of it, they'll suspend you
21  until you take care of the public entity.  But you
22  don't do any of that is my understanding, correct?
23      A   Correct.
24      Q   Before the lawsuit was filed, you're aware
25  that John Castellano filed three charges of

## Page 23

1   discrimination, correct?
2       A   Yes.
3       Q   Did you review each of those charges?  When
4   they were given to the sheriff's office, did you
5   actually read them?
6       A   Yes.
7       Q   So you have seen -- let me pull it up here
8   real quickly.  You have seen before what I've marked
9   as Exhibit 1, which is the April 19th, 2017 charge of
10  discrimination that was filed in June of 2017; is that
11  correct?
12      A   Correct.
13      Q   Let me ask you first.  Other than talking to
14  your attorneys, what did you do when you received that
15  charge?
16      A   Fell out of my chair.  No.  I read it and
17  probably shared that information with my chief of
18  staff.
19      Q   That's Colonel Roberts, is my understanding?
20      A   Yes.
21      Q   And my understanding is he is, himself, a
22  lawyer?
23      A   Yes.
24      Q   Were you seeking legal advice from him?
25      A   Not at that moment.

## Page 24

1       Q   So what did you and Colonel Roberts discuss
2   when you received the charge?
3       A   Both kind of flabbergasted, and I think we
4   then felt we should share that with my attorney.
5       Q   And your attorney is the City Counselor's
6   office; is that correct?
7       A   Yes, but I don't think -- I have a personal
8   attorney who I think we might have shared that with
9   first.
10      Q   Let me ask you again.  I'm not asking for
11  communications you had with your personal attorney,
12  but who is your personal attorney?
13      A   At that time it was Jolene Taft.
14      Q   Did she work for the sheriff's department or
15  was she external to the sheriff's department?
16      A   She was external to the sheriff's
17  department.
18      Q   Did you charge anybody in your department to
19  do an investigation regarding the first charge of
20  discrimination, Exhibit 1?
21      A   No.
22      Q   Why not?
23      A   I didn't think I should.  I didn't think I
24  needed to.  We would wait and see what happens.
25      Q   How did you become aware of the charge?  Who

## Page 25

1   made you aware of Exhibit 1?
2       A   I believe I got something in the mail from
3   EEOC.
4       Q   So you actually received the mail, opened it
5   and became aware of the charge.
6       A   Yes.
7       Q   Did you do anything else with respect to
8   Exhibit 1 after you received it, other than talking to
9   either your personal attorney or the City Counselor's
10  office, other than this brief conversation it sounds
11  like you had with Colonel Roberts?
12      A   No, I didn't do anything with that.
13      Q   If I'm understanding your testimony
14  correctly, the only thing you and Colonel Roberts
15  discussed is what you should do with it?
16      A   Yes.
17      Q   And the decision was that what you should do
18  with it was let an attorney know.
19      A   Right, and then go back and see what
20  happened.
21      Q   And at some time did you become aware of
22  John Castellano filing a second charge of
23  discrimination?
24      A   Yes.
25      Q   The second charge of discrimination, would

7 (Pages 22 to 25)

Sheriff Vernon Betts

Page 26

1    that be what I have Bates-labeled as Exhibit 2, which
2    is alleged to have taken place on August 7th of 2017?
3        A    I'm assuming so because I was informed about
4    a second suit I think from Korey.  I'm not sure who
5    told me about the second suit.
6        Q    And actually, I'm not talking about a
7    lawsuit, I'm talking about this actual charge of
8    discrimination.  So you would have received this -- if
9    it was file-stamped in October of '17, you would have
10   received it sometime probably in October of '17.
11       A    Yes.
12       Q    And how did you become aware of the second
13   charge?  Did you also receive that in the mail or did
14   somebody give it to you?
15       A    I believe so.
16       Q    Which one, received it in the mail or
17   somebody gave it to you?
18       A    I believe I received it in the mail.
19       Q    So then what did you do when you received
20   the second charge of discrimination?
21       A    Basically the same thing, just shared it
22   with, you know, my chief of staff and the lawyer and
23   put it away in the drawer.
24       Q    Did you request any investigation after the
25   second charge?

Page 27

1        A    No.
2        Q    And why not?
3        A    I didn't see no need to.
4        Q    Why didn't you feel there was a need to
5    investigate whether you had discriminated?
6            MS. LEWIS:  Object that it misstates
7    testimony.
8    BY MS. PETRUSKA:
9        Q    Subject to that, you can answer.
10       A    Ask me the question again.
11       Q    Why did you not believe there was a need to
12   investigate this allegation of discrimination?
13       A    Well, because it wasn't true, so what was
14   there for me to look into?
15       Q    And the other reason?
16       A    Same thing.
17       Q    And then at a certain point then you also
18   received a third charge of discrimination, which I've
19   marked as Exhibit 3, that relates to an incident that
20   took place on 11/26 of '18; is that correct?
21       A    I guess.  I'm not familiar with a third
22   charge of discrimination.
23       Q    Let me give you a second.  Take a second to
24   look at that to see if it refreshes your recollection.
25       A    Okay.  Okay, I'm somewhat familiar with this

Page 28

1    charge.
2        Q    So having reviewed Exhibit 3, it refreshes
3    your recollection that you've seen it before today; is
4    that correct?
5        A    Correct.
6        Q    Did you become aware of the third charge the
7    same way, you received it in the mail, you opened it
8    and you read it?
9        A    I don't remember.
10       Q    Do you know what you did when you received
11   the third charge?
12       A    Probably the same thing I did with the other
13   charges, tuck it away and let's see what happens.
14       Q    Did you charge anybody to investigate the
15   third charge of discrimination, Exhibit 3?
16       A    No.
17       Q    And why not?
18       A    Same reason.  They were false charges, so I
19   didn't see any reason.  Investigate who, investigate
20   what?  I had no reason to investigate anybody.  False
21   charges, as far as I was concerned.
22       Q    Wasn't Deputy Castellano asking that you be
23   investigated?
24       A    I guess that's what he was doing.  I don't
25   know.

Page 29

1        Q    All three charges accuse you of race and/or
2    retaliation discrimination in terms of making
3    promotions, correct?
4        A    Correct.
5        Q    And my understanding is you are the
6    decision-maker in the sheriff's department in terms of
7    making promotions; is that correct?
8        A    Correct.
9        Q    So basically he was accusing you of
10   discriminating or retaliating against him, correct?
11       A    Correct.
12       Q    And my understanding is you testified a
13   minute ago that they're false charges, so you denied
14   discriminating against Deputy Castellano; is that
15   correct?
16       A    That's correct.
17       Q    Did it make you angry that Deputy Castellano
18   was accusing you of that kind of conduct?
19       A    Yeah, it ticked me off a little bit.
20       Q    And why was that?
21       A    Would you like to get accused of being
22   racist?
23       Q    Sir, unfortunately, the reality today is I
24   get to ask the questions, not you.  Is that your
25   answer, though?  You answered with a question.  If

8 (Pages 26 to 29)

Sheriff Vernon Betts

Page 62

1    Sheriff, to one of the documents I'm hoping you have
2    at this point, and that would be Exhibit 6, your
3    January 3rd, 2017 manual.
4        A   I have that.
5        Q   This was produced to me by the City, and
6    it's got Bates numbers of 1 to 75.  I know they just
7    gave me what you gave me, but I want to verify
8    through you this is a complete copy of the
9    January 3rd, 2017 sheriff's manual; is that correct?
10       A   Correct.
11       Q   And you promulgated the manual, because on
12   page one it says Vernon Betts, correct?
13       A   Correct.
14       Q   Now, let me ask you this, because this is
15   just a couple of days after you're sworn in.  Did you
16   just repromulgate Murphy's manual?  You have a
17   transition period.  You know you've been elected and
18   you know you're going to be sworn in.  So did you
19   repromulgate Murphy's manual with your name on it or
20   did you create your own new manual to try and show
21   that you were going to do things differently?
22       A   Well, this is the one, Exhibit 6 is Murphy's
23   manual that I just determined that you use --
24       Q   Repromulgated?
25       A   Yeah.  But because later on I did -- we did

Page 63

1    do a new -- I think you got Exhibit 7.
2        Q   So at a later date, you look at the manual
3    and you make the changes you want to make in it, but
4    when you first take office, you say Murphy's -- I'm
5    going to be a little bit snarky here, Murphy's law
6    controls.
7        A   Yes.
8        Q   Murphy's law, isn't that where everything
9    bad happens to you or something?
10       A   Yes.
11       Q   You keep his rules and regulations into
12   effect until you get a sense of what's going on in the
13   office.
14       A   Yes, ma'am.
15       Q   And what I want to do is direct you to
16   Section 5 of the manual, it's at page 15, whether you
17   look at the Bates number or the actual page number.
18       A   I got it.
19       Q   And it talks about the appraisal process.
20       A   Yes.
21       Q   Do you see that?
22       A   Yes, I have it.
23       Q   So it talks about, like you said, that the
24   performance appraisal is done annually during the
25   month of their anniversary of hire.  It talks about

Page 64

1    what areas you're going to do appraisals on, which is
2    on page 16.  And then if you go to page 17, it talks
3    about the completion of the performance appraisal.
4        And then if you go one more page out, the
5    procedure, it talks about by the third day of the
6    month, every supervising officer will receive a list
7    of all subordinates who report directly so that they
8    know what evaluations they're supposed to do.  Does
9    that list go out?
10       A   By the third day of the month, each
11   supervising officer will receive a list of all
12   subordinates who report to such supervising officers
13   and hiring -- ask me that question again.  Did this
14   procedure go out?
15       Q   Right.  It sounds like according to the
16   procedure, sergeants or lieutenants get a rolling list
17   every month of these are the people we want you to
18   evaluate.
19       A   No.
20       Q   Does that list go out?
21       A   Yeah, that kind of went out.  We don't
22   adhere specifically to that.
23       Q   So the list of people to be evaluated does
24   not go out electronically somehow to remind people.
25   But you're saying that people still do the

Page 65

1    evaluations, is my understanding, correct?
2        A   Yes.
3        Q   I've got you now.
4        If you go to subparts four and five of
5    Section E, the procedure, it does say that the final
6    evaluation goes to the sheriff or his designee by the
7    end of the month, unless there is an extension.
8        Since you've been sheriff, do you receive a
9    number of evaluations at the end of each month?
10       A   I receive those evaluations throughout the
11   course of the month because everybody basically tries
12   to give me their evaluation of that employee on that
13   employee's anniversary date.
14       Q   You're not getting them all as one stack at
15   the end of the month, you're getting them as they come
16   in during the month.
17       A   Yes.
18       Q   The bottom line is you're getting a number
19   of evaluations during the course of the month, and
20   that's how you know that people are being evaluated
21   like they're supposed to be.
22       A   Yes.
23       Q   It says:  The final step in the process is
24   the sheriff will review all completed performance
25   evaluations.

17 (Pages 62 to 65)

Sheriff Vernon Betts

Page 66

1    And my understanding of your previous
2 testimony is you do that.
3    A   Yes, ma'am.
4    Q   Because the other part talks about you can
5 have a designee, but you don't designate somebody to
6 do that, you do it yourself, is my understanding.
7    A   Yes, ma'am, I do that myself.
8    Q   And then it talks about a process that can
9 be followed for below standards.  If there's a below
10 standard overall evaluation, do you follow that
11 process that's set forth in paragraph six?  We're now
12 on page 19.
13    A   Yes, ma'am.
14    Q   So basically it says in terms of below
15 standards, you can look at it and you can overrule a
16 below standards rating.  Have you ever overruled a
17 below standards rating?
18    A   Yes.
19    Q   How many times would you say you've done
20 that in your three years and nine months as sheriff?
21    A   Just a few times.
22    Q   Do you remember any of the deputies you've
23 done it for?
24    A   No, I don't remember the deputies
25 specifically, but I remember the reasons, the

Page 67

1 incident, the reasoning that I did.
2    Q   And what would be the reason that you would
3 overrule a below standards evaluation?
4    A   When that supervisor grades that person and
5 that grading is not consistent with other facets of
6 the evaluation, then I may overrule a specific section
7 of that evaluation.
8        And that example would be if you are -- I'm
9 very picky about time, being on time, and your
10 attendance.  And if a person has perfect attendance,
11 they shouldn't be graded poorly.  But that has
12 happened a couple of times, so I've overruled that.
13    Q   So someone showing up regularly and doing
14 their job and getting a poor performance evaluation,
15 you might look into that and supersede the
16 individual's supervisor's poor performance evaluation;
17 is that correct?
18    A   That's correct.
19    Q   If you look at -- if you go back to
20 section -- or page 15, section one, it says:  The
21 purpose of the appraisal is to promote effective
22 personnel management in the sheriff's department.
23        And do you agree that an annual performance
24 appraisal helps you to effectively manage the
25 personnel in your department?

Page 68

1    A   I do.
2    Q   And you would have considered -- I'm
3 assuming, but I'm not trying to put words in your
4 mouth, you would consider the appraisal process to be
5 particularly important if you thought you were
6 inheriting a dysfunctional department, right?
7    A   Yes, ma'am.
8    Q   You want this written feedback to see how
9 your deputies are doing and who you need to improve or
10 let go, right?
11    A   Yes, ma'am.
12    Q   Let me ask you this:  Since you've been
13 sheriff, how many deputies have you had to terminate?
14    A   I've terminated several deputies.
15    Q   Can you give me -- several is a range.  Has
16 it been more than five but less than ten?
17    A   Yes.  Well, let me think for a minute.
18    Q   Sure, sure, take your time.
19    A   I'm thinking right off the top of my head, I
20 can tell you about five.  Five come to mind right off
21 the top of my head.
22    Q   And just let me -- since this isn't a
23 termination case, the five that you can think of, how
24 many are black and how many are white?
25    A   I think all of them were black.

Page 69

1    Q   And then you referenced it before.  I'm
2 going to have you pick up now what's been marked as
3 Exhibit 7 for purposes of deposition.
4    A   Yes.
5    Q   And this is a manual that's dated March 16th
6 of 2018.  Is this the manual that you rewrote after
7 you had been in office for a period of time and then
8 promulgated as your policies and procedures?
9    A   Yes.
10    Q   And I'm just going to first ask you, this
11 particular manual is Bates labeled 971 to 1,078.  Is
12 it your complete manual?
13    A   Yes.
14    Q   If you go to the same section five, which I
15 believe is still at the same corresponding pages, so
16 page 15 of the actual manual, the Bates label 986,
17 there is the performance appraisal process.  I've
18 taken a look at it and I'm certainly giving you as
19 much time as you need to look at it, but it's my
20 understanding that that particular performance
21 appraisal process did not change when you did
22 revisions to the manual.  It's the same one that's
23 been in effect since you've been elected, correct?
24    A   Pretty much.  I believe so, yes.
25    Q   Like I said, if you want to take your time

18 (Pages 66 to 69)

Sheriff Vernon Betts

Page 122

1      A   Yeah, yeah.
2      Q   So there's four people that you've promoted
3  to lieutenant.
4      A   Right.  Okay.  I just overlooked him.
5  Right.
6      Q   And so let me ask it this way.  For Davis,
7  where is she assigned as a lieutenant?
8      A   She's a lieutenant over the Civil Courts
9  Building.
10     Q   And how about Roop?
11     A   Dawn Roop is the lieutenant over the
12  Carnahan Building.
13     Q   And how about Hogan?
14     A   Hogan is the lieutenant over outside
15  service.
16     Q   And Gamache?
17     A   Mike Gamache is lieutenant over
18  transportation.
19     Q   And then -- so if I'm remembering the
20  numbers correctly, the three other lieutenants have
21  been there since before you took office.
22     A   Yes.
23     Q   I'm going to represent to you that we have
24  records that show that there have been 12 people
25  promoted from deputy to sergeant.  Does that sound

Page 123

1  correct?
2      A   That could be.
3      Q   And we're going to go over each one of them.
4        Let me ask you this:  So Davis was promoted
5  to sergeant, according to records, on May 23rd of
6  2017.  Do you have any reason to dispute that?
7      A   Felicia Davis was promoted from -- yes.
8  Yeah.  No, I don't dispute that.  And we said
9  promoted.  Actually, she was already acting sergeant
10  when I got here, so I don't really consider that --
11  I've never been a proponent of the word "acting."
12  Either you're doing it or you're not.  And so Felicia
13  actually was acting sergeant when I got here, and so
14  we just eliminate that word acting.
15     Q   So you made her a sergeant because she was
16  acting in the capacity, you don't like acting, and so
17  if somebody's acting, they should have a position, so
18  you made her a sergeant.
19     A   That's how I feel.  She was already doing
20  the job.
21     Q   Do you have a time in rank requirement
22  before somebody can be promoted from one rank to the
23  next?
24     A   No, I don't.
25     Q   So records show that Davis, Felicia Davis,

Page 124

1  was promoted to lieutenant on January 8th of 2018, so
2  about seven or eight months later.  How is it that she
3  gets promoted so quickly?
4      A   My need to try to fill those spots, to make
5  sure I'm getting the confluence with my shop that I
6  need.  There was an opening there.
7      Q   How had the opening -- how had the opening
8  become available in the lieutenant position?  Did
9  somebody die, retire?
10     A   Yeah.  I think that lieutenant spot was --
11  his name escapes me.  We had a lieutenant that
12  retired.  It will come to me, but that's how that spot
13  came open.  We had a lieutenant that retired.
14        Korey -- I had a lieutenant that I wasn't
15  happy with.  Korey might be able to help me on this.
16  I had a lieutenant that I wasn't happy with because,
17  remember, Korey, he couldn't do the time sheets.  Do
18  you remember that story that included my brother and
19  blah, blah, blah?
20        MS. LEWIS:  I remember the situation.  I do
21  not remember the name.
22        THE WITNESS:  The name?  Okay.  Lynette, I'm
23  sorry, I can't --
24  BY MS. PETRUSKA:
25     Q   But that position came open due to a

Page 125

1  retirement.
2      A   Yes.
3      Q   Now I'm going to refer you back to your
4  manuals, both Exhibits 6 and 7.  And you're aware that
5  there are promotion processes defined in both of your
6  manuals; is that correct?
7      A   Correct.
8      Q   And that process or that policy is set out
9  at Section 4 in both Exhibit 6 and Exhibit 7, correct?
10     A   Correct.
11     Q   And are you familiar with the policy as it's
12  defined in your manual?
13     A   I am.
14     Q   And it's my understanding that you don't
15  follow the policy; is that correct?
16     A   That's correct.
17        MS. LEWIS:  Objection.  Argumentative.
18  BY MS. PETRUSKA:
19     Q   Why don't you follow the policy?
20     A   Because I don't have to.
21     Q   Why do you say that you don't have to?
22     A   Because the manual tells me I don't have to.
23     Q   Let me ask it this way, then:  Why would you
24  promulgate a policy that explains how you're going to
25  do promotions if you don't use it?

32  (Pages 122 to 125)

Sheriff Vernon Betts

Page 126

1    A  It's a guide.  We need guidelines, but that
2  don't mean I have to adhere strictly to the guideline.
3    Q  Have you ever used or followed the policy
4  that's set forth in Exhibit 6 or Exhibit 7 to make a
5  promotion during your tenure as sheriff?
6    A  I don't believe I have.
7    Q  Would you agree that the policy, Section 4,
8  is the same whether I look at Exhibit 6 or Exhibit 7,
9  correct?
10    A  Correct.
11    Q  And so let me ask you this:  When you take
12  office, you put your name on Sheriff Murphy's manual
13  and say we're going to continue to follow his
14  policies.  And I get that, you haven't had a chance to
15  look at them, so you're going to do what's been done
16  before.  But by the time you get to Exhibit 7, why
17  would you have a promotion policy that you would put
18  in your manual and tell people was going to be how you
19  were going to promote people if you already knew you
20  weren't going to use it?
21    A  Well, I didn't know I wasn't going to use
22  it.  I just didn't use it.
23    Q  By then you'd been in office for a year and
24  three months and you had never used it, correct?
25    A  Right.  And at the time I was making those

Page 127

1  promotions, I didn't see where the policy was the tool
2  that I wanted to steer my guidance on on making that
3  promotion.
4    Q  I didn't mean to cut you off.
5    A  I don't think the policy was what I wanted
6  to use to steer me on making that promotion.
7    Q  So why didn't you write a different policy
8  to let deputies know how you were going to make
9  promotions?
10    A  Because I can tell them how I'm going to
11  make promotions, which I've done.
12    Q  What have you told them about how you're
13  going to make promotions?
14    A  Just like we said earlier in this
15  conversation, it's noted.  It's noted out there that
16  promotions, there are openings.  You can write me a
17  letter, tell me what you think your qualifications are
18  that give you the merit to get that position.  So
19  that's what we've done.  We've had people come in, sit
20  down and talk to me.  They come in and talk to me
21  about their merit, and so I can discuss that merit
22  with them.  I don't necessarily have to have a policy
23  that's going to dictate.
24    Q  Why didn't you just take it out of your
25  policy manual when you updated it in March of 2018?

Page 128

1    MS. LEWIS:  Objection.  Asked and answered.
2    THE WITNESS:  That's probably the plan.
3  We're probably going to do that.  Just haven't gotten
4  around to it.
5  BY MS. PETRUSKA:
6    Q  Do you know why a policy was first put into
7  the policy manual for promotion -- actually, strike
8  that whole question, it's bad.
9    Do you know why a promotion section was put
10  into the manual when it was?
11    A  No, I don't know why.
12    Q  Were you ever told that the sheriff's
13  department developed a written promotion policy
14  because of the previous lawsuit we've talked about?
15    A  You know, I just lost you all.  I clicked on
16  something.  What do I need -- I'm sorry, Lynette.
17    Q  We can hear you if you can't hear us.
18    (Discussion off the record.)
19  BY MS. PETRUSKA:
20    Q  So the question pending is:  Were you ever
21  told that the policy was put in place because of the
22  previous lawsuit we talked about?  I believe it was
23  the one where you mentioned -- no, I went too far back
24  in my own notes.
25    A  I can tell you no.

Page 129

1    Q  Tyrone Williams, I guess, was involved.
2    A  I was never told that policy was put in
3  place because of that lawsuit.
4    Q  So you knew the policy existed before you
5  were there, but you don't know why it existed before
6  you were there.
7    A  Right.
8    Q  And I just want to check on a couple of
9  things.  So you have never created an eligibility
10  list.
11    A  Correct.
12    Q  You have never done written testing as part
13  of a promotion process; is that correct?
14    A  Correct.
15    Q  Do you review any documents as part of the
16  promotion process, whether it's tied to the policy or
17  not?
18    A  No, I don't.
19    Q  The written policy, I'm sorry.
20    A  No, I don't.
21    Q  So you don't look at the discipline record,
22  the past performance evaluations, anything like that
23  to get a sense of the deputy before you make a
24  promotion.
25    A  I have a sense already when I consider that

33 (Pages 126 to 129)

Sheriff Vernon Betts

## Page 130

1    person, and usually in my conversation with people in
2    the office, like Tim Haill, if that person has had any
3    kind of disciplinary action, Tim is pretty good at
4    saying, hey, you know this person did such and such
5    and such and such and such.
6        Q   I'm going to ask this, because it will
7    eliminate -- when I go through each of the individual
8    promotions, it will eliminate this question for each.
9        So when you've considered promoting somebody
10   from deputy to sergeant in each of those 12 times that
11   we're going to talk about shortly, you have never
12   pulled the personnel file to get a sense of their
13   discipline record, their performance evaluations, what
14   training certificates might be in there.
15       A   You're right.  I never pull the file.
16       Q   Like I said, I won't ask that question 12
17   times, then.
18       Have you ever formally waived the promotion
19   policy set forth in Section 5 of your manual?
20       A   When you say formally waived.
21       Q   Right.
22       A   No, I've never formally waived the policy.
23   I guess informally, I've ignored the policy.  I think
24   that's what we're talking about.
25       Q   And that's what I'm asking about.  So is

## Page 131

1    there any document or memo that would say that, you
2    know, for this promotion or from this point going
3    forward, we're waiving or not following this policy?
4        A   No.
5        Q   Did you promise anybody a promotion before
6    you were elected sheriff?
7        A   No.
8        Q   And that would include Antoine Cannon,
9    correct?
10       A   That would include Mr. Cannon.
11       Q   Did you ever hear that he was going around
12   bragging that if you were elected sheriff, he would be
13   promoted to sergeant?
14       A   I'm sure he and several other folks probably
15   did that.
16       Q   Do you know who the other several folks
17   were?
18       A   No.  I'm just sure that kind of stuff
19   happens.  I'm sure people make those -- Lynette, just
20   off the top of my head I'm kind of laughing because I
21   had one deputy that never even got hired, but he put
22   it in the St. Louis America that he was going to be
23   the new HR guy.  That was Pat Hill.
24       So you get that kind of stuff going on,
25   people thinking that they're going to do this and do

## Page 132

1    that.  So they say what they want to say.
2        Antoine Cannon was working in a position, and when I
3    came on as sheriff, he wasn't or nobody else was
4    automatically promoted just because they had some kind
5    of relationship with me.  I think we've discussed how
6    he became promoted.  If not, we can always discuss
7    that issue.
8        Q   We're going to get into each individual
9    ones, because we just talked broad scope about the
10   process.
11       What kind of a relationship did
12   Antoine Cannon have with you?
13       A   A pretty cordial relationship.  I knew him
14   well, like I knew several other of the -- a lot of the
15   deputies.  I worked here as a deputy, so a pretty
16   cordial relationship with a lot of the deputies.
17       Q   Did he work on your campaign?
18       A   Yes, he did.
19       Q   Did you socialize with him?  I don't mean
20   like were you cordial to him when you saw him in the
21   halls, but would you go out for dinner, a beer
22   together?  Was he was in your home, were you in his
23   home?
24       A   No.  I don't socialize with any of my
25   deputies pretty much.

## Page 133

1        Q   That was going to be my next question again.
2    I think I'm going to let you start doing both ends of
3    this.
4        So there's nobody in the -- you don't --
5    you're not a person that socializes with your
6    subordinates.  You draw the line.
7        A   Lynette, now, when we say socialize, if
8    there's something special, one of my deputies calls me
9    and says hey, my birthday, so and so, we're going to
10   be down, I may, I may, I may, but it ain't like every
11   weekend guys are going to be hanging out down at the
12   bar and I'm going down there.  No, I don't do that.  I
13   don't -- I don't go out with my kids, and I don't go
14   out with my employees.  I'm just trying to draw you a
15   picture of the kind of guy that I am.
16       Q   And that's what I'm trying to understand.
17   By socialize, I don't mean like if somebody's
18   celebrating 40 years in the sheriff's department and
19   the sheriff's department holds a big party for him and
20   a number of people go and you're one of those people,
21   or something significant happens in their life, like
22   they get married.  I'm really talking more about the
23   informal stuff that would signify you're friends as
24   opposed to work colleagues.  And that doesn't happen.
25       A   No.

34  (Pages 130 to 133)

Sheriff Vernon Betts

Page 154

1      A   Well, that's what I'm saying.  He doesn't
2   have all of the attributes that I want in a
3   supervisor.  So, therefore, it disqualifies him in my
4   mind.
5      Q   So does that mean that while you're sheriff
6   that John Castellano will never be promoted to
7   sergeant?
8      A   No, that's not true.  You know, he could
9   be -- you know, he might go to school, get educated, I
10  don't know.  Several -- a lot of different things.
11  I'm not saying he could never be promoted while I'm
12  sheriff, that's not right.
13     Q   So let me ask it this way:  In your mind,
14  what would John Castellano need to do to be considered
15  for promotion?
16     A   I'd have to give --
17        MS. LEWIS:  Sorry, Sheriff.  I'm just going
18  to object to the form.  It's an improper hypothetical.
19        Go ahead and answer.
20        THE WITNESS:  I have to give that some
21  thought, some thought about what else John needs to do
22  in order to get promoted under Vernon Betts.
23  BY MS. PETRUSKA:
24     Q   Let me know when you've had enough time to
25  think about it and then we'll get back to it.

Page 155

1      A   Do you want me to think about it right now?
2      Q   I'll give you a few minutes right now.  If
3   you can't think of anything, we'll move on and I'll
4   come back to it.
5      A   Let's move on.  We'll come back to it.
6      Q   Then let me go back to my previous question.
7   Where does he fail in his qualifications in your mind?
8   What does he not have that right now he can't be
9   promoted?
10     A   I haven't seen anything out of
11  John Castellano that brings him to the forefront of
12  being promoted.  He's not exceptional in any work.  He
13  hasn't done anything outstanding since I've been here.
14  He definitely doesn't communicate.  His communication
15  skill is very poor.  Extremely poor.  I've only spoken
16  to the -- the guy has only spoken to me once, I think,
17  in the four years that I've been here.  And that's a
18  major part, communication in being a supervisor in my
19  department.  You have to be able to relate to the
20  employees, communicate.  And if you don't even
21  communicate with the sheriff, how in the heck are you
22  going to communicate with the employees?
23        And so, like I said, I've not seen anything
24  above and beyond.  His work ethic has not stood out in
25  any kind of way.  And all of those people that I've

Page 156

1   promoted, Lynette, something has stood out with them
2   that caused me to promote them.  I have not seen
3   anything with Mr. Castellano that stands out that I
4   should put him on my -- top of my list.
5      Q   Have you ever said anything critical or
6   negative about John Castellano to your supervisory
7   staff?
8      A   Well, I don't think I've said anything
9   positive about him, I don't know.  John Castellano
10  doesn't come up in my conversations very often.
11     Q   And have you ever discussed firing
12  Castellano with your supervisory staff?
13     A   Not yet.
14     Q   When you say "not yet," it makes it sound
15  like it might be on the horizon.  Is it on the
16  horizon?
17     A   I don't know.
18        MS. LEWIS:  Objection.  Misstates testimony.
19  BY MS. PETRUSKA:
20     Q   Has John Castellano done anything that would
21  make you consider terminating him?
22        Did you not hear my question?
23     A   I heard it.
24     Q   Okay.  I wasn't sure since I wasn't getting
25  an answer, and I know we've had connectivity problems

Page 157

1   during the day.
2      A   I don't even think about Mr. Castellano.
3      Q   Well, don't you think about the performances
4   of all your deputies?
5      A   Yeah, when it's performance -- when I'm
6   evaluating them.  From day to day, I don't have a
7   specific deputy I come in and I zero in, let me think
8   about this particular guy.  Too much going on for
9   that.
10     Q   Okay.  But per your previous testimony, you
11  review all performance appraisals, so you know how
12  supervisors are rating their employees, correct?
13     A   Correct.
14     Q   And if I'm understanding your testimony,
15  and, obviously, I'm not speaking about the future, but
16  as we sit here right now, John Castellano hasn't done
17  anything related to his job that you're currently
18  considering firing him.
19     A   As it relates to his job?  No.
20     Q   Yes.
21     A   No.
22     Q   I want to ask those same questions --
23        MS. PETRUSKA:  If you don't object, Korey,
24  I'm just going to lump them together for speed.
25

Sheriff Vernon Betts

Page 158

BY MS. PETRUSKA:
2    Q   Have you talked to -- we've already asked
3  about your supervisory staff.  Have you talked to
4  anybody in the sheriff's department, so any employee,
5  about John's job performance, said anything negative
6  about him or critical of him or his performance or
7  talked to them about terminating his performance?
8    A   No.
9    Q   Why did you transfer John to the hospital
10  unit on January 12th of 2017?
11    A   Was it to the hospital unit or was it to,
12  like, the transportation unit?  So I think, and I'm
13  not sure, I may have this all mixed up, but we had --
14  are you there?
15    Q   Yeah.  I think I was trying to get -- let me
16  take this off.  I think I was trying to get an exhibit
17  ready to refresh your recollection, but go ahead.
18    A   We had made a personnel move where we -- I
19  think that's where we promoted Mr. Cannon, because we
20  had demoted Mr. Norise, so we had that open spot that
21  we needed to fill.  So I think that's why we moved
22  Mr. Castellano to that spot, which I think was an
23  increase in pay.
24    Q   Let me do this.  I'm going to see if this
25  refreshes your recollection.  I'm going to show you --

Page 159

1  is it up there?
2    A   Yeah, something's there.
3    Q   Are you seeing a document, and if I scroll
4  down, it says Depo 12?
5    A   Yes.
6    Q   This is a memo dated January 12th of 2017
7  that says effective Wednesday, January 18, Castellano
8  is going from the courts to the hospital unit and
9  Burklow is going from the hospital unit to the courts.
10    A   Yeah, I see that.
11    Q   And that would be your signature at the
12  bottom, correct?
13    A   That's correct.
14    Q   And so why did you make that transfer?
15    A   Burklow is going from the hospital unit to
16  Carnahan extra board -- I can't remember exactly what
17  was going on, but I know Burklow didn't end up moving,
18  but we needed somebody in that -- and that wasn't -- I
19  don't know if he actually went to the hospital unit.
20  But I do remember this.  I do remember him being
21  transferred.
22    Q   Did you transfer him to nights to retaliate
23  against him?
24    A   For what?
25    Q   I'm just asking.  Did you transfer him to

Page 160

1  nights to retaliate against him?
2    A   He hadn't done anything for me to have to
3  retaliate against.
4    Q   So the answer would be no, you didn't do it
5  to retaliate against him.
6    A   Right.  No.
7    Q   You testified a moment ago that -- let me
8  get this off.
9        (Discussion off the record.)
10  BY MS. PETRUSKA:
11    Q   Sheriff, I'm showing you what's been marked
12  as Plaintiff's Exhibit 13.  It's an email -- or a
13  promotion/demotion list dated April 19, 2017, which is
14  what you talked about before.  Castellano is
15  transferred to the jail crew and Cannon is promoted to
16  sergeant, correct?
17    A   Correct.
18    Q   Let me ask you first, why did Norise get
19  demoted?
20    A   Because he had been written up twice by his
21  supervisor and continued to just violate rules and do
22  stuff that he didn't have no business doing.  I would
23  have to go back and look up the specific write-ups,
24  but I can remember that he was written up twice by his
25  supervisor.  And the first time he was written up I

Page 161

1  had given him a warning that if he continued, that he
2  would lose his rank.
3    Q   But you don't remember why he was written
4  up?
5    A   No, I don't remember specifically why the
6  lieutenant steward wrote him up, but I know he was
7  wrote up twice before he lost his rank.
8    Q   Bottom line, though, it's a disciplinary
9  demotion, involuntary, he doesn't request it.
10    A   Right.
11    Q   And is April of 2017, then, with this
12  demotion, it sounds like that's the first time you
13  have a sergeant's opening, correct?
14    A   Correct.
15    Q   Why do you transfer Castellano to the jail
16  crew on April 19th?
17    A   Because promoting Antoine Cannon now to
18  sergeant gives me a vacancy, and I needed somebody to
19  help Antoine Cannon on that crew.
20    Q   So his moving up the rank creates an opening
21  below him.  I've got you now.
22    A   Right.
23    Q   Again, I'm going to try to do this in a
24  broad stroke.  It's my understanding that with the
25  exception of maybe some roll calls that you don't

41 (Pages 158 to 161)

Page 162

1    remember the specific dates, it was not your policy or
2    practice to say I've got this opening right now,
3    please apply by this date if you're interested.
4       A   Right.
5       Q   So there's no announcement related to what
6    I'm going to call the April sergeant's opening.  No
7    specific announcement, there might have been a verbal
8    announcement.
9       A   And you're correct.
10      Q   Do you know, according to my documentation,
11   it looks like you do eight or nine promotions to
12   sergeant, which results in the promotion of the 12
13   people.  So there's a couple of times that you're
14   promoting two people on the same day, okay?  So in
15   terms of those eight or nine promotions, do you know
16   how many times you announced openings at the roll call
17   meetings?
18      A   I do not.
19      Q   So if I'm understanding your testimony, you
20   had a sergeant's opening in the transportation unit --
21      A   Yes.
22      Q   -- because of Norise's demotion.
23      A   Yes.
24      Q   Did anybody apply for this particular
25   position?

Page 163

1       A   No.
2       Q   Who did you consider for this particular
3    promotion?
4       A   Mr. Cannon.
5       Q   Is he the only one you considered?
6       A   Yes.  There's a reason for that.
7       Q   We're going to get to that.  Did any
8    supervisors recommend Cannon or anybody else for this
9    particular promotion?
10      A   No.
11      Q   You said you considered Castellano for
12   certain promotions, so did you consider Castellano for
13   this particular promotion?
14      A   No.  And when I say I considered, that's
15   been after the fact, after all of this here.  Things
16   that have gone on the last several months,
17   Mr. Castellano popped in my head.  But, no, at the
18   time that all this is going on, no, Mr. Castellano was
19   not considered at this time.
20      Q   Were you aware that Castellano had expressed
21   interest in open sergeant positions before Murphy
22   retired?
23      A   No.
24      Q   Did somebody forward any kind of
25   communication along that line to you?

Page 164

1       A   Only after this all of this stuff kicked
2    off.
3       Q   You learned about that related to the
4    lawsuits is what I'm understanding, correct?
5       A   Yes.
6       Q   Told you I wouldn't ask you that whole set
7    of questions about review because we covered it all,
8    so I'm not going to do it.
9           So why did you promote Cannon to this
10   particular sergeant's promotion?
11      A   Because he was working hand and hand with
12   Norise Chapelle, the two of them had been working
13   together.  He knew the job, knew the responsibility.
14   He was carrying out the responsibility, from what I
15   could see and understand, in a very excellent fashion.
16   So all I simply considered myself doing was removing
17   Chapelle from that position and moving Antoine Cannon
18   up.  That's all I really considered myself doing, is
19   moving him up.
20          He was already doing what they did at night.
21   The two of them worked together, and so there was no
22   reason to go do a search for somebody to put in that
23   spot when you've already got somebody working right
24   there in that spot.  Know the job, got the education,
25   and had been there, promote him.  So that's what I

Page 165

1    did.
2       Q   So it was your understanding that he was
3    doing a good job in the position?
4       A   He was doing a good job.  I'm observing all
5    of that.
6       Q   If he was evaluated after you took office
7    and before he was promoted, you would have seen and
8    reviewed his evaluation, correct?
9       A   Correct.
10      Q   Can you see what's been marked as Depo
11   Exhibit 16 at this point?
12      A   Yes, ma'am.
13      Q   And that is Cannon's performance evaluation
14   at the jail crew by Sergeant Norise, correct?
15      A   Yes.
16      Q   And it's dated January 24th of 2017,
17   correct?
18      A   Yes, ma'am.
19      Q   And you would have seen that then because
20   it's in his personnel file, correct?
21      A   I don't know if I have that in my file, and
22   I said a few minutes ago that I would have seen it.  I
23   would have seen it if it was given to me, and I don't
24   believe this was ever given to me.
25      Q   Let me ask you first.  It says:  Rating

42  (Pages 162 to 165)

Sheriff Vernon Betts

Page 166

1    commander should consult Procedural Order 99-001 and
2    99-002 regarding the preparation of the performance
3    appraisal.
4        What are those?
5        A   I don't have a clue.
6        Q   You said before that one of the things that
7    was important to you in terms of promoting somebody is
8    that they're there and do the job, correct?
9        A   Correct.
10       Q   Do you see here that Cannon needed
11   improvement in terms of attendance in January of 2017?
12       A   I see that.
13       Q   And Norise rated him as needing improvement
14   in his knowledge of the position in January of 2017?
15       A   I see that.
16       Q   And that he needed improvement in complying
17   with the rules, regulations and authority in
18   January 2017, correct?
19       A   Correct.  I see all of that.
20       Q   As well as supervisory performance.
21       A   Right.
22       Q   So you said that your practice is to talk to
23   the supervisor about -- the immediate supervisor about
24   somebody you're thinking about promoting.  Did you
25   talk to Norise about Cannon?

Page 167

1        A   I did not.
2        Q   Why not?
3        A   Probably because Norise is Norise, and just
4    like I'm looking at this evaluation and I bet this
5    evaluation is probably -- I bet Cannon would have
6    total objection.  This is the first time I've seen
7    this, and I'm sure Cannon would object to this
8    evaluation.  And I'm saying that this evaluation is
9    probably the way that it is not so much because of the
10   employee merits this, but because of the supervisor
11   grading him, and that's one reason why that supervisor
12   is no longer the supervisor.
13       Q   But, I mean, again, you're the sheriff, so
14   if you disagreed with this evaluation, you could have
15   overwritten it in January of 2017, correct?
16       A   What I'm saying to you, Lynette, is I never
17   got this evaluation.
18       Q   Anything else that factored into your
19   decision to promote Cannon to the sergeant's position
20   in transportation?
21       A   No.
22       Q   And again, if I'm understanding your
23   previous testimony, you never considered anybody else
24   for the first promotion other than Cannon, so you
25   didn't compare him to other candidates, correct?

Page 168

1        A   Correct.
2        Q   So I'm not going to ask you how you compared
3    them to other candidates, okay?
4        I know I asked you to describe your process
5    for promotions earlier and you outlined that
6    generally.  But in your answer to interrogatory 15 in
7    the state lawsuit, you said that you promote someone
8    on merit based on your personal knowledge, okay?
9        A   Okay.
10       Q   I can show you that interrogatory answer if
11   you want, but to save time, you can accept my
12   representation.
13       A   I go along with what you're saying.
14       Q   What I want to understand is when you say
15   you promote somebody based on merit, what does merit
16   mean to you?
17       A   Merit means to me, and we have said this
18   earlier in our conversation, merit means to me that
19   that person has conducted himself in a professional
20   way on the job, carried out the responsibilities of
21   the job, and conducts himself off the job, but
22   basically on the job conducts himself, carries out the
23   responsibility, communicates with his supervisor and
24   his employer, has done those things that we asked him
25   to do.  And when I say "those things," the

Page 169

1    responsibilities of his job based on as I communicate
2    with his supervisors.  Do I get any reflection on this
3    guy not doing what he's supposed to do?  And so the
4    reports that I get from supervision.
5        So when I say merit, this person has done
6    basically those things that I think are things that
7    would qualify him for being promoted or whatever.
8        Q   And if I'm understanding your testimony,
9    then, so merit is basically what -- when we were
10   talking about qualities before, merit is the quality
11   you identified before.
12       A   Sure.
13       Q   I've got you now.  When you say based on
14   your personal knowledge, how do you obtain personal
15   knowledge of these folks that you're considering for
16   promotion?
17       A   How do I obtain personal -- when I say I'm
18   promoting these people based on personal knowledge, my
19   knowledge of the skills that it takes to carry
20   yourself on a job.  And so I obtain that knowledge by
21   interviewing, talking to -- as we said, talking to
22   their supervisor, seeing what the person had done.  A
23   lot of these jobs, I've actually gone with the
24   employees to actually see what's done, know what's
25   going on.  I'm out on the floor, I'm not in the office

43  (Pages 166 to 169)

Sheriff Vernon Betts

## Page 170

1  24/7 and all that kind of stuff, but I'm out on the
2  floor, watching and seeing. And so from my
3  observation, and then, like I said, from communicating
4  with the other supervisors, maybe not even his own
5  immediate supervisor.
6       Because people are going to make reports.
7  Maybe not technical or direct reports, but just by
8  verbally saying, hey, you know so on, you know that
9  Cannon did this, Cannon did that. So you take all of
10  that kind of information. To me, that's what I do,
11  and then I make my determinations as to whether or not
12  I want to promote a person or not.
13       Q   Now, you talked about doing interviewing.
14  What kind of interviewing do you do?
15       A   When we talk about interviewing, are we
16  talking about new employees or --
17       Q   You said that you interview the employee and
18  you talk to the supervisor.
19       A   Okay.
20       Q   You've already explained what you do in
21  terms of talking to the supervisor, so what do you do
22  in terms of interviewing when you're considering a
23  promotion?
24       A   I'll call that person into my office, or
25  maybe not. Maybe I'll just see him in the hallway and

## Page 171

1  ask him, you know, what do you think you're going to
2  be doing as a supervisor. And I may -- and that's
3  kind of a rhetorical question, but let me tell you
4  what you're going to be doing. You're going to be
5  doing this, this and this. Can you adhere to that
6  responsibility?
7       Usually when I say I'm interviewing a
8  candidate, I'll talk to that person and kind of let
9  him know this ain't -- when I promote you, if you get
10  promoted, it ain't going to be no walk in the park.
11  We're talking about some responsibilities here.
12       And that's why I've had a few people say,
13  hey, no, I don't want to be a supervisor because I'm
14  going to have to come to work at times where I don't
15  want -- I don't want my family to be interrupted, my
16  family time to be interrupted, and that's the kind of
17  stuff when I say interview, I'll ask people about
18  those kinds of things.
19       We talk about pay. I've had one person to
20  turn down becoming a supervisor because the pay wasn't
21  what he thought it was going to be. But you talk
22  about pay, you talk about responsibility, you talk
23  about them having to work times. Right now with all
24  the stuff that's going on, I may get a call in the
25  next five minutes, we're going to have a protest

## Page 172

1  downtown, and we have to -- we do the staging for the
2  police. What I mean by that, we provide the vans and
3  the vehicles for moving. If I call you today, I need
4  you to be on that crew. I need you to come to work.
5  I don't need you to tell me you're getting ready to
6  take the kids to the park to play ball.
7       So, Lynette, in my interview, we talk about
8  just in general a gamut of different things. And
9  that's how I kind of get an idea as to whether or not
10  I want that person to work for me as a supervisor, if
11  I'm going to promote that person.
12       Q   Let me ask you this: I know in the Cannon
13  promotion you only considered him, so that's how you
14  talked to him. Some of these other promotions when
15  you were considering several people as opposed to a
16  specific individual, do you talk to several people
17  about those things?
18       A   I'll talk to each person about those same
19  things.
20       Q   So, right. I don't know -- you know, let me
21  just randomly pick a promotion, and I'm not saying it
22  happened this time, but there's another promotion in
23  May of '17. So if you're considering three people for
24  that slot, you would bring each of those three people
25  in and have that kind of a conversation with them?

## Page 173

1       A   Yes.
2       Q   It's not just who you're considering to be
3  your top candidate.
4       A   Yes. And like I said, when you say bring
5  them in, that may not have necessarily been a formal
6  process where I say, hey, I want you to come, I also
7  want to talk to you. I might have met them somewhere in
8  the hallway somewhere and we just stop, standing off
9  to the side, talk about, you know.
10       Q   I understand. So it might not be a formal
11  interview. If they work in a certain area, you might
12  just pull them aside and talk to them in their area.
13       A   Right.
14       Q   My understanding is Cannon had been working
15  with the sheriff's department about three years when
16  you promoted him; is that correct?
17       A   I think so.
18       Q   Do you know what units he had worked in in
19  the sheriff's department when he was promoted to
20  sergeant?
21       A   I'm not sure. I kind of think he'd been in
22  transportation all the time.
23       Q   Maybe I didn't look at them closely enough.
24  Is there a documentation on the forms that say what
25  unit they're assigned to?

44 (Pages 170 to 173)

Sturm Reporting Services, Inc.
314.780.2816

Sheriff Vernon Betts

Page 174

1  A  Yes.
2  Q  I see those employee forms.
3  A  Yes.
4  Q  On the form it actually says what unit
5  you're assigned to?
6  A  Yes.
7  Q  But you don't know if he had worked in
8  transportation the whole three years because you
9  weren't there for a good chunk of that.
10  A  Right.  I don't know exactly where he
11  worked.
12  Q  So with respect to Cannon, if I'm
13  understanding your testimony, you don't have a -- you
14  don't have a supervising sergeant you can talk to
15  because it's Norise, correct?
16  A  Correct.
17  Q  So do you talk to anybody else about Cannon
18  to get a sense of him other than your own perspective?
19  A  I'm sure that I probably talked to
20  Lester Stewart, who both Norise and Cannon reported
21  to.  He was the lieutenant.  I'm sure that in passing
22  the other supervisors in the office may have given me
23  their take.  If Cannon had been a terrible employee,
24  I'm sure Tim or Tammy or the major would have said,
25  no, wait a minute, that's who you're promoting?  It's

Page 175

1  terrible.  So we didn't get that reflection from
2  anybody.
3  Q  When you say "the major," which major would
4  it be if it's in transportation?
5  A  It would have been Major Lammert.
6  Q  So you talked to some individuals and it was
7  your personal observations, correct?
8  A  Correct.
9  Q  Anything else that factored in to the
10  decision to promote Cannon?
11  A  Well, his educational background really
12  impressed me.
13  Q  Anything else?
14  A  His character and demeanor.  Whenever I
15  would see him, it always seemed to be about the
16  business.  Pleasant.  Pleasant attitude.
17  Q  You stressed a couple of times communication
18  skills.  What did you know about his communication
19  skills, him being Cannon?
20  A  Well, I know he communicates.  He
21  communicated with me on a regular basis whenever I
22  would see him.  I'm a former schoolteacher, so I know
23  when you can put together a sentence.  His
24  communication skills were decent.  And always cordial.
25  And seemed to, from my observation, get along with all

Page 176

1  the other people that he had to interact with.
2  Q  When you promoted Cannon, did you know he
3  had received a written reprimand for professionalism
4  and a lack of common courtesy in his daily
5  performance?
6  A  I did not know that.
7  MS. LEWIS:  You did or did not?  I'm sorry.
8  THE WITNESS:  I did not know that.
9  BY MS. PETRUSKA:
10  Q  Would that have had any impact on your
11  decision?
12  A  Yes, it would have.
13  Q  If it was in his personnel file, why didn't
14  you know that?
15  A  Because it wasn't in my personnel file of
16  him.
17  Q  Did you ask anybody if he had any kind of
18  disciplinary history?
19  A  I don't think I did.
20  Q  I just want to be clear.  I want to see if
21  this refreshes your recollection in any way.  I'm
22  showing you now what's previously been marked as
23  Deposition Exhibit 17.  It's a memo dated December 11,
24  2014 produced to us by the City.  And I do understand
25  you are not on the sheriff's department at this point.

Page 177

1  Are you telling me that this is the first time you're
2  seeing this particular memo?
3  A  I am.
4  Q  And as we sit here today, you don't know the
5  specific facts set around that particular write-up; is
6  that correct?
7  A  That's correct.
8  Q  What conduct he engaged in that was found to
9  be uncourteous or lacked professionalism?
10  A  I have no idea.
11  Q  And my understanding is Cannon is no longer
12  with the sheriff's department; is that correct?
13  A  That's correct.
14  Q  Did he resign or was he fired?
15  A  He was fired.
16  Q  Why was he fired?
17  A  Because he went through a legal situation
18  that ended up causing him to have a felony, and you
19  can't work for the sheriff's department if you have a
20  felony on your record.
21  Q  He was actually charged with domestic
22  assault, correct?
23  A  Correct.
24  Q  Between the time he was charged and
25  convicted, what was his status with the sheriff's

Sturm Reporting Services, Inc.
314.780.2816

Sheriff Vernon Betts

Page 194

1    of people that you considered to be like finalists or
2    your serious candidates?
3         A    No.  I have a list.
4         Q    I'm not asking about the list per policy,
5    but in your own mind, whether it's written or in your
6    mind, do you have two or three people you're seriously
7    considering that you think could be a good person for
8    this job?
9         A    Probably at that time I probably had two or
10   three people.
11        Q    As we sit here today, do you know who they
12   are?
13        A    No, I don't.  I can't remember back then.
14        Q    Why is it that McGinnist got this particular
15   promotion?
16        A    McGinnist, probably if there was a slot and,
17   there again, based on those attributes and those
18   things that we've talked about a couple times now,
19   that's why McGinnist got that spot.  Working in that
20   particular area is usually one of the first things we
21   look at.  And then all those other things that I
22   talked about.  We talked about merit.  And then him
23   displaying -- that's how he got promoted.
24        Q    So you're saying that McGinnist worked in
25   courts when he was promoted to sergeant?

Page 195

1         A    Yes.  Yeah, I believe -- yes.
2         Q    When you promoted McGinnist to sergeant, did
3    you know he had previously been arrested?  Had you and
4    him ever discussed that?
5         A    No, we had not.
6         Q    Are you learning that for the first time
7    today?
8         A    Yes, ma'am.
9              MS. PETRUSKA:  Korey, just so you know, this
10   is one of the documents I told you I would use
11   something from but destroy, so I don't have the
12   document anymore.  But that is where it came from.
13             MS. LEWIS:  Fine.
14   BY MS. PETRUSKA:
15        Q    So you don't know what he was arrested for,
16   correct?
17        A    No, I do not.
18        Q    If you had known he was previously arrested,
19   would that have factored into your decision about
20   whether he should be promoted?
21        A    It certainly would have.
22        Q    Why is that?
23        A    Just like I've said over and over, that what
24   I've tried to stress with these deputies is that you
25   are a deputy 24/7, 365 days a year on and off the job.

Page 196

1    And your character, demeanor and all that impacts how
2    I feel about you working on my job.  And if you're not
3    doing what you're supposed to do off the job, at some
4    point you're not going to do what you're supposed to
5    do on the job.
6              Yes, I think it's all relevant and all has a
7    bearing.  So we have had employees get fired because
8    of their misbehavior off the job.
9         Q    To your knowledge, had McGinnist ever been
10   moved because a female had complained about him
11   harassing her?
12        A    No.
13        Q    You don't know anything about that?
14        A    I don't know anything about that.
15        Q    Were you aware of any issues or problems
16   with McGinnist's job performance?
17        A    No.
18        Q    What supervisors would you have talked to
19   about McGinnist in terms of input on the promotion, if
20   anybody?
21        A    Probably Dawn Roop.  Again, Tim Haill.
22   Maybe Major Lammert.
23        Q    And do you remember what any of them told
24   you about McGinnist?
25        A    Nothing specifically.  None of them.  I

Page 197

1    would have remembered if any of them came to me and
2    put up a strong challenge not to promote him.
3         Q    You've talked about these different
4    attributes and qualities you look for in terms of
5    promotion.  So let me ask you this:  How did McGinnist
6    stand out compared to other deputies on these
7    interpersonal and communication skills you talk about?
8    What made him stand out and made him best for the job?
9         A    He seemed to be able to communicate to me.
10   He seemed to be able to articulate the job that he --
11   whenever talked about -- when I got there, I think he
12   was working in Division 26, 27, and that's -- you're
13   moving the prisoners from the jail to video court and
14   all that, and he seemed to be very proficient at
15   knowing what goes on in the courtroom.  And that's one
16   of the reasons, one of the things that caught my
17   attention.
18             And then, of course, him being able to work
19   with all the other deputies.  I never got any reports
20   from any deputies that he -- they didn't like him,
21   didn't get along with him.  And some of the stuff that
22   you've just told me, I'm flabbergasted.
23        Q    How did McGinnist stand out with respect to
24   his leadership ability compared to other deputies?
25        A    Seemed to be able to lead.  In talking with

50  (Pages 194 to 197)

Sheriff Vernon Betts

Page 198

1  him, I think he had been some kind of officer in other
2  aspects, in other places where he had worked.  I got
3  that information.
4      Q   Do you know where you got that information?
5      A   From him.
6      Q   Was that part of when you interviewed him,
7  whether it was in your office or somewhere else?
8      A   Sure.  Yeah, that was -- could have been.
9      Q   Has McGinnist incurred any discipline since
10  he was promoted to sergeant?
11      A   Yes, ma'am.
12      Q   And what has he been disciplined for?
13      A   I guess recently, just the other day, he
14  lost his stripes.
15      Q   So he's been demoted?
16      A   He's been demoted as of this past Friday.
17  He's been in my office a couple of times because he
18  had run-ins with his superiors.  There's been
19  discrepancies as to how things should run and who said
20  what and what was done that was right or wrong, and so
21  he's been in the office for that.
22          I think I suspended him before, too, I have
23  to look and see.  But just recently, he's been
24  suspended.  He was suspended last week and he lost his
25  stripes.  But he's had two incidents before this

Page 199

1  recent incident.
2      Q   Were you aware that in 2010 he was suspended
3  for two weeks and made to go to anger management
4  counseling?
5      A   In 2010?
6      Q   Because of a confrontation he had had at
7  Barnes Hospital where he threatened to blow somebody's
8  brains out?
9      A   I was not aware of that.
10      Q   Are you aware that that is in his
11  disciplinary file?
12          MS. LEWIS:  Objection.  Assumes facts not in
13  evidence.
14          THE WITNESS:  Do I have to answer that?
15          MS. LEWIS:  Yes, sir, if you know.
16          THE WITNESS:  I was not aware of that being
17  in his disciplinary file because, as I've said before,
18  I don't go perusing through the files when I'm making
19  these kind of decisions.
20      Q   Isn't that something you would want to know
21  before you promoted somebody to sergeant if in the
22  past they've gotten involved in a verbal confrontation
23  and threatened to blow somebody's brains out?
24      A   I would want to know that, yes.
25      Q   If it's in the personnel file in your

Page 200

1  office, there's nothing that keeps you from looking at
2  any file in your office, correct?
3      A   That's correct.
4      Q   So my question is, and I will represent that
5  the two-week suspension, anger management counseling
6  and two years of probation related to an incident at
7  Barnes Hospital is, in fact, part of the file that was
8  produced to us yesterday related to discipline on
9  McGinnist.  And so wouldn't you want to be reading
10  these files, these personnel files to make sure you
11  don't have these kinds of problems before you promote
12  somebody?
13          MS. LEWIS:  Objection.
14          THE WITNESS:  I guess from now on I will.
15          MS. PETRUSKA:  I'm sorry, Korey?
16          MS. LEWIS:  Objection.  Argumentative.
17          Go ahead, Vernon.
18  BY MS. PETRUSKA:
19      Q   I'm sorry, your answer was I guess from
20  now --
21      A   I'm pretty sure from now on I will.
22      Q   Would it concern you if a deputy gave one
23  account of an event that was contradicted by multiple
24  witnesses, would you be concerned about that deputy's
25  honesty?

Page 201

1      A   Most definitely, yes.
2      Q   I'm assuming because you hadn't seen the
3  McGinnist file, you weren't aware that he gave a
4  statement that was contradicted by numerous witnesses.
5      A   You're correct in that.
6      Q   If I'm understanding your testimony
7  correctly, McGinnist, who was promoted in August of
8  '17, wasn't one of the best picks you made because
9  you've since had to demote him; is that correct?
10          MS. LEWIS:  Objection.  Argumentative.
11          THE WITNESS:  You can say that.
12  BY MS. PETRUSKA:
13      Q   And you said he had some run-ins with his
14  supervisor.  What were the run-ins he had with his
15  supervisor?
16      A   I don't remember the exact gist of the
17  conversation, but I know a couple of times he's been
18  in my office because he and Dawn Roop had some
19  question or some problems.
20      Q   So you interviewed McGinnist for this
21  position per what you described before.  Did you
22  interview anybody else for this particular position,
23  the August of 2017 promotion?
24      A   I'm sure I looked at -- if they gave me the
25  letters before I filled the position, I'm sure I

51 (Pages 198 to 201)

Sheriff Vernon Betts

Page 202

1    looked at those letters and probably talked to those
2    people.
3        Q    Do you have any recollection as we sit here
4    today in terms of what you talked to Mosely or Honer
5    about?
6        A    No, I don't.
7        Q    Let me ask you this: Why would you have
8    talked to McGinnist about the position if he didn't
9    give you a letter?
10       A    Did he give me a letter?
11       Q    I haven't seen one. So why would you talk
12   to McGinnist about the sergeant's position if he
13   didn't give you a letter saying he was interested?
14       A    Because there again, if that sergeant
15   position, Lynette, opened up in an area where that
16   person is working, that's usually one of the first
17   things that tipped me off in appointing a person to a
18   position, is that they worked and know the routine and
19   know what needs to be done there.
20       Q    But Castellano had worked in the courts for
21   a number of years, correct?
22       A    Correct.
23       Q    So he would have known the position, too,
24   correct?
25       A    Yeah. We keep going back over the same

Page 203

1    thing. I had no idea that Mr. Castellano wanted to be
2    promoted.
3        Q    Well, how did you --
4        A    I never got a letter from Mr. Castellano,
5    and he never talked to me about a promotion. And that
6    don't mean that I go around asking everybody who wants
7    to be promoted. I don't.
8        Q    But you take it upon yourself, then, to talk
9    to Danny McGinnist and promote him, even though he
10   doesn't give you a letter; is that correct?
11       A    Correct.
12       Q    How did McGinnist stand out with respect to
13   professionalism compared to the other deputies you
14   considered?
15       A    From what I could see, he did his job and
16   did it well.
17       Q    Anything else?
18       A    Like we've been talking about, his character
19   on the job seemed to be pretty good.
20       Q    What did McGinnist do in terms of standing
21   out in terms of good judgment compared to other
22   deputies that you thought he was the best person for
23   the job?
24       A    In terms of best judgment, just looking at
25   his everyday work and how he conducted himself and how

Page 204

1    he did his work. Never any kind of complaints from
2    his judge or anything like that.
3        Q    Were you getting complaints from any of the
4    other deputies' judges?
5        A    No.
6        Q    How did McGinnist stand out with respect to
7    decisionmaking compared to the other deputies you
8    considered?
9        A    Seemed to be just as capable at making
10   decisions as anybody else.
11       Q    My understanding is for each of these
12   promotions, you said you selected the best person for
13   the job, correct?
14       A    Well, no, no. I say what I thought was the
15   best person. I'm -- that's objective, Lynette. I'm
16   picking who I think may be the best person, yeah, for
17   the job.
18       Q    Right. You're picking the person you think
19   is the best person for the job out of a pool of
20   potential people you can promote, correct?
21       A    Yes.
22       Q    And what I'm asking is why is McGinnist the
23   best in terms of decisionmaking compared to the other
24   people you considered?
25       A    McGinnist had not had a chance to me compare

Page 205

1    his decisionmaking against anybody else's no more than
2    what they -- all those guys do on an everyday basis.
3    They come in and they make decisions to do their job,
4    do it well, then make the decisions to be at work and
5    be on time, and that's what I saw out of McGinnist.
6    That you don't see out of all the deputies. But he
7    seemed to be just as regular and on time and as good
8    as anybody else that could have done -- that could
9    have been selected for the job.
10       Q    What was McGinnist's attendance or tardiness
11   record compared to the other deputies?
12       A    I don't know.
13       Q    And what was his relevant work experience
14   compared to the other deputies you considered?
15       A    Well, I know he had worked outside, he
16   worked for the housing department and stuff like that.
17   But basically, again, making him a supervisor in that
18   particular spot, he had handled that responsibility
19   working in the courts in what I thought was a pretty
20   good fashion and -- and obviously, I never got
21   complaints from Don, his supervisor, before he was
22   promoted. All of his problems with the department and
23   me has come up since he's been promoted.
24       Q    You talked about promoting McGinnist because
25   of his attitude. What about his attitude made him

52 (Pages 202 to 205)

Sheriff Vernon Betts

Page 214

1    Q   And so the next promotions take place on
2    December 3rd of 2018.  Does that sound correct to you?
3    A   I guess you're right.
4    Q   And how are there two sergeants positions
5    open at that time?
6    A   Who are the people that got promoted?
7    Q   Those would be Evans and Allen.
8    A   Evans and Allen.  Again, I would have to
9    talk to Tammy Hogan how we had two spots open at the
10   same time.  There might have been some promotions from
11   sergeant to lieutenant at that time.  I don't know.
12   If those were the two promotions.
13   Q   Where did -- where was Evans promoted to
14   sergeant to, what unit?
15   A   Evans came out of outside service and
16   Walter Allen came out of the courts.
17   Q   Okay.  So when they're deputies, they're
18   outside service for Evans and Allen is courts.  When
19   they're sergeants, where do they go?
20   A   Both of them went to -- Walter Allen went to
21   sergeant on the Civil Courts side where he had been a
22   deputy working in the courts, so he became a sergeant
23   on that Civil Courts side.
24        And then Anthony Evans, who also worked
25   outside service, and they're staging point is in Civil

Page 215

1    Courts, but he became sergeant and then he came over
2    to the Carnahan Building.
3    Q   Okay.  So in December of 2018, you have two
4    positions open.  Who did you consider for these -- it
5    sounds like -- so they're both court sergeants,
6    correct?
7    A   Right, yes.
8    Q   One in each building, but they're both doing
9    the same job, just in different buildings.
10   A   Yes.
11   Q   So who did you consider to be court
12   sergeants in the -- I'm sorry, December of 2018?
13   A   Well, if I promoted Walter Allen, and I
14   think Walter Allen -- I'm not sure if Walter Allen is
15   the one person that did not give me a letter.  But by
16   this point I'm getting letters from everybody.  So if
17   I had the openings, I was considering everybody.
18   Q   So at this point --
19   A   Or whoever gave me a letter, not -- take
20   that back.  Not everybody, but whoever had given me a
21   letter or whoever had approached me -- maybe not even
22   a letter, but whoever had approached me with some
23   concern about being promoted, I'm sure I told them
24   give me something in writing.
25   Q   Right.  Because if -- I'm assuming -- we

Page 216

1    used to be the City attorneys for Frontenac, and
2    people would approach me and say, hey, I want you to
3    look at this ticket for me.  And I would say, okay,
4    send me an email so I don't forget.
5        I'm assuming if somebody came to you and
6    said, hey, Sheriff, I'd like to be considered for
7    promotion, particularly -- particularly from deputy to
8    sergeant, you're going to tell them send me a letter,
9    give me your qualifications, and I'll put you on my
10   radar just like I would anybody else, right?
11   A   Yes.
12   Q   If they just say to you in passing, hey, I'd
13   like to be promoted, you may not remember that six
14   months down the road.
15   A   No, I wouldn't remember that.  I'm telling
16   you I wouldn't remember.
17   Q   So you're telling people if they're serious
18   enough about wanting to be promoted, let you know in
19   writing and let you know why they think they should be
20   promoted, correct?
21   A   Yes.
22   Q   So do you know who else you -- you know,
23   again, I understand that you're saying you're
24   considering anybody that puts in a letter and you're
25   saying, okay, yes or no, but what I'm really focused

Page 217

1    on are who are the people you seriously considered for
2    this particular promotion.
3    A   I don't have -- I don't have a serious list
4    for those kind of things.  I just don't have a
5    serious -- this -- these are people.
6    Q   Let me ask it this way:  You said when
7    you're seriously considering somebody, you talk to
8    them about the open position, correct?
9    A   Yes.
10   Q   So who beside Evans and Allen did you talk
11   to about the December of 2018 promotion?
12   A   I don't remember.  It could have been
13   Tyrone Williams, it could have been Neil Reilly, it
14   could have been Joe Mopkins.  It could have been
15   anybody.  Anybody that gave me a letter or anybody --
16   Q   Are you saying you seriously consider
17   anybody that gives you a letter?
18   A   There again, you're using that term
19   "seriously."  I don't take the letters and throw them
20   in the trashcan.  I take those letters, I read them,
21   and then that runs through my head and my heart.  Is
22   this person going to be the kind of person that I want
23   to be on my supervisory team and can they lead this
24   department and do the things that we need?  All of
25   that will run through my head based on what I know

55 (Pages 214 to 217)

Sturm Reporting Services, Inc.
314.780.2816

Sheriff Vernon Betts

Page 222

```
 1   letters that were submitted for sergeant promotion.
 2   Is there anybody that sent a letter to you that you
 3   did not talk to about the responsibilities of the
 4   position? Because my understanding is, you said that
 5   when you get a letter --
 6      A   Right.
 7      Q   -- you kind of talk to them and say do you
 8   really understand what you're asking for.
 9      A   Yes.
10      Q   So my question is: Is there anybody in
11   Exhibit 26 that you did not talk to and say do you
12   really understand what you're asking for before I
13   consider you for promotion?
14      A   As I thumb through these letters, I don't
15   see anybody that I think I missed in saying that to.
16      Q   Now, I want to understand. Anybody that
17   tells you they're interested, you talk to them about
18   the duties and responsibilities. It's kind of just --
19   I guess it sounds like it's your way of making sure
20   that they really understand what they -- in fact, be
21   careful what you ask for, you might get it, correct?
22      A   Correct.
23      Q   But there's also -- when you're considering
24   people for promotion, you also talk to them at that
25   time; is that correct?
```

Page 223

```
 1      A   Correct.
 2      Q   And at that time -- so like -- so in
 3   December of '18 you're considering Evans and Allen for
 4   promotion. So you talk to each one of them, correct?
 5      A   Correct. But I think -- I think
 6   Mr. Walter Allen, I think I missed talking -- well,
 7   let me see. I don't think I missed talking to him,
 8   but I don't know that I got a letter from him. That's
 9   what I think I'm confusing. I don't think I got a
10   letter from Walter Allen.
11      Q   But you did talk to Evans and Allen about
12   this particular promotion and how you were considering
13   them for it, correct?
14      A   Yes.
15      Q   What did you talk to Evans and Allen about
16   as it related to this particular promotion as opposed
17   to the more generic talk you had with everybody when
18   they give you a letter?
19      A   Well, the responsibility of that particular
20   job and where I think I wanted them to work -- there
21   again, just off the top of my head, I'm sure I talked
22   to them basically about the same thing, their
23   responsibility of the job and what they're going to
24   have to do.
25      Q   So if you talked to them once before, you
```

Page 224

```
 1   talked to them a second time more specifically related
 2   to the promotion, this is what this job is going to
 3   require, this is what your commitment's need to be,
 4   are you sure you're up for it, are you sure you want
 5   to do it, correct?
 6      A   Correct.
 7      Q   Let me ask you this: When you've talked to
 8   people that you're considering for a specific
 9   promotion, have you ever decided -- I know you told me
10   that some people have told you, you know, now that
11   you've explained it to me, I'm not really interested,
12   whether it's because of what the job requires or what
13   it pays, but after talking to somebody, have you ever
14   made the decision that they're not the best qualified
15   person for the job?
16      A   Yes.
17      Q   Who did you consider for a promotion that
18   you decided to move on and pick somebody else after
19   you talked to them?
20      A   I talked to Brian Jones about a promotion.
21   And I don't know if it was that I thought it wouldn't
22   be best or he thought that it would interfere with his
23   making more money, as I think about that. I know he
24   was one of the ones that turned it down.
25      Q   Do you remember what promotion you talked to
```

Page 225

```
 1   him about, which one of the 12 that you've had open in
 2   your three-plus years as sheriff?
 3      A   Yeah, I -- right now, Frank Parker is the
 4   sergeant in outside service, and that's the same
 5   position that I had thought about promoting
 6   Brian Jones.
 7      Q   So you talked to Brian Jones about an
 8   outside services sergeant position. Either based upon
 9   what he said to you, you decided he wasn't the best
10   person or he might have said I'm not interested --
11      A   Exactly.
12      Q   -- and then Parker got the promotion; is
13   that correct?
14      A   That's correct.
15      Q   Anybody else that you can remember talking
16   to and then deciding they might not be the best person
17   for the promotion?
18      A   No.
19      Q   Would it be the same group of supervisors
20   you talked to about, their being Evans' and Allen's
21   promotions, the majors, Tim Haill, Captain Hogan?
22      A   Yes.
23      Q   Anybody else?
24      A   No, basically the same people.
25      Q   Do you ever talk to Colonel Roberts about
```

57 (Pages 222 to 225)

Sheriff Vernon Betts

Page 226

```
 1    promotions?
 2         A    Sure, yeah.
 3         Q    And which promotions do you talk to
 4    Colonel Roberts about.
 5         A    About all of them.
 6         Q    Do you talk to him one-on-one about who he
 7    thinks might be best or do you talk to him in a group
 8    setting, what we're talking about these monthly
 9    meetings?
10         A    Most of the time -- a lot of times
11    one-on-one.
12         Q    Has he ever made a specific recommendation
13    for a promotion?
14         A    No, he's never made a specific
15    recommendation for a promotion.
16         Q    Have you ever told him, I'm thinking about
17    these two people and he recommends to you I think this
18    person would be the better one for the job?
19         A    He may have made some kind of reflection
20    like that.
21         Q    Do you have a specific recollection?
22         A    No, I can't remember who specifically, but
23    in the course of all those people that we've promoted,
24    he may have said something, because I'm asking his
25    opinion.
```

Page 227

```
 1         Q    So you would have also spoken to Evans' and
 2    Allen's supervisors.  Who would have been their
 3    supervisor or supervisors?  It sounds like it would be
 4    different, though, because they came from different
 5    departments.
 6         A    Over there in the courts, Walter Allen's
 7    supervisor would have been Felicia Davis.  And in
 8    outside service where Anthony Evans was working, his
 9    supervisor would have been Neil Hogan.
10         Q    Do you remember what Davis or Neil Hogan
11    told you about Evans and Allen in terms of their work?
12         A    Just that they thought they were good
13    choices and that they'd go along with that promotion.
14         Q    And then you also said that you talked to
15    the -- I think you said you talked to the receiving
16    supervisor about the selection as well.  So who would
17    have been the lieutenant or lieutenants that Evans and
18    Allen would have been working under?
19         A    So once Walter Allen is promoted, he's going
20    to be working under Felicia Davis, his current
21    supervisor.  And then once Anthony Evans is promoted,
22    he's going to come across the street and he would be
23    working under Dawn Roop.
24         Q    What did Davis and Roop tell you about
25    receiving them as sergeants?
```

Page 228

```
 1         A    They were all in.  Nothing negative or
 2    nothing specific against either one of those guys.
 3    They thought they were good choices, too.
 4         Q    By this time you have a pool of qualified
 5    applicants is my understanding, correct, because
 6    people are sending you letters, they've kind of gotten
 7    a sense that that's what they need to do to be
 8    considered, correct?
 9         A    Yes, ma'am.
10         Q    Let's focus first on Evans.  What is it
11    about Evans that you consider him to be the best
12    qualified person for the job?
13         A    Well, one of the things that struck me with
14    Mr. Evans is that I think Mr. Evans has perfect
15    attendance for all the years that he's been with the
16    sheriff's department.  That's one of the things that
17    jumped out at me right away.  Again, very upstanding
18    young man, personality, get along with everybody.
19              And the same thing applies with
20    Walter Allen.  Walter Allen is the deputy that
21    replaced me as the bailiff in Division 5,
22    Judge Mark Neil.  The same demeanor, character,
23    upstanding, personality good, knows how to communicate
24    with other employees.
25         Q    Anything else that you -- any other reason
```

Page 229

```
 1    that you thought Allen was the best candidate for the
 2    other open position?
 3         A    No, nothing other than what I just told you.
 4    Skill, experience, you know.
 5         Q    So at this point you have two positions open
 6    in courts, is my understanding, one in each.  And I
 7    know you keep getting hung up on my word serious.  Is
 8    there anybody else that you considered to be a
 9    finalist for this position?  So somebody you thought,
10    I could select this person, other than Allen and
11    Evans?
12         A    Yes.
13         Q    Who were the other people that you
14    considered to be in this finalist group?
15         A    Tyrone Williams, Nate Friar, John Beine.
16    Don't ask me to how to spell it.
17         Q    Anybody else?
18         A    I know those guys were on my mind, yeah.
19         Q    Beine, I'm going to look for a spelling.
20    You're saying that with a B as in boy, right?
21         A    Yes.  Lynette, as I think about it and we
22    talk about all these other positions, those are guys
23    who all the time have been floating around in my head.
24    They could have been considered.  So when you talk
25    about my list, did I sit down and write their names on
```

58 (Pages 226 to 229)

Sheriff Vernon Betts

Page 230

 1  a list? No. But did I have guys? These guys, I knew
 2  of their integrity, as you would say integrity.
 3          Now, there again, all of that has got to be
 4  qualified, but when you talk about them doing the job
 5  and working as a deputy, I knew those guys had the
 6  ability. I don't think anybody on that job, Lynette,
 7  you're going to find didn't have some kind of some
 8  skeletons in their closet. So I had to pick the best
 9  that I had. When we say the best, and that's
10  relevant, but we had to pick from what we had.
11      Q   Let me go back. I told you I'd give you
12  some time to think about it and go back to it. What
13  would John Castellano have to do to be considered for
14  promotion in your sheriff's department?
15          MS. LEWIS: Object to the form. Improper
16  hypothetical.
17          Go right ahead, Vernon.
18          THE WITNESS: Yeah. John Castellano? I
19  don't know.
20  BY MS. PETRUSKA:
21      Q   I need to give you more time?
22      A   Probably several years, I don't know. I'm
23  not going to answer that question.
24      Q   You're refusing to answer that question?
25      A   I'm saying I can't answer that question.

Page 231

 1          THE WITNESS: Korey, is there some kind of
 2  penalty for not answering that question or what?
 3          MS. LEWIS: You need to answer any question
 4  to the best of your ability. So I think what Lynette
 5  wants to figure out here is, is there something that
 6  you're not understanding about the question or what
 7  aspect are you struggling with to answer?
 8          THE WITNESS: So the question is what would
 9  it take for John Castellano for Vernon Betts -- what's
10  the question?
11  BY MS. PETRUSKA:
12      Q   What would John Castellano have to do to be
13  considered for promotion?
14          MS. LEWIS: Same objection.
15          THE WITNESS: John Castellano has got to
16  improve in every aspect of his person, personality,
17  work ethic. Like I said before, he doesn't do
18  anything to get himself in trouble, but he doesn't do
19  anything to stand out. He ain't hitting 300, if you
20  understand that analogy.
21  BY MS. PETRUSKA:
22      Q   I do. So are you saying that the people
23  that you promoted are hitting 300?
24      A   When I selected them they were. They were
25  doing just what I thought they should be doing. And I

Page 232

 1  think that's the point, Lynette. It's my prerogative
 2  to determine who I want to work for me, and those
 3  people, I ain't saying that they were angels, I'm
 4  saying that they were doing what I asked them to do at
 5  the time.
 6      Q   You said that he would have to improve his
 7  personality. What about his personality is deficient
 8  that he's not currently being considered for
 9  promotion?
10      A   You've got to be able to communicate with
11  the people that you work with.
12      Q   How is he failing to communicate?
13      A   That's one of his flaws as far as I can see.
14      Q   And my question is, right: What have you
15  observed that shows that he fails to communicate with
16  people?
17      A   He's not a -- I don't see him cordially
18  communicating with anybody. He definitely doesn't
19  communicate with his sheriff. That's the first person
20  you've got to start off with.
21      Q   Anything else in terms of his communication
22  and personality?
23      A   His judgment. Judgment. To me he hasn't
24  used the best judgment. There's a couple different
25  situations, and I'm afraid that that will lead into --

Page 233

 1  any time you -- he doesn't use good judgment. He
 2  didn't use good judgment.
 3      Q   You said there are specific situations.
 4  What specific things has he done that you believe do
 5  not show good judgment?
 6      A   Well, I know that he had an altercation with
 7  Antoine Cannon once. They went to move some
 8  prisoners, pick up prisoners or whatever, and
 9  Antoine Cannon was his supervisor. He tells
10  Antoine Cannon -- Antoine Cannon gives him the keys to
11  drive, and he tells Antoine Cannon that he ain't
12  driving. That was a no no. I'm not sure if -- I
13  think that was a write-up. I think that's in his
14  file.
15      Q   Anything else?
16      A   Yes. He -- I know one time his car wouldn't
17  start, and instead of him asking his supervisor or
18  calling me and asking me can he use one of the vans,
19  he spends the night sleeping on the floor of the
20  building or something to that effect, but he's staying
21  all night on the job. Judgment, judgment, judgment.
22          And then overall, I mean, if you wanted to
23  be promoted, how come you just didn't come to me
24  and -- or how come you just didn't write a letter and
25  say, hey, I would like to, like everybody else, like

59 (Pages 230 to 233)

Sheriff Vernon Betts

Page 234

1  everybody else.  So you want to talk about judgment?
2  And then even when it even finally got around to him,
3  after all of this stuff of writing a letter, he
4  doesn't bring me the letter, like everybody else know
5  that they're supposed to, he takes it and gives it to
6  somebody else.
7      A couple times, instead of coming to me, he
8  said something to Mike Gamache about something.
9  Instead of coming to me, he gives Tim Haill a letter.
10  Everybody around there knows the procedures and they
11  know what to do, but he doesn't follow that, he
12  doesn't do that.
13      Q  So I want to make sure I'm understanding.
14  When he wanted to be considered for promotion, he gave
15  the letter to Tim Haill?
16      A  Yeah, he gave Tim Haill some kind of letter.
17  Never gave me a letter.  As of today I have not gotten
18  a letter from his hand to mine to him wanting to be
19  promoted like I've gotten all these other letters.
20  These people bring those letters to me, and I take
21  them and put them in my desk drawer.
22      Q  But you are aware that John Castellano has
23  provided a letter requesting promotion, correct?
24      A  Sure.  Never gave it to me.
25      Q  I understand the difference you're making,

Page 235

1  but you have a letter in your desk drawer from
2  John Castellano just like the other deputies, correct?
3      A  Correct.
4      Q  You said he talked to Sergeant Gamache about
5  something he didn't talk to you about.  What was that?
6      A  I think it was about promotion.  I don't
7  know.  He didn't talk to me.
8      Q  You said you had issues with his work ethic.
9  What about his worth ethic prevents him from being
10  promoted?
11      A  There again, his work ethic, he doesn't
12  communicate.  We keep going back to that same thing.
13  There's -- they call it having church, but every
14  morning I sit in the hallway at the front door, and
15  every deputy coming in for work stops and holds some
16  kind of yada, yada with the sheriff.  He never does
17  that.  He never does that.  Four years.
18      He doesn't stop, as far as I can see.  And
19  don't necessarily have to be conversation with me.  I
20  don't see him having a whole lot of great
21  conversations with any of the rest of the deputies
22  from what I can see.  I'm not around him 24/7, but
23  what I can see.
24      And I listen to these guys talk, and I'm
25  around these guys, and I don't get anybody whooping

Page 236

1  and hollering about how nice Mr. Castellano is.  And
2  if you're going to be somebody's supervisor, Lynette,
3  you've got to have that kind of personality, you've
4  got to be able to get along with the people.  You have
5  to be able to interact.  And so all I can see, comes
6  in, do his job, I guess he communicates with whoever
7  he's working with for that day, and that's it.  I want
8  to see a little bit more than that from people.  And
9  all those people that have been promoted, they
10  demonstrate that kind of personality, cordiality,
11  communication.  They do.
12      Q  You said the other thing is he's done
13  nothing to stand out, so he's done nothing to show
14  that he's hitting 300.  So in terms of the people that
15  we've talked about that you've promoted, what did
16  Antoine Cannon do to show that he was hitting 300?
17      A  I told you before, that man had a couple
18  degrees.  And then he comes in and does his job, does
19  it, from what I could see, very well, and communicates
20  that to me in passing.  There are many, many times he
21  has a deputy and/or once promoted, there was always
22  Sheriff, this, Sheriff we did that, Sheriff, how are
23  you doing.  I don't get that from Mr. Castellano.
24      Q  What did Tim Haill do to show that he was
25  hitting 300 or standing out as a deputy?

Page 237

1      A  Actually, he hit 350.  Off the chain.  Come
2  in, and those things that I need done, not only did he
3  act as HR, but he does the time, payroll time, keeping
4  everybody's time correct so that they can get paid
5  correctly.  He's in on the disciplinary action.
6      He's working right now, he's my liaison to
7  the Criminal Justice Coordinating Council, many of the
8  conversations that we hold inside the shop.  Tim has
9  knowledge because of his years of experience.  We're
10  talking about the courts, the jails or anything else,
11  he's worked in those areas.  He has extensive
12  knowledge.  Seems like to me the man's a pretty smart
13  guy.  I might promote him again.  I don't know.  Tim
14  does an excellent job for me.  Makes my job a lot
15  easier.
16      Q  Felicia Davis, how did she stand out?
17      A  Same way.  Felicia has been working that
18  job -- I think Felicia has been, what, 30 years on the
19  job.  I never have to worry about the 15, 20, 25, 30
20  inmates that we have to transport back and forth,
21  bring them down to the holding cell, which is in the
22  Civil Courts Building.  Felicia runs that operation.
23  I mean, aficionado, on top of things.  And I never
24  have to worry about getting them from court down to
25  the holding cell, from the holding cell back over to

Sturm Reporting Services, Inc.
314.780.2816