Sheriff Vernon Betts

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHN N. CASTELLANO, III,            )
                                    )
Plaintiff,                          )
                                    )
                                    )
vs.                                 )   Case 4:19-CV-02304-SRC
                                    )
                                    )
VERNON BETTS, et al.,               )
                                    )
Defendants.                         )

ZOOM DEPOSITION OF SHERIFF VERNON BETTS

Taken on behalf of Plaintiff

September 3, 2020

Jo Ann Sturm, CSR, CCR
REGISTERED PROFESSIONAL REPORTER
ILLINOIS CSR NUMBER: 084-002267
MISSOURI CCR NUMBER: 716

STURM REPORTING SERVICES, INC.
2144 Gray Avenue
St. Louis, Missouri  63117
(314) 780-2816

Exhibit 3

Sheriff Vernon Betts

Page 14

1     A   Yes, ma'am.
2     Q   The reason I'm assuming that is if the
3  defendants wanted to ask you questions, they'd just
4  call you.
5     A   Yes.
6     Q   Did you believe that -- did you believe that
7  Johnny Chester had been discriminated against by
8  Sheriff Murphy?
9     A   Not in that case.
10    Q   What do you mean by not in that case?  Did
11  you believe that he had been discriminated against --
12  Mr. Chester had been discriminated in other ways but
13  not in the way he had set forth in his case?
14    A   Probably so, yeah.
15    Q   Why did you -- how did you believe that
16  Mr. -- was he a deputy, he was not a sergeant?
17    A   No, he wasn't a sergeant, he was a deputy.
18    Q   How did you believe that Deputy Chester was
19  discriminated against by Sheriff Murphy?
20    A   Well, not only -- yeah -- he may not have
21  been given a fair opportunity to -- I don't know.  I
22  just believe with all the stuff going on in the --
23  under Murphy's regime that he probably was
24  discriminated against.
25    Q   Let me ask you this.  Was Deputy Chester

Page 15

1  fired by Sheriff Murphy?
2     A   Yes.
3     Q   And he challenged his termination in the
4  lawsuit, correct?
5     A   Yes.
6     Q   And you believe that he was properly
7  terminated would be my understanding of your prior
8  testimony; is that correct?
9     A   Yes.
10    Q   That was not race based.
11    A   No, it was not.
12    Q   Why did you believe that Deputy Chester was
13  properly terminated by Murphy?
14    A   Because of the incident, because of the
15  ramification of the incident had nothing to do with
16  race.  It had something to do with him not carrying
17  out his instructions that his supervisor gave him,
18  following orders.
19    Q   Did you witness the insubordination
20  personally or did you just hear about it?
21    A   I heard about it.
22    Q   I'm assuming when he was insubordinate, you
23  were not the sheriff, correct?
24    A   Correct.
25    Q   But I did note from the pleadings because

Page 16

1  you were the sheriff when the case came to trial, you
2  had some kind of official capacity involvement in the
3  lawsuit; is that correct?
4     A   That's correct.
5     Q   What had you heard about the incident that
6  resulted in Deputy Chester's termination?
7     A   Well, I had heard about the situation that
8  took place, an altercation between he and, I think,
9  Mike Gamache was a sergeant at that time.  So I heard
10  bits and pieces about that altercation from several
11  different people.
12    Q   And I'm assuming when you became sheriff,
13  you had access to all the files, so you could review
14  any investigation into that particular incident as
15  well; is that correct?
16    A   That's correct, but I didn't.
17    Q   And then you said that -- to your knowledge,
18  did Deputy Chester ever seek promotion while he worked
19  for Sergeant Murphy?
20    A   I believe so.
21    Q   Do you believe he was denied promotion on
22  the basis of race?
23    A   I'm not sure.
24    Q   So tell me, then -- let me go back to your
25  words.  What was going on with Murphy at the time that

Page 17

1  you testified that you believed that Deputy Chester
2  had been discriminated against in other ways, but not
3  with respect to his termination?  How had he been
4  discriminated against?
5     A   I know that he and other African-American
6  deputies had made requests for positions and raises
7  and all kind of stuff like that, and I know that he
8  had been denied.  I think not based on qualifications,
9  from what I understand, but based on probably color.
10    Q   And any other way that you -- any other way
11  that you believe that Deputy Chester may have been
12  discriminated against on the basis of his race?
13    A   No.
14    Q   And you said that there were other deputies
15  that were -- that you believed suffered similarly.
16  Who were the other African-American deputies that you
17  believed -- sorry, I'm turning my phone on silent so I
18  don't hear the ding again -- what other deputies do
19  you believe were discriminated against on the basis of
20  their race during Sheriff Murphy's tenure?
21    A   Well, I understand that there was a lawsuit
22  filed in that regard.  I don't remember all of the
23  deputies who were involved.  But I understand that
24  there was a racial lawsuit filed.
25    Q   So -- I'm sorry, didn't mean to cut you off.

5  (Pages 14 to 17)

Sheriff Vernon Betts

Page 22

1   head gestures.  Korey and I don't want to be fighting
2   after the deposition is over whether an uh-huh was a
3   yes or a no.  So if you say that clearly, we can avoid
4   those issues.
5        I'm assuming all of those little rules for a
6   deposition are agreeable to you?
7   A   Yes.
8   Q   I had a police chief once tell me I wasn't
9   going to tell him what to do, and he walked out after
10  I did that.  So I'm glad to see we don't have to deal
11  with that today.
12       Let me ask you first.  Does the sheriff's
13  department have any kind of a rule about whether an
14  employee can work for it when it has an outstanding
15  tax obligation, whether that be local, state or
16  federal?
17  A   We do not.
18  Q   And some public employers, right, if you owe
19  a public entity money, they'll give you a notice and
20  then if you don't take care of it, they'll suspend you
21  until you take care of the public entity.  But you
22  don't do any of that is my understanding, correct?
23  A   Correct.
24  Q   Before the lawsuit was filed, you're aware
25  that John Castellano filed three charges of

Page 23

1   discrimination, correct?
2   A   Yes.
3   Q   Did you review each of those charges?  When
4   they were given to the sheriff's office, did you
5   actually read them?
6   A   Yes.
7   Q   So you have seen -- let me pull it up here
8   real quickly.  You have seen before what I've marked
9   as Exhibit 1, which is the April 19th, 2017 charge of
10  discrimination that was filed in June of 2017; is that
11  correct?
12  A   Correct.
13  Q   Let me ask you first.  Other than talking to
14  your attorneys, what did you do when you received that
15  charge?
16  A   Fell out of my chair.  No.  I read it and
17  probably shared that information with my chief of
18  staff.
19  Q   That's Colonel Roberts, is my understanding?
20  A   Yes.
21  Q   And my understanding is he is, himself, a
22  lawyer?
23  A   Yes.
24  Q   Were you seeking legal advice from him?
25  A   Not at that moment.

Page 24

1   Q   So what did you and Colonel Roberts discuss
2   when you received that charge?
3   A   Both kind of flabbergasted, and I think we
4   then felt we should share that with my attorney.
5   Q   And your attorney is the City Counselor's
6   office; is that correct?
7   A   Yes, but I don't think -- I have a personal
8   attorney who I think we might have shared that with
9   first.
10  Q   Let me ask you again.  I'm not asking for
11  communications you had with your personal attorney,
12  but who is your personal attorney?
13  A   At that time it was Jolene Taft.
14  Q   Did she work for the sheriff's department or
15  was she external to the sheriff's department?
16  A   She was external to the sheriff's
17  department.
18  Q   Did you charge anybody in your department to
19  do an investigation regarding the first charge of
20  discrimination, Exhibit 1?
21  A   No.
22  Q   Why not?
23  A   I didn't think I should.  I didn't think I
24  needed to.  We would wait and see what happens.
25  Q   How did you become aware of the charge?  Who

Page 25

1   made you aware of Exhibit 1?
2   A   I believe I got something in the mail from
3   EEOC.
4   Q   So you actually received the mail, opened it
5   and became aware of the charge.
6   A   Yes.
7   Q   Did you do anything else with respect to
8   Exhibit 1 after you received it, other than talking to
9   either your personal attorney or the City Counselor's
10  office, other than this brief conversation it sounds
11  like you had with Colonel Roberts?
12  A   No, I didn't do anything with that.
13  Q   If I'm understanding your testimony
14  correctly, the only thing you and Colonel Roberts
15  discussed is what you should do with it?
16  A   Yes.
17  Q   And the decision was that what you should do
18  with it was let an attorney know.
19  A   Right, and then go back and see what
20  happened.
21  Q   And at some time did you become aware of
22  John Castellano filing a second charge of
23  discrimination?
24  A   Yes.
25  Q   The second charge of discrimination, would

7  (Pages 22 to 25)

Sheriff Vernon Betts

Page 26

1    that be what I have Bates-labeled as Exhibit 2, which
2    is alleged to have taken place on August 7th of 2017?
3        A   I'm assuming so because I was informed about
4    a second suit I think from Korey.  I'm not sure who
5    told me about the second suit.
6        Q   And actually, I'm not talking about a
7    lawsuit, I'm talking about this actual charge of
8    discrimination.  So you would have received this -- if
9    it was file-stamped in October of '17, you would have
10   received it sometime probably in October of '17.
11       A   Yes.
12       Q   And how did you become aware of the second
13   charge?  Did you also receive that in the mail or did
14   somebody give it to you?
15       A   I believe so.
16       Q   Which one, received it in the mail or
17   somebody gave it to you?
18       A   I believe I received it in the mail.
19       Q   So then what did you do when you received
20   the second charge of discrimination?
21       A   Basically the same thing, just shared it
22   with, you know, my chief of staff and the lawyer and
23   put it away in the drawer.
24       Q   Did you request any investigation after the
25   second charge?

Page 27

1        A   No.
2        Q   And why not?
3        A   I didn't see no need to.
4        Q   Why didn't you feel there was a need to
5    investigate whether you had discriminated?
6        MS. LEWIS:  Object that it misstates
7    testimony.
8    BY MS. PETRUSKA:
9        Q   Subject to that, you can answer.
10       A   Ask me the question again.
11       Q   Why did you not believe there was a need to
12   investigate this allegation of discrimination?
13       A   Well, because it wasn't true, so what was
14   there for me to look into?
15       Q   And the other reason?
16       A   Same thing.
17       Q   And then at a certain point then you also
18   received a third charge of discrimination, which I've
19   marked as Exhibit 3, that relates to an incident that
20   took place on 11/26 of '18; is that correct?
21       A   I guess.  I'm not familiar with a third
22   charge of discrimination.
23       Q   Let me give you a second.  Take a second to
24   look at that to see if it refreshes your recollection.
25       A   Okay.  Okay, I'm somewhat familiar with this

Page 28

1    charge.
2        Q   So having reviewed Exhibit 3, it refreshes
3    your recollection that you've seen it before today; is
4    that correct?
5        A   Correct.
6        Q   Did you become aware of the third charge the
7    same way, you received it in the mail, you opened it
8    and you read it?
9        A   I don't remember.
10       Q   Do you know what you did when you received
11   the third charge?
12       A   Probably the same thing I did with the other
13   charges, tuck it away and let's see what happens.
14       Q   Did you charge anybody to investigate the
15   third charge of discrimination, Exhibit 3?
16       A   No.
17       Q   And why not?
18       A   Same reason.  They were false charges, so I
19   didn't see any reason.  Investigate who, investigate
20   what?  I had no reason to investigate anybody.  False
21   charges, as far as I was concerned.
22       Q   Wasn't Deputy Castellano asking that you be
23   investigated?
24       A   I guess that's what he was doing.  I don't
25   know.

Page 29

1        Q   All three charges accuse you of race and/or
2    retaliation discrimination in terms of making
3    promotions, correct?
4        A   Correct.
5        Q   And my understanding is you are the
6    decision-maker in the sheriff's department in terms of
7    making promotions; is that correct?
8        A   Correct.
9        Q   So basically he was accusing you of
10   discriminating or retaliating against him, correct?
11       A   Correct.
12       Q   And my understanding is you testified a
13   minute ago that they're false charges, so you denied
14   discriminating against Deputy Castellano; is that
15   correct?
16       A   That's correct.
17       Q   Did it make you angry that Deputy Castellano
18   was accusing you of that kind of conduct?
19       A   Yeah, it ticked me off a little bit.
20       Q   And why was that?
21       A   Would you like to get accused of being
22   racist?
23       Q   Sir, unfortunately, the reality today is I
24   get to ask the questions, not you.  Is that your
25   answer, though?  You answered with a question.  If

8  (Pages 26 to 29)

Sheriff Vernon Betts

Page 30

1    that's your answer, I'll move on.  If you have another
2    answer, I'll let you answer again.
3        A   I'll answer again.  No, I didn't like being
4    accused of something that I didn't do.
5        Q   Did you ever tell anybody that you were
6    going to make Castellano pay for falsely accusing you
7    of discrimination or retaliation, or words to that
8    effect?
9        A   No.
10       Q   Did you ever tell Deputy Castellano that you
11   were angry about the charges?
12       A   No.
13       Q   Did you ever tell anybody you were angry
14   about the charges?
15       A   I'm sure I did.
16       Q   Who did you tell you were angry about the
17   charges?
18       A   Probably like my wife, my family, maybe
19   people in the office.  I don't know.
20       Q   When you say "people in the office," you
21   have a core staff that works in close proximity to you
22   in a master office suite; is that correct?
23       A   That's correct.
24       Q   Who are the people in the office?  Who are
25   the other people that work in that master suite?

Page 31

1        A   Steve Roberts, my chief of staff; Tim Haill,
2    my HR guy; Captain Hogan, my person that handles all
3    the financials.  Basically those are the three --
4    Gregg Christian, who acts as a secretary.  He may not
5    have been in that position at the time.  I'm sure
6    people in the office.  I'm sure I expressed something
7    to them.
8        Q   Do you remember what you said to Mr. Roberts
9    about being angry about the allegations?
10       A   I don't remember specifically.
11       Q   How about Tim Haill?
12       A   I don't remember specifically what I said to
13   Tim.
14       Q   And it's Captain Hogan, H-O-G-A-N; is that
15   correct?
16       A   That's correct.
17       Q   What did you say to Captain Hogan?
18       A   I don't remember specifically what I said to
19   Captain Hogan.
20       Q   And then the secretary, it sounds like you
21   may have had different secretaries during your tenure.
22   So let me ask you first:  Who have been the
23   secretaries in your office since you've been sheriff?
24       A   Well, there's only been the one.  We've had
25   a host of people come in and answer the telephones for

Page 32

1    us, but as far as somebody on a permanent basis, it's
2    only been -- we went the first couple of years without
3    a secretary, and so the last couple of years has
4    basically been Gregg Christian.
5        Q   You said last couple years.  So would that
6    be sometime in 2018 he started as the secretary?
7        A   I would say late 2018, possibly first part
8    of 2019, yes.
9        Q   And is Christianson (sic) also a deputy?
10       A   Yes.
11       Q   Does he have any rank or is he an unranked
12   deputy?
13       A   No, he's a nonranked deputy.
14       Q   Were you aware that the -- that there were
15   position statements filed in response to two of the
16   charges of discrimination?
17       A   I'm not understanding what you mean when you
18   say position statements.
19       Q   Let me do this.  I'm going to pull one up.
20   Give me a second.
21           I'm showing you now what's been marked as
22   Exhibit 4, which is a position statement, or what
23   lawyers call a position statement, that's dated
24   April 9th of 2019, directed to the EEOC.
25           I'm going to scroll down real fast.  If you

Page 33

1    look at the bottom of this, you'll notice that your
2    attorney, Korey Lewis, submitted it.
3            MS. LEWIS:  We're just seeing your folder.
4    I'm not seeing an exhibit pulled up.  I don't know if
5    anybody else is having the same issue.
6            THE WITNESS:  That's all I see.
7            MS. PETRUSKA:  Are you seeing my master
8    folder with exhibits?
9            MS. LEWIS:  There you go.
10           MS. PETRUSKA:  Hold on just a second.
11   BY MS. PETRUSKA:
12       Q   Do you see the exhibit now?
13       A   Yes, I see the bottom of it, Korey.
14       Q   Where it says Korey Lewis, Assistant City
15   Counselor?
16       A   Yes.
17       Q   Yeah, it was showing me something different.
18   So I was seeing the exhibit and assuming everybody was
19   seeing the same thing.  Okay.
20           Let me ask you this, Sheriff.  Did you see
21   Exhibit 4 before it was submitted to the EEOC in April
22   of 2019?  Let me get...
23       A   Probably.  I don't remember.
24       Q   You're not saying you didn't see it, you're
25   just saying you don't have a present recollection of

Sturm Reporting Services, Inc.
314.780.2816

Sheriff Vernon Betts

Page 42

1   Q   Did it say anything more than the two
2   sentences quoted in this article?
3   A   No, it did not.
4   Q   So you would agree that you were elected on
5   a platform of reforming a deeply dysfunctional
6   department?
7   A   Yes.
8   Q   And so what did you think was dysfunctional
9   about the department when you were running for
10  sheriff?
11  A   Just about everything was dysfunctional
12  about the department.
13  Q   Can you give me --
14  A   Yeah, I can give you something specific.
15  The way that they operated, they move people from
16  place to place without any consideration.  People
17  working at the sheriff's department were doing all
18  kinds of things that they shouldn't have been doing.
19  I don't know if you know the history of the sheriff's
20  department, but we've had guys on drugs, we've had
21  guys come to work drunk, we've had sexual harassment
22  on the job.  Just about everything that you could
23  think of went on at the sheriff's department.  And
24  it's been properly -- if you go back through the
25  newspapers, there's all kinds of stories about the St.

Page 43

1   Louis sheriff's department.  And I witnessed that.  I
2   witnessed that the three years I worked there.
3   Q   Anything else that you thought was
4   dysfunctional about the sheriff's department that you
5   wanted to change?
6   A   Yeah.  Yes.
7   Q   What would that be?
8   A   I've done a lot of -- several things since
9   I've been there.  When they get ready to move a person
10  from one department to another, there should be some
11  kind of notification to that person so that that
12  person can get their livelihood together, notify
13  family that they're being moved maybe from one set of
14  working hours, from maybe evenings to days or back and
15  forth.  That kind of thing is done on a regular basis
16  without any kind of notification when you move people
17  around.
18  You gave assignments to people that had no
19  real functioning progress to the department.  For
20  instance, they would give -- the holding cell requires
21  only two people to supervise that holding cell.
22  Sometime they would put seven people in the holding
23  cell, and before the end of the day, five of those
24  seven people would disappear, on occasion go to the
25  ballgame, go to the tavern, get drunk.

Page 44

1   You had employees who would show up in the
2   daytime and then disappear in the evening and vice
3   versa.  People who appeared in the evening, but you
4   never saw them in the daytime, and those people should
5   have been working a full eight-hour day.  They were
6   not.
7   I could sit here and go through story after
8   story.  You had all kind of disciplinary issues going
9   on, things that never should have been -- deputies
10  would take the vehicles home with them and then use
11  the vehicles for driving around drug dealers.  Just
12  stuff that should never have happened at the sheriff's
13  department.  That's why I refer to that as being a
14  dysfunctional department.
15  Q   Did you consider the way that promotions
16  were made to be dysfunctional and resolve to change
17  that as well?
18  A   Yeah, that was kind of taken into some
19  consideration, yes.
20  Q   What did you think -- what did you think was
21  dysfunctional about Sheriff Murphy's promotion
22  process?
23  A   Well, I don't think Sheriff Murphy really
24  had any formal say-so in promotions because I don't
25  think he knew enough about what was going on.  That

Page 45

1   was one of the main points.  Murphy was not involved
2   in the department like I am.  So I think that was one
3   thing.  So you got people being moved and promotions
4   and people being moved into places where they never
5   should have been.
6   Q   Did you think unqualified people were being
7   promoted under Murphy's tenure?
8   A   Yes.
9   Q   I know you've probably made a number of
10  changes related to other dysfunctions you've seen in
11  the department, but let me focus on transfers and
12  promotions.
13  What have you done since elected sheriff to
14  change things to address issues you were seeing with
15  transfers and promotions?
16  A   Probably the biggest thing when it comes to
17  transfers and promotions -- well, a couple of things.
18  I was about to say probably the biggest thing, I try
19  not to transfer anybody from one department to another
20  and/or -- especially for one time frame.
21  Say, for instance, they're working nights,
22  they're working days to nights without giving them a
23  period of time to make that transition in their
24  personal life.  So what we've tried to institute is
25  like a two-week period.

12  (Pages 42 to 45)

Sheriff Vernon Betts

Page 46

1    Now, we don't always stick to that.  Depends
2  on the demand and how soon we've got to get somebody
3  in a place, but we try not to just -- like Murphy did
4  me.  I came to work -- I was getting off on a Friday
5  evening at 3:00 o'clock, and I got a letter open, and
6  the letter said for me to report to the hospital crew
7  Sunday night.  Well, okay, I did what they told me.
8  But I thought that was very unfair.  So that's one of
9  the things we've changed.
10    We also, we don't -- I sit down, and before
11  we make all of these changes, I've had several
12  sitdowns and skull sessions with my supervisors.  We
13  try not to make a change, moving one person from one
14  place to another, without getting both supervisors,
15  the one that he's leaving and the one that he's going
16  to, involved in whether or not that's a good move.  So
17  we try to get the supervisors involved.
18    That I didn't see when Murphy was going on.
19  Murphy and whoever in the office, as far as I could
20  see, they made the changes, nobody else had any say-so
21  to say about it.  I try to get my people involved.
22    And then, thirdly, I also try, we talk to
23  the employees before we decide.  I've had several
24  times where we've started to move somebody, but that
25  person was maybe in school or childcare came into

Page 47

1  play.  So we try to consider those kind of things.
2    One that just popped in my head.  We wanted
3  to move one deputy, and he's on dialysis, and he has
4  to go certain days.  So now we considered that.  So we
5  made some other move rather than mess with his days of
6  going to dialysis.
7    Those kind of things we try to look at and
8  try to bring in that human factor.  We don't just jump
9  up and move people.  That's the way it seemed to be
10  when I was a deputy here.  They did what they wanted
11  to do without question.
12    Q   Let me ask you this.  How do you believe
13  your promotion process is different than Murphy's was?
14    A   Those examples, my promotion process, I take
15  into consideration when I'm thinking about promoting a
16  person, I do talk to those parties that are going to
17  be involved.  I'm not promoting a person to a position
18  and I know the history of that person and know that
19  that person didn't get along with the supervisor he's
20  going to be reporting to.  I think you consider those
21  kind of things.
22    I don't believe Murphy did that kind of
23  stuff.  Matter of fact, I know they didn't.  Either
24  you did what they told you to do or, as I know it has
25  been said, if you don't like it, you go home.  So, no,

Page 48

1  I don't think that's the way you operate.
2    Q   How did you know that Murphy didn't do those
3  things?  Were you a supervisor when he was --
4    A   I worked here.
5    Q   But were you a supervisor when he was the
6  sheriff?
7    A   No.
8    Q   So do you know for a fact that he never
9  talked to supervisors -- other supervisors before he
10  made a promotion?
11    A   I don't know that for a fact.
12    Q   When you say you would talk to the parties
13  involved, are the parties involved the supervisor --
14  when you say you're going to talk to the parties
15  involved in a promotion, who are the parties involved
16  in a promotion you're talking to?
17    A   The parties involved would be the supervisor
18  that he presently reports to and the supervisor that
19  he would be going to, and then the employee
20  themselves.
21    Q   So let me make sure I'm understanding.  So
22  if you're considering a promotion of somebody from
23  deputy to sergeant, before you made that decision, you
24  would talk to that deputy's current sergeant --
25    A   Yes.

Page 49

1    Q   -- correct?
2    A   Yes.
3    Q   And then you would talk to the lieutenant
4  that would be supervising that sergeant, because if
5  they're going to get promoted, the next level
6  supervisor would be a lieutenant, correct?
7    A   Correct.
8    Q   And then you would talk to the employee
9  themselves?
10    A   Yes.
11    Q   Is there anybody else you talk to as part of
12  the process?
13    A   Yes.
14    Q   Who else do you talk to?
15    A   Always, always talk -- 99 percent of the
16  time, I talk to the HR.  I would talk to
17  Captain Hogan.  I would have to talk to HR.  Of
18  course, HR, the person's going to be moving and making
19  record of that person moving from one place to the
20  other, so I always talk to HR.  And when I say HR, I
21  can give you a name if you have to have a specific
22  name.
23    Q   I was going to ask you that, so if you'd
24  like to provide it, it saves me a question.
25    A   That specific name would be Tim Haill.  Then

13  (Pages 46 to 49)

Sheriff Vernon Betts

## Page 50

1  I would also talk to Captain Hogan because, of course,
2  I have a -- you know, I have my employees and I have a
3  budget that I have to work from, and I have so many
4  people that I can slide in each place, so many
5  sergeants, so many lieutenants, so many captains, and
6  so I'm always talking to Captain Haill --
7  Captain Hogan to see if I'm over the number I'm
8  supposed to have in a specific category, if I'm under,
9  or where are we, and can I move at this time, can I
10  not, blah, blah, blah.  So it's kind of a whole
11  department kind of thing.
12         Sheriff is not doing any of this kind of
13  stuff in a bubble.  There's usually two or three or
14  four people, even, you know, we go so far as to
15  include maybe both of the majors in our movement.
16  What do they think about it?  Because this person may
17  be moving from one building to another.  So, there
18  again, I want to get the input of Major Lammert, who's
19  over the Carnahan Building, Major George Harsley,
20  who's over the Civil Courts Building, and probably
21  most of the time I'm saying that before I made those
22  kind of moves, promotions, those two people would also
23  be included.
24      Q   I want to be -- when you talk to Tim Haill
25  or Captain Hogan, are you getting their -- are you

## Page 51

1  getting a recommendation in terms of whether the
2  person should be promoted or not, or are you providing
3  them with information so that they can do the correct
4  administrative work?
5      A   Both.  If they have some input,
6  Captain Hogan's been here for a number of years, and
7  she knows the background and history on a deputy.
8  Same way with Haill, Sergeant Haill, same way with
9  Major Harsley and Major Lammert.  Yes, I would be
10  seeking some input from those people, too, as to
11  whether or not they thought that was a good promotion
12  or it should or should not take place.
13      Q   So let me make sure.  When you talk to the
14  deputy you're considering for promotion, what purpose
15  is served by talking to that particular deputy?
16      A   Basically to find out if that deputy wants
17  to be promoted.  I've had several incidents, several
18  situations here where I actually had deputies turn
19  down promotions, and I'll give you a reason why some
20  of them turned down, because being promoted in the
21  sheriff's department is going to require more
22  responsibility, and some of these guys know that, and
23  they work a secondary job where they're making a
24  pretty good salary and they don't want to do anything
25  that's going to interfere with the secondary work.

## Page 52

1  That's been the reason for some of these guys.  A
2  couple of them have actually turned down promotions
3  because they didn't want anything interfering.
4         So I talk -- I'll talk to the employee.
5  Some of them, when I talk about the responsibility of
6  the job, they just don't think that they want to be
7  entangled in all the responsibility of what it's going
8  to take.  Their life as a sheriff deputy is more
9  comfortable now than if they were to become a
10  supervisor.
11      Q   When you talk to the deputy, have you
12  already selected him or her as a finalist, so you're
13  going to the deputy and saying I'm considering you for
14  this promotion, do you want it?  Or do you still have
15  three or four candidates in mind when you go to the
16  deputy?
17      A   You're right.  Usually I'll have still maybe
18  a couple of people still in mind, just in case.
19      Q   When you go to the deputy, you might still
20  have several people in mind, but somebody surfaced as
21  the top of your list and you're asking them if they're
22  interested in the job before you make the final
23  selection.  Am I understanding your testimony
24  correctly?
25      A   Yes.

## Page 53

1      Q   And in your time as sheriff, who has told
2  you they didn't want a promotion?
3      A   I've had Gary Jackson told me he didn't want
4  to be promoted.  I've had my deputy, Ricky,
5  Ricky Phillips, who got his -- he's POST certified.
6  He's the only POST certified deputy I have.  He did
7  not want to be promoted.  Those are the two I can
8  think off the top of my head.
9      Q   We're going to move on because I don't want
10  to keep you till midnight.  But if you think of
11  somebody else, just say, hey, I remembered another
12  deputy that turned me down and we'll add it to the
13  record.
14      A   Yes, ma'am.
15      Q   Because I do understand you might not
16  remember everybody as you sit here right now.
17         Let me ask you, is Gary Jackson -- do you
18  prefer I use black and white to refer to the races or
19  African-American and Caucasian?
20      A   Black and white.
21      Q   Is Jerry Jackson black or white?
22      A   Black.
23      Q   And what about Ricky Phillips?
24      A   White.
25      Q   When your sheriff's department issued the

Sturm Reporting Services, Inc.
314.780.2816

Sheriff Vernon Betts

Page 54

1  statement that we saw a moment ago that's Exhibit
2  8 and talked about a deeply dysfunctional department,
3  did you think that part of the dysfunction that
4  existed before you, that people were being promoted to
5  jobs that they weren't qualified for?
6      A   Yes.
7      Q   And did you think that some of the
8  dysfunction before you again was if people were being
9  promoted to jobs based upon their race as opposed to
10 their qualifications?
11     A   Maybe not in all cases.
12     Q   But you did think it was happening in some
13 cases, if I understand your previous testimony,
14 correct?
15     A   Yes.
16     Q   After the Post-Dispatch article came out,
17 did you ever tell anybody that Castellano would pay
18 for suing you, or, again, words to that effect?
19     A   He hasn't yet, no.
20     Q   In terms of the second lawsuit, it sounds
21 like you said earlier that Korey gave you the second
22 lawsuit and it was federal, so we might have had them
23 accept service or anything like that.  Do you remember
24 how you learned of the second lawsuit, the federal
25 one?

Page 55

1      A   I really don't.
2      Q   Let me ask it this way.  Did you read the
3  lawsuit when it was filed?
4      A   I probably did.  Now, I'm thinking that once
5  all of this stuff got started and I was talking to
6  Korey, Korey informed me of a lot of stuff going on.
7      Q   We're not going to get into what she told
8  you about.  If she told you a lawsuit was filed and
9  handed it to you, that's not necessarily privileged.
10 So she's probably not going to jump up and down if you
11 tell me that.  But if you start telling me what you
12 and her talked about after she handed you the lawsuit
13 so that you could start preparing to defend it, she's
14 going to jump up and down.  And I'm not looking for
15 her to do that, okay?
16     A   Right.
17     Q   If you remember her giving it to you, that's
18 fine.  If you don't remember how you learned about the
19 federal lawsuit or how it was given to you, that's
20 fine, too, just say I don't remember.
21     A   I don't remember.
22     Q   And then what I'm particularly interested
23 in, though, is not how it started, but how it looks
24 today.
25         And I'm showing you, if this has been done

Page 56

1  correctly now, what's been marked as Plaintiff's Depo
2  Exhibit 27, and it's titled second amended complaint.
3  And, Sheriff, I'm just asking, have you ever seen the
4  second amended complaint?
5      A   I believe so.
6      Q   The end of the document is going to show
7  that we filed this on January 10th of 2020.  Do you
8  remember approximately when you might have received
9  the second amended complaint?
10     A   I don't remember.
11         (Discussion off the record.)
12 BY MS. PETRUSKA:
13     Q   So other than your attorney, did you talk to
14 anybody about the second amended complaint whenever
15 you received it?
16     A   I don't remember specifically talking about
17 that second amended complaint.
18     Q   And what -- as it relates to the second
19 amended complaint, so don't worry about previous
20 iterations of the lawsuit, what is your understanding
21 of what John Castellano is suing you for?
22     A   Are you talking about the second?
23     Q   Yes.
24     A   Suing me for racism is what I thought.
25     Q   That's your understanding of the complaint?

Page 57

1      A   Yeah.  Yes.
2      Q   Is it also your understanding that he's
3  suing you for retaliating against him because he
4  complained about you making race-based employment
5  decisions?
6      A   Yeah, I understand that part of it, too.
7      Q   Since you've been sheriff, how often have
8  your employees been evaluated?
9      A   Everybody is instructed to evaluate their
10 employees once a year.
11     Q   Are you required to review and sign off on
12 the evaluations?
13     A   I'm not required to, but I do, though.
14     Q   Do you keep some kind of a log, then?  My
15 understanding of the policy is that employees are
16 supposed to be evaluated annually on their hire
17 anniversary?
18     A   Yes.
19     Q   Do you keep some kind of a log as to
20 whether -- maybe not you personally, but an
21 administrative assistant, do you keep some kind of a
22 record to make sure your supervisors are evaluating
23 people annually like they're supposed to do?
24     A   I don't keep a record, but they've been
25 instructed to do that, and if it comes to my attention

15  (Pages 54 to 57)

Sheriff Vernon Betts

| Page 58 |
|---|

1    that they haven't done that, then everybody knows that
2    there's something -- somebody is going to have to
3    answer to the piper.
4        Q   So your expectation is that your supervisors
5    evaluate their subordinates annually, that that be
6    shown at least to you so that you have a sense that
7    people are being evaluated as they're supposed to be.
8        A   Yes.  I keep a copy of that evaluation.
9        Q   You have a copy?
10       A   Yes.
11       Q   So you have a copy of the evaluation.  I'm
12   assuming there are personnel files in the department
13   as well; is that correct?
14       A   Yes.
15       Q   Is the evaluation also maintained in the
16   personnel file?
17       A   Yes.
18       Q   I know you're one of those weird hybrid
19   departments of the City.  Does the City's HR
20   department also keep a copy of your personnel files or
21   are they exclusive to the sheriff's department because
22   you're really not a City department, you're a county
23   department?
24       A   Right.  They're exclusive just to the
25   sheriff's department.

| Page 59 |
|---|

1        Q   So it sounds like there's a personnel file
2    for each employee, and where are the personnel files
3    maintained?
4        A   In what we call our outer office.
5        Q   And then you said that you keep a file of
6    the evaluations.  Where do you maintain the
7    evaluations that you keep?
8        A   In my office.
9        Q   And so you have one for each deputy, or is
10   this for the deputies you supervise?
11       A   I have a file for each deputy.
12       Q   Now, I noticed on some of the employee
13   status forms there's a notation for a pay increase
14   that talks about exceptional duty performance.  What
15   does that mean?
16       A   Well, some people have gotten, I think, some
17   kind of stipend because they've gone above and beyond
18   their work.  Yeah.  Whenever they go above and beyond,
19   there's a possibility for them to get a stipend.
20       Q   So that's a stipend, it's not an actual
21   annualized increase.
22       A   Right, no.
23       Q   So it's a one-time payment for going above
24   and beyond the call of duty.
25       A   Correct.

| Page 60 |
|---|

1        Q   And then I also saw something that was
2    called an accelerated pay increase on the employee
3    status forms.  Can you explain to me what an
4    accelerated pay increase is?
5        A   I'm not totally sure about this, but
6    accelerated pay increase -- the sheriff has the
7    prerogative to go above and beyond the two percent.
8    And I think when we talk about -- when I think of the
9    accelerated payment, that's what that is, if they get
10   more than the two percent.
11           And I think -- now, I would have to talk to
12   Tammy Hogan, who keeps track of all of that specific
13   stuff, but we've had a situation where one employee is
14   doing the work that a supervisor should be doing, then
15   that employee gets that accelerated pay increase.
16       Q   And then it sounds like the standard pay
17   increase is two percent a year; is that correct?
18       A   That's correct.
19       Q   Now, if I'm doing an exceptional job, can I
20   get -- if I'm doing an exceptional job, can I get an
21   increase beyond the two percent?  So can I get -- it
22   sounds like your two percent may be a cost of living
23   adjustment, everybody gets it?
24       A   Everybody, right, correct.
25       Q   Can I also get a merit increase as an

| Page 61 |
|---|

1    employee of your department?
2        A   I think so, yes.
3        Q   And a merit increase would actually be an
4    increase that annualizes over the entire year as
5    opposed to this bonus; is that correct?
6        A   Well, the merit increase -- yes, you're
7    correct.
8        Q   And then if I'm promoted to sergeant from
9    deputy, do I get a standardized increase or does it
10   depend?  So if I increase a rank, do I get a
11   five percent, ten percent or --
12       A   Yes, yes.  You'll get some kind of increase
13   and sometimes the amount of the increase depends on
14   where you already are on your pay scale, based on the
15   number of years you've been here.
16       Q   It's not a set if I'm promoted, I get a
17   five percent increase or I get a ten percent increase.
18       A   No.
19       Q   Because you guys use a grade and step scale,
20   correct?
21       A   Correct.
22       Q   So the increase I get may depend on where I
23   am in terms of my grade and step as a deputy.
24       A   Correct.
25       Q   I've gotcha.  I want to draw your attention,

16  (Pages 58 to 61)

Sheriff Vernon Betts

---

Page 62

1  Sheriff, to one of the documents I'm hoping you have
2  at this point, and that would be Exhibit 6, your
3  January 3rd, 2017 manual.
4      A   I have that.
5      Q   This was produced to me by the City, and
6  it's got Bates numbers of 1 to 75. I know they just
7  gave me what you gave them, but I want to verify
8  through you this is a complete copy of the
9  January 3rd, 2017 sheriff's manual; is that correct?
10     A   Correct.
11     Q   And you promulgated the manual, because on
12  page one it says Vernon Betts, correct?
13     A   Correct.
14     Q   Now, let me ask you this, because this is
15  just a couple of days after you're sworn in. Did you
16  just repromulgate Murphy's manual? You have a
17  transition period. You know you've been elected and
18  you know you're going to be sworn in. So did you
19  repromulgate Murphy's manual with your name on it or
20  did you create your own new manual to try and show
21  that you were going to do things differently?
22     A   Well, this is the one, Exhibit 6 is Murphy's
23  manual that I just determined that you use --
24     Q   Repromulgated?
25     A   Yeah. But because later on I did -- we did

---

Page 63

1  do a new -- I think you got Exhibit 7.
2      Q   So at a later date, you look at the manual
3  and you make the changes you want to make in it, but
4  when you first take office, you say Murphy's -- I'm
5  going to be a little bit snarky here, Murphy's law
6  controls.
7      A   Yes.
8      Q   Murphy's law, isn't that where everything
9  bad happens to you or something?
10     A   Yes.
11     Q   You keep his rules and regulations into
12  effect until you get a sense of what's going on in the
13  office.
14     A   Yes, ma'am.
15     Q   And what I want to do is direct you to
16  Section 5 of the manual, it's at page 15, whether you
17  look at the Bates number or the actual page number.
18     A   I got it.
19     Q   And it talks about the appraisal process.
20     A   Yes.
21     Q   Do you see that?
22     A   Yes, I have it.
23     Q   So it talks about, like you said, that the
24  performance appraisal is done annually during the
25  month of their anniversary of hire. It talks about

---

Page 64

1  what areas you're going to do appraisals on, which is
2  on page 16. And then if you go to page 17, it talks
3  about the completion of the performance appraisal.
4      And then if you go one more page out, the
5  procedure, it talks about by the third day of the
6  month, every supervising officer will receive a list
7  of all subordinates who report directly so that they
8  know what evaluations they're supposed to do. Does
9  that list go out?
10     A   By the third day of the month, each
11  supervising officer will receive a list of all
12  subordinates who report to such supervising officers
13  and hiring -- ask me that question again. Did this
14  procedure go out?
15     Q   Right. It sounds like according to the
16  procedure, sergeants or lieutenants get a rolling list
17  every month of these are the people we want you to
18  evaluate.
19     A   No.
20     Q   Does that list go out?
21     A   Yeah, that kind of went out. We don't
22  adhere specifically to that.
23     Q   So the list of people to be evaluated does
24  not go out electronically somehow to remind people.
25  But you're saying that people still do the

---

Page 65

1  evaluations, is my understanding, correct?
2      A   Yes.
3      Q   I've got you now.
4      If you go to subparts four and five of
5  Section E, the procedure, it does say that the final
6  evaluation goes to the sheriff or his designee by the
7  end of the month, unless there is an extension.
8      Since you've been sheriff, do you receive a
9  number of evaluations at the end of each month?
10     A   I receive those evaluations throughout the
11  course of the month because everybody basically tries
12  to give me their evaluation of that employee on that
13  employee's anniversary date.
14     Q   You're not getting them all as one stack at
15  the end of the month, you're getting them as they come
16  in during the month.
17     A   Yes.
18     Q   The bottom line is you're getting a number
19  of evaluations during the course of the month, and
20  that's how you know that people are being evaluated
21  like they're supposed to be.
22     A   Yes.
23     Q   It says: The final step in the process is
24  the sheriff will review all completed performance
25  evaluations.

17  (Pages 62 to 65)

Sheriff Vernon Betts

```
 1        And my understanding of your previous
 2   testimony is you do that.
 3        A   Yes, ma'am.
 4        Q   Because the other part talks about you can
 5   have a designee, but you don't designate somebody to
 6   do that, you do it yourself, is my understanding.
 7        A   Yes, ma'am, I do that myself.
 8        Q   And then it talks about a process that can
 9   be followed for below standards.  If there's a below
10   standard overall evaluation, do you follow that
11   process that's set forth in paragraph six?  We're now
12   on page 19.
13        A   Yes, ma'am.
14        Q   So basically it says in terms of below
15   standards, you can look at it and you can overrule a
16   below standards rating.  Have you ever overruled a
17   below standards rating?
18        A   Yes.
19        Q   How many times would you say you've done
20   that in your three years and nine months as sheriff?
21        A   Just a few times.
22        Q   Do you remember any of the deputies you've
23   done it for?
24        A   No, I don't remember the deputies
25   specifically, but I remember the reasons, the
```

```
 1   incident, the reasoning that I did.
 2        Q   And what would be the reason that you would
 3   overrule a below standards evaluation?
 4        A   When that supervisor grades that person and
 5   that grading is not consistent with other facets of
 6   the evaluation, then I may overrule a specific section
 7   of that evaluation.
 8            And that example would be if you are -- I'm
 9   very picky about time, being on time, and your
10   attendance.  And if a person has perfect attendance,
11   they shouldn't be graded poorly.  But that has
12   happened a couple of times, so I've overruled that.
13        Q   So someone showing up regularly and doing
14   their job and getting a poor performance evaluation,
15   you might look into that and supersede the
16   individual's supervisor's poor performance evaluation;
17   is that correct?
18        A   That's correct.
19        Q   If you look at -- if you go back to
20   section -- or page 15, section one, it says:  The
21   purpose of the appraisal is to promote effective
22   personnel management in the sheriff's department.
23            And do you agree that an annual performance
24   appraisal helps you to effectively manage the
25   personnel in your department?
```

```
 1        A   I do.
 2        Q   And you would have considered -- I'm
 3   assuming, but I'm not trying to put words in your
 4   mouth, you would consider the appraisal process to be
 5   particularly important if you thought you were
 6   inheriting a dysfunctional department, right?
 7        A   Yes, ma'am.
 8        Q   You want this written feedback to see how
 9   your deputies are doing and who you need to improve or
10   let go, right?
11        A   Yes, ma'am.
12        Q   Let me ask you this:  Since you've been
13   sheriff, how many deputies have you had to terminate?
14        A   I've terminated several deputies.
15        Q   Can you give me -- several is a range.  Has
16   it been more than five but less than ten?
17        A   Yes.  Well, let me think for a minute.
18        Q   Sure, sure, take your time.
19        A   I'm thinking right off the top of my head, I
20   can tell you about five.  Five come to mind right off
21   the top of my head.
22        Q   And just let me -- since this isn't a
23   termination case, the five that you can think of, how
24   many are black and how many are white?
25        A   I think all of them were black.
```

```
 1        Q   And then you referenced it before.  I'm
 2   going to have you pick up now what's been marked as
 3   Exhibit 7 for purposes of deposition.
 4        A   Yes.
 5        Q   And this is a manual that's dated March 16th
 6   of 2018.  Is this the manual that you rewrote after
 7   you had been in office for a period of time and then
 8   promulgated as your policies and procedures?
 9        A   Yes.
10        Q   And I'm just going to first ask you, this
11   particular manual is Bates labeled 971 to 1,078.  Is
12   it your complete manual?
13        A   Yes.
14        Q   If you go to the same section five, which I
15   believe is still at the same corresponding pages, so
16   page 15 of the actual manual, the Bates label 986,
17   there is the performance appraisal process.  I've
18   taken a look at it and I'm certainly giving you as
19   much time as you need to look at it, but it's my
20   understanding that that particular performance
21   appraisal process did not change when you did
22   revisions to the manual.  It's the same one that's
23   been in effect since you've been elected, correct?
24        A   Pretty much.  I believe so, yes.
25        Q   Like I said, if you want to take your time
```

18  (Pages 66 to 69)

Sheriff Vernon Betts

Page 70

1   and take a look at it, feel free, and then you can
2   answer again, but that's what it looked like to me.
3        So even when you change the manual in '18,
4   you still require an annual performance appraisal for
5   each of your employees, correct?
6        A   Correct.
7        Q   And those would be in the personnel files,
8   correct?
9        A   Correct.
10       Q   Or in your office.
11       A   Correct, in my office.
12       Q   You said you keep a copy as well, right?
13       A   Yes.
14       Q   So there's at least two copies somewhere.
15       A   I believe so, yeah.
16       Q   I'm going to represent to you, Sheriff, that
17  in terms of the folks that have been promoted to
18  sergeant, we only received an evaluation from Cannon
19  from 2017, a single evaluation on Felicia Davis that I
20  can't tell you the date, because it's not a complete
21  evaluation, and an evaluation on Anthony Evans dated
22  2018.
23       If I'm understanding your previous testimony
24  correctly, there should be more evaluations in all of
25  those personnel files, correct?

Page 71

1        A   Should be.
2        Q   And what I would ask you to do as part of
3   this deposition is to look to see where those are so
4   that they can be produced to us as part of this
5   lawsuit, okay?  You don't have to do it personally.
6   I'm assuming you'll direct somebody in your office to
7   do it.
8        A   I will look, but if you don't have them
9   already, they're probably not there.
10       Q   I will represent to you, and, again, the
11  documents will speak for themselves, in terms of
12  Castellano's file, we have evaluations from 2001,
13  2002, 2003, 2004, 2005, 2006, 2009, 2010, 2011, 2017
14  and 2018.  That sounds like it's more consistent with
15  your policy, correct?
16       A   Sounds like it, yes.
17       Q   Now, I'm not going to ask you to account for
18  anything that happened before you were elected
19  sheriff, so like why Castellano doesn't have
20  evaluations for '07, '08 and '09.  So '17 we have one
21  and '18 we have one.  Can you account for why he would
22  not have an evaluation for 2019?
23       A   I don't know that he doesn't have one for
24  2019.  He should.
25       Q   He should.  Again, I'm only focusing on the

Page 72

1   time that you've been in office.  So you're saying
2   from the period of time from 2017 to today, everybody
3   that's had an annual -- has hit their annual hiring
4   date should have four evaluations in their file, those
5   being 2017, '18, '19 and '20.  I understand we haven't
6   finished '20 yet, so some of them might not have them,
7   correct?
8        A   That's correct, but I can tell you already
9   that I know, there again, the lack of efficiency of
10  the entire department, I know that there are people
11  who don't have all four evaluations from the time I
12  started till now.
13       Q   Are you disciplining your supervisors if
14  they don't give you the evaluations you expect from
15  them?
16       A   There has been verbal discipline.
17       Q   Would you have a sense of how many
18  evaluations you're missing at this point in time?
19       A   No, I don't at this particular time because
20  I think within the last two years, and I've been
21  pretty adamant about getting these evaluations, I've
22  got a boatload of those things that I've looked
23  through sitting on my desk as we speak.  And so to me
24  it seems like they began to really adhere to what I've
25  been trying to get them to do, and that is make sure

Page 73

1   you give me an evaluation on every employee, every
2   period.  Every time their anniversary date comes up,
3   I'm looking for an evaluation.
4        I can tell you now that that has been the
5   subject of some of our supervisory meetings because I
6   haven't gotten that from everybody.  But as we move
7   along in my tenure, I think my supervisor will tell
8   you that the sheriff is getting more and more dogmatic
9   about them following through with the paperwork that
10  they're supposed to do, and that we may not be too
11  far, as you just talked about, disciplinary.
12  Actually, we may not be too far from some of the
13  supervisors being disciplined because they haven't
14  carried through with their work.
15       Q   Would you be surprised to learn if
16  Sergeant Haill testified that he hasn't been evaluated
17  since 2014?
18       A   No, I wouldn't be surprised.
19       Q   And why is that?  Wouldn't you expect your
20  lieutenant to be evaluating your sergeant?
21       A   Well, in the case of Sergeant Haill, I don't
22  think we've established specifically as to who would
23  evaluate him.  And so in his case I think that is
24  actually the case.  With him being in the position
25  that he's in and in the office, I don't think I have

19  (Pages 70 to 73)

Sheriff Vernon Betts

Page 74

1  directly assigned that responsibility to anybody and,
2  therefore, Sergeant Haill probably had not been
3  evaluated, at least not on paper.  But as we say that,
4  I evaluate Sergeant Haill every day.
5      Q   But not on paper, correct?
6      A   Not on paper.
7      Q   But if I'm understanding your previous
8  testimony, these performance evaluations are an
9  important tool for you to understand how your deputies
10  are functioning, and your overall practice is you
11  expect them to be turned in as required by your
12  policy, correct?
13      A   Correct.
14      Q   You said that you had warned some of your
15  supervisors that they had failed to turn in
16  evaluations.  Who are the supervisors that you warned
17  about failing to turn in timely performance
18  appraisals?
19      A   All of them.  Twenty-two supervisors.
20      Q   So supervisors who are evaluating, if I'm
21  understanding correctly, so sergeants would evaluate
22  deputies that are under their command, correct?
23      A   Correct.
24      Q   Lieutenants would evaluate sergeants.
25      A   Correct.

Page 75

1      Q   Captains would evaluate the lieutenants.
2      A   Correct.
3      Q   You have two majors, so I'm assuming the
4  majors evaluate the captains?
5      A   Correct.
6      Q   Do you evaluate the major or does
7  Colonel Roberts?
8      A   I evaluate the majors.
9          MS. PETRUSKA:  This may be a good -- we're
10  about an hour and a half, hour and 40 minutes.  I know
11  you mentioned needing to use the restroom.  All of us
12  have probably had our morning routine that requires
13  drinking something, so this may be a good time to take
14  a first quick bathroom break.  Do we want to take a
15  quick break and try and come back within five minutes,
16  or does somebody need a little bit more time?
17          THE WITNESS:  That's fine with me.
18          (A short recess was taken.)
19  BY MS. PETRUSKA:
20      Q   Sheriff, I want to go back.  You said that
21  when you do a promotion, 99 percent of the time you
22  talk to Tim Haill, Captain Hogan, Major Lammert, and
23  was it Major Harmen in Civil Courts?
24      A   Major George Harsley.
25      Q   Could you spell that for Jo Ann, please?

Page 76

1      A   H-A-R-S-L-E-Y.
2      Q   Just like it sounds, then.  I want to
3  include, then, the supervisor, current supervisor and
4  the potential future supervisor.  So there's a team of
5  people you've talked to related to virtually every
6  promotion decision you've made since you became
7  sheriff; is that correct?
8      A   That's correct.
9      Q   And then in terms of evaluations, do you
10  review them when you're considering somebody for
11  promotion?
12      A   In terms of the appraisal?
13      Q   Yes.  So the performance evaluations we were
14  talking about --
15      A   No, I don't.
16      Q   -- before the break.
17      A   I don't review those when I'm considering
18  somebody for a promotion.
19      Q   You don't pull them and review them before
20  the promotion.
21      A   No, I don't.
22      Q   Now, to move this along, my understanding is
23  the sheriff's department is divided into different
24  units; is that correct?
25      A   That's correct.

Page 77

1      Q   And if I'm understanding the manual
2  correctly, those units currently are the courtroom
3  unit, the service unit, the office support unit, the
4  transportation and jail unit, the hospital security
5  unit, security, criminal records and, finally, a
6  property unit; is that correct?
7      A   Pretty much, yes.
8      Q   Can you think of any other unit there is in
9  the sheriff's department?
10      A   I don't know if you've mentioned the outside
11  service unit.
12      Q   Would that be the same thing as what's
13  called the service unit?
14      A   That might be what you're calling service
15  unit.  I don't know.
16      Q   I think that's what the manual called it,
17  but I might have skipped a word.  That could be very
18  well true, too.
19          So can you briefly tell me -- so courtroom
20  unit, that's just what --
21          (Discussion off the record.)
22  BY MS. PETRUSKA:
23      Q   So courtroom unit are the deputies we see as
24  we enter the courtroom and in the courtroom, they're
25  providing security during the day; is that correct?

Sheriff Vernon Betts

---

Page 86

1    A   That's correct.
2    Q   Were you aware that a number of his
3  companies had declared bankruptcy?
4    A   I was aware of that.
5    Q   Did the bankruptcies give you any reason to
6  be of concern in terms of hiring Mr. Roberts as your
7  chief deputy or your undersheriff?
8    A   No, it did not.
9    Q   If you had known about this $35 million
10 judgment entered against Mr. Roberts, et al., would
11 that have been of concern to you when you were hiring
12 him as your undersheriff?
13   A   Probably not.
14   Q   And why not?
15   A   Because that's his personal business.  I
16 don't think it necessarily will interfere with
17 business that I want him to conduct here at the
18 sheriff's department.
19   Q   When you're doing a background check on
20 deputies, I know you look at their criminal background
21 check, but do you do a credit check to see if they
22 might have a bad credit history that might indicate
23 some reason for concern?
24   A   No, I don't do a credit check.
25   Q   You said that there are two majors,

---

Page 87

1  Major Lammert and Harsley, correct?
2    A   Correct.
3    Q   What is Major Lammert's responsibilities?
4    A   To oversee the Carnahan Building and all the
5  connecting operations.
6    Q   And I believe you said that Harsley had the
7  corresponding duties in the civil building, correct?
8    A   Correct.
9    Q   So you have a major placed in each one of
10 your courtroom operation buildings.
11   A   Correct.
12   Q   I know you talked about Steve Roberts having
13 a role in property sales that your office handles.  I
14 assume that as the undersheriff, he assumes
15 responsibility when you're not available for whatever
16 reason, but what other duties does the undersheriff
17 have?
18   A   In advising me on just about everything that
19 we do.  He's involved in everything that goes through
20 the office like, you know, if we're disciplining
21 anybody there, he sits and he takes notes.  A lot of
22 the different meetings that I have to go to, he
23 accompanies me on those meetings.  Like I said, he
24 advises me on anything legal that we have in the
25 sheriff's department.  He's probably the first person

---

Page 88

1  I talk to before I talk to Joe Neal, and he'll say,
2  Vernon, we need to talk to Joe Neal.  But he's usually
3  the first person, and that's good to have that legal
4  mind right at hand.  And he's involved in just about
5  every facet of the job, just like everybody else.
6    Q   Do you consult with him then, too, when you
7  make promotion decisions?
8    A   Yes.
9    Q   So, again, virtually every promotion that
10 you've made, you've talked to him about it before it's
11 been made.
12   A   Yes.
13   Q   How many captains are there?
14   A   Three.
15   Q   What are their areas of responsibility or
16 what do they supervise?
17   A   Captain Hogan oversees the office in
18 general, all those in financing and the property room.
19 Captain O'Toole is out of juvenile, he oversees the
20 juvenile operation.
21      And I said three captains and I kind of
22 misspoke there.  One of my captains just passed away,
23 so by reflex I was referring to Don Robinson, who was
24 the captain over the courthouse -- over the civil
25 courts, who works under George Harsley, but he just

---

Page 89

1  passed away a month or so ago.
2    Q   I'm assuming you're planning on filling that
3  position, though; is that correct?
4    A   Yes.
5    Q   So I understand at the moment there's not
6  three captains, but your complement of captains is
7  three.
8    A   Yes, ma'am.
9    Q   Then how many lieutenants are there?
10   A   I had that information right here.  I think
11 I've got seven lieutenants.
12   Q   Generally what is a lieutenant's function
13 that makes it different than a sergeant or a captain,
14 for example?
15   A   Well, a lieutenant, of course, rank has a
16 little more power than the sergeant, but less than the
17 captain.  The lieutenant, we try to have one in each
18 building, and the lieutenant is to assist those
19 sergeants in their daily operations.
20   Q   Am I understanding you correctly, then?  You
21 said one in each building.  Are there seven buildings
22 that you guys cover, and so seven sergeants, or are
23 there fewer buildings but you have a day shift and an
24 afternoon shift, so you have seven lieutenants?
25   A   Correct.  We have only two buildings, but

---

23  (Pages 86 to 89)

Sheriff Vernon Betts

|  | Page 98 |
|---|---|

1  me to be here.
2      Q   And let me clarify, though.  Do you think
3  that's because their person didn't get in or do you
4  think it's because of your race?
5      A   Probably more so that person didn't get in.
6      Q   Do you know -- if you know, do you know who
7  the judges were backing to get in?
8      A   No, I don't.
9      Q   Has any judge -- Kim Gardener talks about it
10  openly, that she thinks that there's somewhat of a
11  race-based conspiracy against her as the first
12  African-American or black female in her job.  Have you
13  felt that with respect to the judges?  You're the
14  first black sheriff in the city, correct?
15      A   No, I'm not.
16      Q   Who was the first black sheriff in the city?
17      A   Benjamin Goins.
18      Q   I remember that name, but in terms of like a
19  real memory, Sheriff Murphy is the only one I
20  remember.
21      A   Yeah.
22      Q   So you didn't come in as the first black
23  sheriff, so you don't have that playing out in your
24  role.
25      A   No, I was the second black sheriff.

|  | Page 99 |
|---|---|

1      Q   Do you feel like there are some judges who
2  don't want you to succeed in your role because you're
3  African-American?
4      MS. LEWIS:  I would again object to the
5  relevance.
6      THE WITNESS:  Probably.  I don't know if
7  they're still here.
8  BY MS. PETRUSKA:
9      Q   Has any judge said or done anything that
10  caused you to -- to you, obviously, that caused you to
11  form that opinion?
12      A   Yes.
13      Q   And what was done to you that led you to
14  believe that a judge might have a race based bias
15  against you?
16      A   When I took office, the judges decided that
17  they would go to Jeff City to get a bill passed to
18  make this an appointed position.
19      Q   Had they ever tried to do that when Murphy
20  was sheriff?
21      A   Yes.
22      Q   So they had gone to Jeff City to try to get
23  an appointed position with him, too?
24      A   Yeah, but I think Murphy was the
25  precipitator.  From what I understand, he was the

|  | Page 100 |
|---|---|

1  precipitator of that whole move, thinking that he
2  would be the one that they would appoint, from what I
3  heard.
4      Q   So before he was elected sheriff, he tried
5  to make that happen when Goins was sheriff?
6      A   No.  This was just --
7      Q   So he was already sheriff, but he thought if
8  he could get them to make it an appointed position he
9  wouldn't have to run every four years.
10      A   I guess.
11      Q   I've gotcha now.  Is that why you thought it
12  was different when they did it to you is because
13  Murphy supported the move to have an appointed
14  sheriff?
15      A   Yes.
16      Q   And you did not.  You believe the sheriff
17  should be elected?
18      A   I do.
19      Q   Again, I think you referenced all other
20  jurisdictions in the state.  In all other
21  jurisdictions the sheriff is an elected position,
22  isn't it?
23      A   All except for St. Louis County, St. Louis
24  County.
25      Q   You talked before that you had given all of

|  | Page 101 |
|---|---|

1  your supervisors an oral admonishment that they needed
2  to get in the written performance evaluations.  Have
3  you committed that to writing with any of your
4  supervisors?  Have you given them a written reprimand
5  or anything more in terms of discipline because of
6  failure to provide performance evals?
7      A   No, I have not.
8      Q   And then in broad strokes, what percentage
9  of your sheriff's department is black employees, what
10  percentage white employees, and to the extent
11  applicable, other races?
12      A   Fifty-three percent of my department is
13  black and 47 percent of my department is white.
14      Q   We talked a minute ago about the personnel
15  files and where they're maintained.  Have you
16  promulgated any policy related to the proper
17  maintenance of personnel files?
18      A   No, I have not.  It's kind of understood
19  that the HR has a set of files and then the sheriff
20  has a set of files.
21      Q   Let me ask it another way.  I know this is
22  what's -- so police departments may have police
23  manuals, but they then also have, you're probably
24  familiar with them, special or general orders for very
25  specific areas of functioning.  Is the manual

26 (Pages 98 to 101)

Sheriff Vernon Betts

Page 106

1   sheriff's file?
2       A   Pretty much anything like that would still
3   go in the HR file.
4       Q   There'd still be an HR copy.  So there's
5   still two versions of that, okay.
6           When new deputies are hired, you mentioned
7   it before, how are they trained?
8       A   How are they trained?
9       Q   Yes.
10      A   They're trained by the person that they are
11  going to be working with.  So say today, just today we
12  have a new employee, he's going to be working in the
13  security unit.  When you come into the Carnahan
14  Building, you're going to see deputies sitting there
15  at the desk.  Well, that new employee is going to be
16  sitting there with another deputy that's been sitting
17  there for years, that's got that experience, and that
18  person is responsible for training that deputy.
19      Q   So it sounds like at least you have a
20  training -- it may be the training program or it may
21  be a component, where a new deputy shadows an
22  experienced deputy that's the training officer for
23  that person.
24      A   Right.  Initially.  Now, we do have formal
25  training where --

Page 107

1       Q   What's your formal training program?
2       A   So each deputy is required to do 160 hours
3   of training, and they will go over to the St. Louis
4   police department.  It's four hours a night, five
5   nights a week for four weeks, and they go and they
6   cover the basics for being a St. Louis sheriff deputy.
7   I mean, from talking about how you use your gun, your
8   mace, the rules, the regulations, just a general
9   training that they would get from, not us, but from
10  the St. Louis police department.
11      Q   So do police officers provide that training
12  or do some of your deputies provide that training?
13      A   The police department provides the bulk of
14  the training.  I think there are one or two segments
15  that my deputy, like my lieutenant, that would be
16  another responsibility.  We have -- throughout the
17  course of the year, we have several periods of
18  training.  Like even today, everybody's taking their
19  gun training.  But we've had mace training.  We have
20  several deputies who have become instructors in those
21  areas, like your mace, your tasers, that kind of
22  stuff.  We provide that in-house training.
23      Q   Was John Castellano part of the new employee
24  training when you became sheriff?
25      A   No, he was not.  He was already a deputy.

Page 108

1       Q   No, no, I'm sorry.  That was not a clear
2   question.  Let me reask it and clarify it.  Was he one
3   of the experienced deputies that was providing
4   training to new deputies when -- in this formalized
5   program when you became sheriff?
6       A   No.
7       Q   To your knowledge, had he ever trained new
8   hires as part of the formalized training program?
9       A   Not to my knowledge.
10      Q   And so it would be your testimony since he
11  never did it during your tenure that he didn't provide
12  new employee training the first time new employees
13  were trained after you became sheriff.
14      A   Correct.
15      Q   Do all the employees of the sheriff's
16  department have email?
17      A   Do they all have email?
18      Q   Yes.  An email address through the sheriff's
19  department or access to it.
20      A   No, I think only my officers have email
21  address.
22      Q   So let me ask it this way:  When you need to
23  communicate something to the entire sheriff's
24  department, how do you do that?
25      A   The supervisors, we send out a memo.

Page 109

1   Everybody has a mailbox and everybody gets a posted
2   memo, as we call it, posted memo, when we want
3   everybody to know something and/or I have the phone
4   numbers -- I should have -- I have the phone numbers
5   of all my employees, all my deputies, and they should
6   have my phone number, several of them.  And so we try
7   to communicate via that apparatus, the phone, but as
8   far as in-house operations, everybody has a mailbox
9   and when we want people to know, they get a memo in
10  their mailbox.
11      Q   So you guys don't have an all-staff email
12  send at this point, but if you want to communicate
13  something to everybody in writing, you will put a memo
14  in every deputy's box.
15      A   Correct.
16      Q   Now, I also understand that you guys do roll
17  calls; is that correct?
18      A   Correct.
19      Q   And my understanding is that there are all
20  employee roll calls and then there might be -- there
21  are court roll calls, is that correct, courthouse roll
22  calls?
23      A   Correct.  There are roll calls basically
24  every day for the court group.  And then all the other
25  departments, the only time they participate in a roll

Sturm Reporting Services, Inc.
314.780.2816

Sheriff Vernon Betts

Page 122

```
1       A   Yeah, yeah.
2       Q   So there's four people that you've promoted
3   to lieutenant.
4       A   Right.  Okay.  I just overlooked him.
5   Right.
6       Q   And so let me ask it this way.  For Davis,
7   where is she assigned as a lieutenant?
8       A   She's a lieutenant over the Civil Courts
9   Building.
10      Q   And how about Roop?
11      A   Dawn Roop is the lieutenant over the
12  Carnahan Building.
13      Q   And how about Hogan?
14      A   Hogan is the lieutenant over outside
15  service.
16      Q   And Gamache?
17      A   Mike Gamache is lieutenant over
18  transportation.
19      Q   And then -- so if I'm remembering the
20  numbers correctly, the three other lieutenants have
21  been there since before you took office.
22      A   Yes.
23      Q   I'm going to represent to you that we have
24  records that show that there have been 12 people
25  promoted from deputy to sergeant.  Does that sound
```

Page 123

```
1   correct?
2       A   That could be.
3       Q   And we're going to go over each one of them.
4           Let me ask you this:  So Davis is promoted
5   to sergeant, according to records, on May 23rd of
6   2017.  Do you have any reason to dispute that?
7       A   Felicia Davis was promoted from -- yes.
8   Yeah.  No, I don't dispute that.  And we said
9   promoted.  Actually, she was already acting sergeant
10  when I got here, so I don't really consider that --
11  I've never been a proponent of the word "acting."
12  Either you're doing it or you're not.  And so Felicia
13  actually was acting sergeant when I got here, and so
14  we just eliminate that word acting.
15      Q   So you made her a sergeant because she was
16  acting in the capacity, you don't like acting, and so
17  if somebody's acting, they should have a position, so
18  you made her a sergeant.
19      A   That's how I feel.  She was already doing
20  the job.
21      Q   Do you have a time in rank requirement
22  before somebody can be promoted from one rank to the
23  next?
24      A   No, I don't.
25      Q   So records show that Davis, Felicia Davis,
```

Page 124

```
1   was promoted to lieutenant on January 8th of 2018, so
2   about seven or eight months later.  How is it that she
3   gets promoted so quickly?
4       A   My need to try to fill those spots, to make
5   sure I'm getting the confluence with my shop that I
6   need.  There was an opening there.
7       Q   How had the opening -- how had the opening
8   become available in the lieutenant position?  Did
9   somebody die, retire?
10      A   Yeah.  I think that lieutenant spot was --
11  his name escapes me.  We had a lieutenant that
12  retired.  It will come to me, but that's how that spot
13  came open.  We had a lieutenant that retired.
14          Korey -- I had a lieutenant that I wasn't
15  happy with.  Korey might be able to help me on this.
16  I had a lieutenant that I wasn't happy with because,
17  remember, Korey, he couldn't do the time sheets.  Do
18  you remember that story that included my brother and
19  blah, blah, blah?
20          MS. LEWIS:  I remember the situation.  I do
21  not remember the name.
22          THE WITNESS:  The name?  Okay.  Lynette, I'm
23  sorry, I can't --
24  BY MS. PETRUSKA:
25      Q   But that position came open due to a
```

Page 125

```
1   retirement.
2       A   Yes.
3       Q   Now I'm going to refer you back to your
4   manuals, both Exhibits 6 and 7.  And you're aware that
5   there are promotion processes defined in both of your
6   manuals; is that correct?
7       A   Correct.
8       Q   And that process or that policy is set out
9   at Section 4 in both Exhibit 6 and Exhibit 7, correct?
10      A   Correct.
11      Q   And are you familiar with the policy as it's
12  defined in your manual?
13      A   I am.
14      Q   And it's my understanding that you don't
15  follow the policy; is that correct?
16      A   That's correct.
17          MS. LEWIS:  Objection.  Argumentative.
18  BY MS. PETRUSKA:
19      Q   Why don't you follow the policy?
20      A   Because I don't have to.
21      Q   Why do you say that you don't have to?
22      A   Because the manual tells me I don't have to.
23      Q   Let me ask it this way, then:  Why would you
24  promulgate a policy that explains how you're going to
25  do promotions if you don't use it?
```

32  (Pages 122 to 125)

Sheriff Vernon Betts

Page 126

1          A   It's a guide.  We need guidelines, but that
2    don't mean I have to adhere strictly to the guideline.
3          Q   Have you ever used or followed the policy
4    that's set forth in Exhibit 6 or Exhibit 7 to make a
5    promotion during your tenure as sheriff?
6          A   I don't believe I have.
7          Q   Would you agree that the policy, Section 4,
8    is the same whether I look at Exhibit 6 or Exhibit 7,
9    correct?
10         A   Correct.
11         Q   And so let me ask you this:  When you take
12   office, you put your name on Sheriff Murphy's manual
13   and say we're going to continue to follow his
14   policies.  And I get that, you haven't had a chance to
15   look at them, so you're going to do what's been done
16   before.  But by the time you get to Exhibit 7, why
17   would you have a promotion policy that you would put
18   in your manual and tell people was going to be how you
19   were going to promote people if you already knew you
20   weren't going to use it?
21         A   Well, I didn't know I wasn't going to use
22   it.  I just didn't use it.
23         Q   By then you'd been in office for a year and
24   three months and you had never used it, correct?
25         A   Right.  And at the time I was making those

Page 127

1    promotions, I didn't see where the policy was the tool
2    that I wanted to steer my guidance on on making that
3    promotion.
4          Q   I didn't mean to cut you off.
5          A   I don't think the policy was what I wanted
6    to use to steer me on making that promotion.
7          Q   So why didn't you write a different policy
8    to let deputies know how you were going to make
9    promotions?
10         A   Because I can tell them how I'm going to
11   make promotions, which I've done.
12         Q   What have you told them about how you're
13   going to make promotions?
14         A   Just like we said earlier in this
15   conversation, it's noted.  It's noted out there that
16   promotions, there are openings.  You can write me a
17   letter, tell me what you think your qualifications are
18   that give you the merit to get that position.  So
19   that's what we've done.  We've had people come in, sit
20   down and talk to me.  They come in and talk to me
21   about their merit, and so I can discuss that merit
22   with them.  I don't necessarily have to have a policy
23   that's going to dictate.
24         Q   Why didn't you just take it out of your
25   policy manual when you updated it in March of 2018?

Page 128

1          MS. LEWIS:  Objection.  Asked and answered.
2          THE WITNESS:  That's probably the plan.
3    We're probably going to do that.  Just haven't gotten
4    around to it.
5    BY MS. PETRUSKA:
6          Q   Do you know why a policy was first put into
7    the policy manual for promotion -- actually, strike
8    that whole question, it's bad.
9          Do you know why a promotion section was put
10   into the manual when it was?
11         A   No, I don't know why.
12         Q   Were you ever told that the sheriff's
13   department developed a written promotion policy
14   because of the previous lawsuit we've talked about?
15         A   You know, I just lost you all.  I clicked on
16   something.  What do I need -- I'm sorry, Lynette.
17         Q   We can hear you if you can't hear us.
18         (Discussion off the record.)
19   BY MS. PETRUSKA:
20         Q   So the question pending is:  Were you ever
21   told that the policy was put in place because of the
22   previous lawsuit we talked about?  I believe it was
23   the one where you mentioned -- no, I went too far back
24   in my own notes.
25         A   I can tell you no.

Page 129

1          Q   Tyrone Williams, I guess, was involved.
2          A   I was never told that that policy was put in
3    place because of that lawsuit.
4          Q   So you knew the policy existed before you
5    were there, but you don't know why it existed before
6    you were there.
7          A   Right.
8          Q   And I just want to check on a couple of
9    things.  So you have never created an eligibility
10   list.
11         A   Correct.
12         Q   You have never done written testing as part
13   of a promotion process; is that correct?
14         A   Correct.
15         Q   Do you review any documents as part of the
16   promotion process, whether it's tied to the policy or
17   not?
18         A   No, I don't.
19         Q   The written policy, I'm sorry.
20         A   No, I don't.
21         Q   So you don't look at the discipline record,
22   the past performance evaluations, anything like that
23   to get a sense of the deputy before you make a
24   promotion.
25         A   I have a sense already when I consider that

33  (Pages 126 to 129)

Sheriff Vernon Betts

Page 130

1  person, and usually in my conversation with people in
2  the office, like Tim Haill, if that person has had any
3  kind of disciplinary action, Tim is pretty good at
4  saying, hey, you know this person did such and such
5  and such and such and such and such.
6      Q   I'm going to ask this, because it will
7  eliminate -- when I go through each of the individual
8  promotions, it will eliminate this question for each.
9      So when you've considered promoting somebody
10  from deputy to sergeant in each of those 12 times that
11  we're going to talk about shortly, you have never
12  pulled the personnel file to get a sense of their
13  discipline record, their performance evaluations, what
14  training certificates might be in there.
15      A   You're right.  I never pull the file.
16      Q   Like I said, I won't ask that question 12
17  times, then.
18      Have you ever formally waived the promotion
19  policy set forth in Section 5 of your manual?
20      A   When you say formally waived.
21      Q   Right.
22      A   No, I've never formally waived the policy.
23  I guess informally, I've ignored the policy.  I think
24  that's what we're talking about.
25      Q   And that's what I'm asking about.  So is

Page 131

1  there any document or memo that would say that, you
2  know, for this promotion or from this point going
3  forward, we're waiving or not following this policy?
4      A   No.
5      Q   Did you promise anybody a promotion before
6  you were elected sheriff?
7      A   No.
8      Q   And that would include Antoine Cannon,
9  correct?
10      A   That would include Mr. Cannon.
11      Q   Did you ever hear that he was going around
12  bragging that if you were elected sheriff, he would be
13  promoted to sergeant?
14      A   I'm sure he and several other folks probably
15  did that.
16      Q   Do you know who the other several folks
17  were?
18      A   No.  I'm just sure that kind of stuff
19  happens.  I'm sure people make those -- Lynette, just
20  off the top of my head I'm kind of laughing because I
21  had one deputy that never even got hired, but he put
22  it in the St. Louis America that he was going to be
23  the new HR guy.  That was Pat Hill.
24      So you get that kind of stuff going on,
25  people thinking that they're going to do this and do

Page 132

1  that.  So they say what they want to say.
2  Antoine Cannon was working in a position, and when I
3  came on as sheriff, he wasn't or nobody else was
4  automatically promoted just because they had some kind
5  of relationship with me.  I think we've discussed how
6  he became promoted.  If not, we can always discuss
7  that issue.
8      Q   We're going to get into each individual
9  ones, because we just talked broad scope about the
10  process.
11      What kind of a relationship did
12  Antoine Cannon have with you?
13      A   A pretty cordial relationship.  I knew him
14  well, like I knew several other of the -- a lot of the
15  deputies.  I worked here as a deputy, so a pretty
16  cordial relationship with a lot of the deputies.
17      Q   Did he work on your campaign?
18      A   Yes, he did.
19      Q   Did you socialize with him?  I don't mean
20  like were you cordial to him when you saw him in the
21  halls, but would you go out for dinner, a beer
22  together?  Was he was in your home, were you in his
23  home?
24      A   No.  I don't socialize with any of my
25  deputies pretty much.

Page 133

1      Q   That was going to be my next question again.
2  I think I'm going to let you start doing both ends of
3  this.
4      So there's nobody in the -- you don't --
5  you're not a person that socializes with your
6  subordinates.  You draw the line.
7      A   Lynette, now, when we say socialize, if
8  there's something special, one of my deputies calls me
9  and says hey, my birthday, so and so, we're going to
10  be down, I may, I may, I may, but it ain't like every
11  weekend guys are going to be hanging out down at the
12  bar and I'm going down there.  No, I don't do that.  I
13  don't -- I don't go out with my kids, and I don't go
14  out with my employees.  I'm just trying to draw you a
15  picture of the kind of guy that I am.
16      Q   And that's what I'm trying to understand.
17  By socialize, I don't mean like if somebody's
18  celebrating 40 years in the sheriff's department and
19  the sheriff's department holds a big party for him and
20  a number of people go and you're one of those people,
21  or something significant happens in their life, like
22  they get married.  I'm really talking more about the
23  informal stuff that would signify you're friends as
24  opposed to work colleagues.  And that doesn't happen.
25      A   No.

34  (Pages 130 to 133)

Sheriff Vernon Betts

Page 134

1  Q   Would it be of concern to you -- for you to
2  learn that your deputies were bragging about them
3  being promoted by you if you didn't tell them that?
4  A   That they were being --
5  Q   That they were bragging that they were going
6  to be promoted by you when you didn't tell them that.
7  Would that of concern to you?
8  A   Yeah, it would be a concern to me.
9  Q   And, one, because it's not true, it sounds
10  like, correct?
11  A   Correct.
12  Q   And the other, I'm assuming, but again,
13  correct me if I'm wrong, another thing would be that
14  if they're running around bragging that you're going
15  to promote them if you're elected, it shows poor
16  judgment.
17  A   It certainly does.  They don't know
18  Vernon Betts.
19  Q   You didn't know that Cannon was doing that.
20  Did you hear any deputies that had said that if you
21  were elected, they were going to be promoted and stop
22  it?
23  A   I don't doubt that Cannon did that because
24  there are a couple of different times that he and I
25  had some conversation about his employment and this

Page 135

1  and that and, you know, I knew we had conversation
2  about it, but I never gave anybody the idea that this
3  is what's going to happen to you when I get there,
4  because I don't work that way.
5  Q   What conversations did you have with Cannon
6  about his employment?
7  A   Well, Cannon is a pretty smart guy, and
8  Cannon -- couple degrees, and Cannon had ideas about
9  the department -- he was already working here, right?
10  Yeah.
11  Q   Yes.
12  A   So he had the ideas about what the
13  department should do this and you should do that and
14  all that.  So we had those kind of conversations.  But
15  me promising him?  No, there was never any promises
16  made because that ain't the way I operate.
17  Q   Actually, what I want to focus on, so
18  excluding conversations you might have had with him
19  about ideas he had for the department, you said you
20  talked to him a couple times about his employment.
21  I'm focusing specifically.  Did you have any issues or
22  problems with Cannon that you were talking to him
23  about his employment?
24  A   And when I say talking to him about his
25  employment, no, nothing specifically.  I can't even

Page 136

1  remember.
2  Q   Did you ever have a conversation with him
3  that he shouldn't be telling people he's going to be
4  promoted?
5  A   No, I don't know if I ever said that to him.
6  Q   Did you have any issues or problems with
7  Cannon as it relates to his employment before you
8  promoted him?
9  A   No.
10  Q   And did you make any representations to the
11  employees of the department about how you would make
12  promotions if you were elected sheriff?  And I'm not
13  talking now about a deputy that claims that you
14  promised him anything.  I mean, you're running for
15  sheriff and you're telling all kinds of people what
16  you're going to do if you're elected.
17  A   Right.
18  Q   What I'm talking about here is as a group,
19  did you ever make any representations that say if I'm
20  elected as sheriff, I'll do da, da, da as it relates
21  to promotions to make sure we've got the best people
22  for the jobs or words to that effect?
23  A   I'm probably sure I did.
24  Q   Do you recall what any kind of
25  representation you made?

Page 137

1  A   No, I don't recall specifically.  So much
2  going on before I became sheriff, and people that
3  wanted to be part of that team, I don't recall
4  specifically what I might have said to who.  But I can
5  assure you I probably said something to somebody about
6  something.  I don't know.
7  Q   Did you ever tell -- again, this would be in
8  broad strokes, not making promises to individuals --
9  but did you ever tell folks that if you were elected
10  sheriff, you would follow the manual policy to make
11  sure that promotions were fair and the best person for
12  the job got it, or words to that effect?
13  A   I don't know if I've ever said that.
14  Q   Did you ever tell the employees -- or did
15  you ever tell your constituency, to include employees
16  of the sheriff's department, that if you were elected
17  sheriff, you would have no problem with them
18  unionizing?
19  A   I know I never said that.  Although I'm --
20  Q   And on that one you're clear that that was
21  never said.
22  A   I don't know if I -- I'm pretty sure that I
23  didn't say that because I know that we don't need a
24  union here, but I am pro union.  So that's why I'm
25  saying I wouldn't say 100 percent that I didn't say

35 (Pages 134 to 137)

Sheriff Vernon Betts

Page 138

1   something like that, but right now, we don't need a
2   union here at the sheriff's department.
3       Q   Do you remember having a conversation with
4   John Castellano after you were elected about him
5   wanting to unionize?
6       A   I don't recall.
7       Q   Again, you're not saying it didn't happen,
8   you're saying as we sit here today, you don't have a
9   present recollection.
10      A   Right, I don't remember.  John Castellano
11  and I, we've never talked.
12      Q   Again, you're anticipating my next question.
13  I'm going to close my computer and let you ask my
14  questions and you can just answer them yourself, okay?
15      A   Sorry, sorry.
16      Q   It will make my job easier.  Right.  You and
17  John Castellano have been opponents in the sheriff's
18  race; is that correct?
19      A   Correct.
20      Q   Do you and him have a cordial relationship
21  after the elections are over?
22      A   We don't.
23      Q   And if I'm understanding your previous
24  testimony, you and him have never spoken personally?
25      A   In the four years I've been here, he has

Page 139

1   spoken to me one time.
2       Q   And when was that?
3       A   I think it was the other day at the election
4   board when we were all filing, you know, a few months
5   ago.
6       Q   Would you not consider John as a sergeant
7   because he's ran against you for office?  Is that a
8   disqualifying factor?
9       A   No, that's not a qualifying factor.
10      Q   Disqualifying factor.
11      A   No, that's not a disqualifying factor.
12      Q   So even though he's run against you, if he's
13  the best person for the job, you would give him the
14  promotion; is that correct?
15      A   I would.
16      MS. PETRUSKA:  Let's take a little bit
17  longer lunch.  I'm about to get into another section
18  again, so it's a good time to take a break.  So let's
19  take a little bit longer lunch break if you want.
20  Everybody's at home.
21      (Discussion off the record.)
22      (A short recess was taken.)
23  BY MS. PETRUSKA:
24      Q   Sheriff, again, I'm not talking about
25  communications with your attorney, but what did you do

Page 140

1   to prepare for your deposition today?
2       A   I didn't do a whole lot.  I had talked with
3   Korey.
4       Q   Did you review any documents?
5       A   Actually, no.  You know, when I say review,
6   I did this morning look at -- I think the exhibits
7   that you were going to have, Korey, I looked at those
8   exhibits this morning.
9       Q   So the only thing you've done to prepare for
10  your deposition is we sent you four exhibits that were
11  a little bit lengthy, and you looked at them and you
12  had communications with Korey.
13      A   Right.
14      Q   And, again, I don't want to know the
15  substance.  When did you communicate with Korey?  And
16  I just want to know how long?
17      A   I communicated with Korey --
18      Q   About your deposition, obviously.  If you
19  talked to her about something else, I don't care.
20      A   Was that last week, Korey?  Last Friday?
21  Last Friday.
22      Q   How long?
23      A   Wasn't too long.  I guess 30 minutes.
24  Wasn't that long.
25      Q   And when you promoted Lieutenant Davis to

Page 141

1   lieutenant, who else did you consider for that
2   promotion?
3       A   Lieutenant Davis promoted to -- I don't
4   think anybody.  I don't think I had a whole lot of
5   options there.
6       Q   So did you attend a roll call -- roll calls,
7   I guess I should say, since there's the two court
8   buildings -- in the court buildings shortly or
9   immediately after you were elected sheriff?  Did you
10  attend the first roll calls to introduce yourself, et
11  cetera?
12      A   Yes.
13      Q   Did you tell the deputies at the courthouse
14  roll call that there are a lot of racists still here
15  that need to leave and not to F with you?
16      A   I don't know if I --
17      Q   Or words to that effect?
18      A   -- I don't know if I used that language, but
19  I'm sure I addressed the issue of there being racist
20  folks here because that seemed to be the whole issue
21  with me running for sheriff, the whole issue of me
22  being elected sheriff, and I'm going to come in and
23  fire all the white folks.  That was what was
24  propagated, from what I understand.  So I thought it
25  was best to clear that air right off the bat.

36  (Pages 138 to 141)

Sheriff Vernon Betts

Page 142

1    Q   So did you say anything about your plans to
2  fire anybody?
3    A   I don't believe I had to stress that.  I
4  don't believe I did.
5    Q   Did you think there were any specific
6  deputies in the sheriff's department that were racist?
7    A   Yes.
8    Q   And who were the deputies that you thought
9  were racist?
10   A   I don't know.
11   Q   You had specific people in mind but you
12  don't know who they were?
13   A   I didn't have any specific people in mind.
14  I know that there had to be some shades of racism,
15  that's what seemed to be talked about all the time, me
16  firing white folks and all that kind of stuff, bull
17  crap.
18   Q   Do you know who said if you were elected,
19  all the white people would be fired?
20   A   I don't know who said it.
21   Q   Did you look at John Castellano while you
22  made that statement about racism in the department?
23   A   Did I look at him?
24   Q   Yes.
25   A   I'm sure I didn't.  Why would I?

Page 143

1    Q   That was going to be my next question.  So
2  you're still anticipating them.
3        Did you ever tell the employees at an
4  all-employee roll call that you can fire whoever you
5  want whenever you want, or words to that effect?
6    A   Probably, yes, probably did.
7    Q   I'm sorry?
8    A   Yes, probably did say that.
9    Q   What was the reason or context of telling
10  people that they could be fired whenever you wanted?
11   A   In your sheriff manual on -- let me find it.
12   Q   Your employees are employees at will, right?
13   A   Right.
14   Q   Is that what you're referencing?
15   A   That's what I was going to reference, yes.
16   Q   So -- but let me ask it this way:  Had
17  something come up in the department that in an
18  all-staff meeting you wanted to remind your employees
19  that they were at-will employees?
20   A   Did you say did something come up?
21   Q   Yes.  Had something frustrated you, had the
22  deputies done something that you wanted to remind them
23  they were at-will and so I guess they better behave
24  themselves, or words to that effect?
25   A   Nothing in particular had come up, other

Page 144

1  than just the general atmosphere.  Lynette, you got
2  people walking around here thinking they can do
3  anything they want to do whenever they get ready.
4  That's been the mantra.  That's been the motif of this
5  sheriff's department that people can do whatever they
6  want to, and those days are long gone.
7    Q   What were you trying to address as it
8  related to the atmosphere?
9    A   That we're not going to continue with the
10  same kind of philosophy, the same kind of attitude
11  that we've had in the past where people can do
12  whatever they want to do, say whatever they want to
13  say, go wherever they want to go, get into anything
14  they want to get into and there not be some kind of
15  ramifications for it.
16   Q   Do you remember -- it sounds like you've had
17  only a limited number of all-staff meetings.  Do you
18  remember in what time frame you made that comment
19  about you could fire people whenever you wanted?
20   A   I sure don't.
21   Q   Did you look at John Castellano when you
22  made that comment?
23   A   No, I'm sure I didn't.
24   Q   Did you say during that communication words
25  to the effect that one of the people who knows this,

Page 145

1  meaning you can fire whoever you want, won't even look
2  at you?
3    A   No.  Why would I say something like that?
4  No, no.  I don't have to try to intimidate anybody,
5  Lynette.
6    Q   So you wouldn't try to intimidate your
7  employees.  And it looks like your lunch is coming.
8        You would not try to intimidate your
9  employees.
10   A   Lynette, 26 years at Ameren as a supervisor.
11  I know what power and authority I have.  I don't have
12  to try to flaunt it, throw it around.  I don't have to
13  do that.
14   Q   I'm sorry.  In addition to your education
15  role, you were also at Ameren for a period of time?
16   A   I worked for Ameren for 30 years, Lynette.
17   Q   What position did you hold at Ameren?
18   A   I retired as a supervisor in the information
19  technology function, and my responsibility was to
20  print and mail bills.  I had 40 employees under me,
21  and I've been supervisor for 26 years at Ameren.
22   Q   Teaching, Ameren, and sheriff's department.
23  Three employers, not two, like I thought.
24   A   Yes, yes.
25   Q   Have you ever told the employees at a roll

37  (Pages 142 to 145)

Sheriff Vernon Betts

---

Page 146

1  call that if they don't support your 2020 run for
2  sheriff they would be fired?
3      A   No, I have not.  Boy, I'd like to know who's
4  saying that.
5      Q   Before you became sheriff -- and I want to
6  separate this from the questions I asked before about
7  promising people promotions -- after you were elected
8  sheriff but before you took office, did you ever talk
9  to any of the deputies about their careers or
10  advancement within the sheriff's department?
11     A   No.  Well, I hesitate.  I don't know, maybe,
12  maybe not.  Because I have a lot of -- a lot of
13  people, Lynette, thought that when Vernon Betts got in
14  office, that they were going to be going places, and
15  it hasn't panned out that way.
16     Q   After you became sheriff, have you
17  approached individual deputies and asked them where
18  they see themselves in the department or going in the
19  department or words to that effect?
20     A   No, no, I haven't.  I don't want anybody
21  getting excited about doing something that ain't going
22  to happen.
23     Q   Let me be more specific.  Did you ever talk
24  to Sergeant Haill after you became sheriff about where
25  he'd like to see himself in your department?

---

Page 147

1      A   Did I ever talk to Sergeant Haill about
2  where I would like to see him in my department?
3      Q   Yes.
4      A   We've probably had some kind of conversation
5  along those lines, but when you say after I became
6  sheriff, it was not -- it was my intent right after I
7  became sheriff Mr. Haill not to be in the position
8  that he's in.  I didn't come in promising him and
9  dictating, telling him he's going to go someplace.
10     Q   What was your intention for him in terms of
11  a position?
12     A   I was going to take -- the position he's
13  sitting in now, it was my intent to remove him from
14  that position and put somebody else there.
15     Q   And who were you going to put in there?
16     A   Pat Hill.
17     Q   Is Pat Hill a deputy?  Is he employed as a
18  deputy or was he never hired at the sheriff's
19  department?
20     A   He was never hired.  Well, Lynette, Pat Hill
21  was a deputy here and he got fired.  He's the deputy
22  that sued for the 1.2 million.  He's the person that
23  sued Murphy because they hung a noose up.  And so
24  Pat Hill kind of thought -- and I've told you this
25  earlier -- that they even put something in the St.

---

Page 148

1  Louis American that he was going to be the new HR guy.
2  Now, that was the thinking, but I didn't promise
3  Pat Hill or anybody else that that was going to
4  happen.  I don't make those promises.  I don't control
5  life.
6      Q   If I'm understanding your previous
7  testimony, you were considering putting Pat Hill --
8      A   Right.  I was considering putting Pat Hill
9  in that position.
10     Q   What, if anything, do you remember talking
11  to Haill about in terms of where you wanted him to be
12  in your sheriff's department?
13     A   I don't remember talking to Tim about where
14  I wanted him to be.  He's in HR, he's doing a heck of
15  a great job, and I think, as I've tried to -- he's
16  doing a great job and he's where I think he -- he's
17  where I want him to be right now --
18     Q   Did you ever -- I'm sorry.
19     A   -- right now he's where I want him to be.
20     Q   Did you ever talk to him about moving him?
21     A   About moving him out of that position?
22     Q   Yes.
23     A   Yes.
24     Q   What did you talk to him about in terms of
25  moving Haill out of the position?

---

Page 149

1      A   Well, Tim Haill knows the story behind
2  Pat Hill and me thinking about putting Pat Hill.
3  Tim Haill is in that position.  When I got here, he
4  remained in that position because he had an advocate
5  who was a good friend of mine, Wayne Brown, who was a
6  former deputy, who begged me to -- he didn't beg, but
7  he said, hey, you need to leave Tim.  Tim's a good
8  guy.  So we considered that.
9      Q   So what did you communicate to Tim, though,
10  Tim Haill?  It sounds like you were considering
11  transferring him and you told him you were thinking
12  about that; is that correct?
13     A   Yes.
14     Q   Where did you tell him you were thinking of
15  transferring him to?
16     A   I don't even know.  I just know I wasn't
17  going to leave him in HR.
18     Q   Why didn't you want to leave him in HR?
19     A   Because I didn't have a relationship with
20  him.  I didn't know nothing about Tim Haill.  Didn't
21  know -- just like we've said, I didn't go digging in
22  his file to see what kind of background he had.  Did
23  he even have credentials to be in HR.  So I didn't --
24  so my initial thoughts was I'm going to move him
25  somewhere else.  And I can't remember if I told him

---

38  (Pages 146 to 149)

Sheriff Vernon Betts

## Page 150

1  where I was going to move him, I can't remember where,
2  but I can remember having a conversation about him not
3  possibly staying in that position.
4      Q   Did you have similar conversations with
5  other deputies like the one you had with Haill?
6      A   In regard to like moving people?
7      Q   Yes.  Now that I'm sheriff, I'm thinking of
8  moving you out of this position, putting you somewhere
9  else.
10     A   Nope, nope, nope.  I think most of the
11 people that are in positions were there when I got
12 there, and I thought about them before I got there and
13 pretty much let them stay where they are.  Tim was one
14 of the rare positions because it was so close to HR
15 and being right in the same room with me, I need
16 somebody that I can trust, and I didn't know all that
17 about Tim Haill at the time.
18     Q   I think I asked you before.  So people come
19 up to you and talk to you about promotions at various
20 times; is that correct?
21     A   Correct.
22     Q   And people send you letters telling you
23 they're interested in promotions at various times as
24 well, not only when you say, hey, I've got an opening
25 and I'm thinking about it, if you're interested, let

## Page 151

1  me know.
2      A   Correct.
3      Q   Have you ever communicated about
4  John Castellano, other than with your attorneys,
5  again, via email?
6      A   No.
7      Q   Have you ever discussed John's job
8  performance with your supervisory staff?
9      A   His job performance?
10     Q   Yes.
11     A   No.
12     Q   Have you ever had any issues, concerns or
13 problems with John's job performance?
14     A   With his job performance?
15     Q   Yeah.
16     A   No.
17     Q   Have you ever discussed John being promoted
18 with your supervisory staff?
19     A   Before or after the lawsuit?
20     Q   Let's start with before the lawsuit.
21     A   No.
22     Q   How about after?
23     A   Yes.
24     Q   Okay.  What did you discuss with your
25 supervisory staff about promoting John after the

## Page 152

1  lawsuits?
2      A   I know that I had a couple of openings, and
3  he could have possibly been in that bunch, but now
4  we've got all this mess going on, I don't know.
5      Q   What do you mean "now that we've got all
6  this mess going on"?
7      A   This lawsuit stuff going on.
8      Q   So then with the lawsuit stuff going on, he
9  might have been in consideration, but he was out of
10 consideration because of the lawsuit?
11         MS. LEWIS:  Objection.  Misstates testimony.
12         THE WITNESS:  No.
13 BY MS. PETRUSKA:
14     Q   So what do you mean by that, that he was in
15 the bunch and then he was out of the bunch?
16     A   I think we need to wait and see how this
17 pans out before we move in that direction.
18     Q   What do you mean by how it pans out, whether
19 he wins or loses?
20     A   I would think so.
21     Q   Why would whether he wins or loses his
22 lawsuit influence a promotion decision?
23     A   Well, how do you think it would look?  How
24 do you think the rest of my employees would feel if he
25 got promoted while all this was going on?

## Page 153

1      Q   And that's your concern, how it would look?
2      A   I think it would damage morale.  I know it
3  would damage morale.
4      Q   How would it damage morale?
5      A   Well, you've got other people who are
6  qualified, and here you promote somebody that's been
7  giving you all kind of hell.  What sense does that
8  make?  That's, I guess, would be what they would
9  interpret it.  I don't know.
10     Q   But his name -- since you've been sheriff,
11 his name has surfaced for promotion, if I'm
12 understanding your testimony, correct?
13     A   I gave it, yeah.  If I'm going to be honest,
14 yes.
15     Q   And he was not selected because of concerns
16 of how it would look because the lawsuit's going on.
17     A   Not so much -- not because of that, no.  He
18 was not selected because he's not qualified for what I
19 wanted.  He's not meeting the qualifications.  It's
20 got nothing to do with the lawsuits.  I don't even
21 know why we're even talking about that.
22     Q   How is he not qualified?
23     A   Well, he doesn't have all the attributes and
24 characteristics that I want in a supervisor.
25     Q   Again, so how is he not qualified?

39 (Pages 150 to 153)

Sheriff Vernon Betts

Page 154

1    A   Well, that's what I'm saying.  He doesn't
2  have all of the attributes that I want in a
3  supervisor.  So, therefore, it disqualifies him in my
4  mind.
5    Q   So does that mean that while you're sheriff
6  that John Castellano will never be promoted to
7  sergeant?
8    A   No, that's not true.  You know, he could
9  be -- you know, he might go to school, get educated, I
10 don't know.  Several -- a lot of different things.
11 I'm not saying he could never be promoted while I'm
12 sheriff, that's not right.
13   Q   So let me ask it this way:  In your mind,
14 what would John Castellano need to do to be considered
15 for promotion?
16   A   I'd have to give --
17       MS. LEWIS:  Sorry, Sheriff.  I'm just going
18 to object to the form.  It's an improper hypothetical.
19 Go ahead and answer.
20       THE WITNESS:  I have to give that some
21 thought, some thought about what else John needs to do
22 in order to get promoted under Vernon Betts.
23 BY MS. PETRUSKA:
24   Q   Let me know when you've had enough time to
25 think about it and then we'll get back to it.

Page 155

1    A   Do you want me to think about it right now?
2    Q   I'll give you a few minutes right now.  If
3  you can't think of anything, we'll move on and I'll
4  come back to it.
5    A   Let's move on.  We'll come back to it.
6    Q   Then let me go back to my previous question.
7  Where does he fail in his qualifications in your mind?
8  What does he not have that right now he can't be
9  promoted?
10   A   I haven't seen anything out of
11 John Castellano that brings him to the forefront of
12 being promoted.  He's not exceptional in any work.  He
13 hasn't done anything outstanding since I've been here.
14 He definitely doesn't communicate.  His communication
15 skill is very poor.  Extremely poor.  I've only spoken
16 to the -- the guy has only spoken to me once, I think,
17 in the four years that I've been here.  And that's a
18 major part, communication in being a supervisor in my
19 department.  You have to be able to relate to the
20 employees, communicate.  And if you don't even
21 communicate with the sheriff, how in the heck are you
22 going to communicate with the employees?
23       And so, like I said, I've not seen anything
24 above and beyond.  His work ethic has not stood out in
25 any kind of way.  And all of those people that I've

Page 156

1  promoted, Lynette, something has stood out with them
2  that caused me to promote them.  I have not seen
3  anything with Mr. Castellano that stands out that I
4  should put him on my -- top of my list.
5    Q   Have you ever said anything critical or
6  negative about John Castellano to your supervisory
7  staff?
8    A   Well, I don't think I've said anything
9  positive about him, I don't know.  John Castellano
10 doesn't come up in my conversations very often.
11   Q   And have you ever discussed firing
12 Castellano with your supervisory staff?
13   A   Not yet.
14   Q   When you say "not yet," it makes it sound
15 like it might be on the horizon.  Is it on the
16 horizon?
17   A   I don't know.
18       MS. LEWIS:  Objection.  Misstates testimony.
19 BY MS. PETRUSKA:
20   Q   Has John Castellano done anything that would
21 make you consider terminating him?
22       Did you not hear my question?
23   A   I heard it.
24   Q   Okay.  I wasn't sure since I wasn't getting
25 an answer, and I know we've had connectivity problems

Page 157

1  during the day.
2    A   I don't even think about Mr. Castellano.
3    Q   Well, don't you think about the performances
4  of all your deputies?
5    A   Yeah, when it's performance -- when I'm
6  evaluating them.  From day to day, I don't have a
7  specific deputy I come in and I zero in, let me think
8  about this particular guy.  Too much going on for
9  that.
10   Q   Okay.  But per your previous testimony, you
11 review all performance appraisals, so you know how
12 supervisors are rating their employees, correct?
13   A   Correct.
14   Q   And if I'm understanding your testimony,
15 and, obviously, I'm not speaking about the future, but
16 as we sit here right now, John Castellano hasn't done
17 anything related to his job that you're currently
18 considering firing him.
19   A   As it relates to his job?  No.
20   Q   Yes.
21   A   No.
22   Q   I want to ask those same questions --
23       MS. PETRUSKA:  If you don't object, Korey,
24 I'm just going to lump them together for speed.
25

40  (Pages 154 to 157)

Sheriff Vernon Betts

Page 158

1    BY MS. PETRUSKA:
2        Q   Have you talked to -- we've already asked
3    about your supervisory staff.  Have you talked to
4    anybody in the sheriff's department, so any employee,
5    about John's job performance, said anything negative
6    about him or critical of him or his performance or
7    talked to them about terminating his performance?
8        A   No.
9        Q   Why did you transfer John to the hospital
10   unit on January 12th of 2017?
11       A   Was it to the hospital unit or was it to,
12   like, the transportation unit?  So I think, and I'm
13   not sure, I may have this all mixed up, but we had --
14   are you there?
15       Q   Yeah.  I think I was trying to get -- let me
16   take this off.  I think I was trying to get an exhibit
17   ready to refresh your recollection, but go ahead.
18       A   We had made a personnel move where we -- I
19   think that's where we promoted Mr. Cannon, because we
20   had demoted Mr. Norise, so we had that open spot that
21   we needed to fill.  So I think that's why we moved
22   Mr. Castellano to that spot, which I think was an
23   increase in pay.
24       Q   Let me do this.  I'm going to see if this
25   refreshes your recollection.  I'm going to show you --

Page 159

1    is it up there?
2        A   Yeah, something's there.
3        Q   Are you seeing a document, and if I scroll
4    down, it says Depo 12?
5        A   Yes.
6        Q   This is a memo dated January 12th of 2017
7    that says effective Wednesday, January 18, Castellano
8    is going from the courts to the hospital unit and
9    Burklow is going from the hospital unit to the courts.
10       A   Yeah, I see that.
11       Q   And that would be your signature at the
12   bottom, correct?
13       A   That's correct.
14       Q   And so why did you make that transfer?
15       A   Burklow is going from the hospital unit to
16   Carnahan extra board -- I can't remember exactly what
17   was going on, but I know Burklow didn't end up moving,
18   but we needed somebody in that -- and that wasn't -- I
19   don't know if he actually went to the hospital unit.
20   But I do remember this.  I do remember him being
21   transferred.
22       Q   Did you transfer him to nights to retaliate
23   against him?
24       A   For what?
25       Q   I'm just asking.  Did you transfer him to

Page 160

1    nights to retaliate against him?
2        A   He hadn't done anything for me to have to
3    retaliate against.
4        Q   So the answer would be no, you didn't do it
5    to retaliate against him.
6        A   Right.  No.
7        Q   You testified a moment ago that -- let me
8    get this off.
9            (Discussion off the record.)
10   BY MS. PETRUSKA:
11       Q   Sheriff, I'm showing you what's been marked
12   as Plaintiff's Exhibit 13.  It's an email -- or a
13   promotion/demotion list dated April 19, 2017, which is
14   what you talked about before.  Castellano is
15   transferred to the jail crew and Cannon is promoted to
16   sergeant, correct?
17       A   Correct.
18       Q   Let me ask you first, why did Norise get
19   demoted?
20       A   Because he had been written up twice by his
21   supervisor and continued to just violate rules and do
22   stuff that he didn't have no business doing.  I would
23   have to go back and look up the specific write-ups,
24   but I can remember that he was written up twice by his
25   supervisor.  And the first time he was written up I

Page 161

1    had given him a warning that if he continued, that he
2    would lose his rank.
3        Q   But you don't remember why he was written
4    up?
5        A   No, I don't remember specifically why the
6    lieutenant steward wrote him up, but I know he was
7    wrote up twice before he lost his rank.
8        Q   Bottom line, though, it's a disciplinary
9    demotion, involuntary, he doesn't request it.
10       A   Right.
11       Q   And is April of 2017, then, with this
12   demotion, it sounds like that's the first time you
13   have a sergeant's opening, correct?
14       A   Correct.
15       Q   Why do you transfer Castellano to the jail
16   crew on April 19th?
17       A   Because promoting Antoine Cannon now to
18   sergeant gives me a vacancy, and I needed somebody to
19   help Antoine Cannon on that crew.
20       Q   So his moving up the rank creates an opening
21   below him.  I've got you now.
22       A   Right.
23       Q   Again, I'm going to try to do this in a
24   broad stroke.  It's my understanding that with the
25   exception of maybe some roll calls that you don't

41  (Pages 158 to 161)

Sheriff Vernon Betts

## Page 162

1  remember the specific dates, it was not your policy or
2  practice to say I've got this opening right now,
3  please apply by this date if you're interested.
4      A   Right.
5      Q   So there's no announcement related to what
6  I'm going to call the April sergeant's opening.  No
7  specific announcement, there might have been a verbal
8  announcement.
9      A   And you're correct.
10     Q   Do you know, according to my documentation,
11 it looks like you do eight or nine promotions to
12 sergeant, which results in the promotion of the 12
13 people.  So there's a couple of times that you're
14 promoting two people on the same day, okay?  So in
15 terms of those eight or nine promotions, do you know
16 how many times you announced openings at the roll call
17 meetings?
18     A   I do not.
19     Q   So if I'm understanding your testimony, you
20 had a sergeant's opening in the transportation unit --
21     A   Yes.
22     Q   -- because of Norise's demotion.
23     A   Yes.
24     Q   Did anybody apply for this particular
25 position?

## Page 163

1      A   No.
2      Q   Who did you consider for this particular
3  promotion?
4      A   Mr. Cannon.
5      Q   Is he the only one you considered?
6      A   Yes.  There's a reason for that.
7      Q   We're going to get to that.  Did any
8  supervisors recommend Cannon or anybody else for this
9  particular promotion?
10     A   No.
11     Q   You said you considered Castellano for
12 certain promotions, so did you consider Castellano for
13 this particular promotion?
14     A   No.  And when I say I considered, that's
15 been after the fact, after all of this here.  Things
16 that have gone on the last several months,
17 Mr. Castellano popped in my head.  But, no, at the
18 time that all this is going on, no, Mr. Castellano was
19 not considered at this time.
20     Q   Were you aware that Castellano had expressed
21 interest in open sergeant positions before Murphy
22 retired?
23     A   No.
24     Q   Did somebody forward any kind of
25 communication along that line to you?

## Page 164

1      A   Only after this all of this stuff kicked
2  off.
3      Q   You learned about that related to the
4  lawsuits is what I'm understanding, correct?
5      A   Yes.
6      Q   Told you I wouldn't ask you that whole set
7  of questions about review because we covered it all,
8  so I'm not going to do it.
9          So why did you promote Cannon to this
10 particular sergeant's promotion?
11     A   Because he was working hand in hand with
12 Norise Chapelle, the two of them had been working
13 together.  He knew the job, knew the responsibility.
14 He was carrying out the responsibility, from what I
15 could see and understand, in a very excellent fashion.
16 So all I simply considered myself doing was removing
17 Chapelle from that position and moving Antoine Cannon
18 up.  That's all I really considered myself doing, is
19 moving him up.
20         He was already doing what they did at night.
21 The two of them worked together, and so there was no
22 reason to go do a search for somebody to put in that
23 spot when you've already got somebody working right
24 there in that spot.  Know the job, got the education,
25 and had been there, promote him.  So that's what I

## Page 165

1  did.
2      Q   So it was your understanding that he was
3  doing a good job in the position?
4      A   He was doing a good job.  I'm observing all
5  of that.
6      Q   If he was evaluated after you took office
7  and before he was promoted, you would have seen and
8  reviewed his evaluation, correct?
9      A   Correct.
10     Q   Can you see what's been marked as Depo
11 Exhibit 16 at this point?
12     A   Yes, ma'am.
13     Q   And that is Cannon's performance evaluation
14 at the jail crew by Sergeant Norise, correct?
15     A   Yes.
16     Q   And it's dated January 24th of 2017,
17 correct?
18     A   Yes, ma'am.
19     Q   And you would have seen that then because
20 it's in his personnel file, correct?
21     A   I don't know if I have that in my file, and
22 I said a few minutes ago that I would have seen it.  I
23 would have seen it if it was given to me, and I don't
24 believe this was ever given to me.
25     Q   Let me ask you first.  It says:  Rating

42  (Pages 162 to 165)

Sheriff Vernon Betts

Page 166

1  commander should consult Procedural Order 99-001 and
2  99-002 regarding the preparation of the performance
3  appraisal.
4       What are those?
5       A  I don't have a clue.
6       Q  You said before that one of the things that
7  was important to you in terms of promoting somebody is
8  that they're there and do the job, correct?
9       A  Correct.
10      Q  Do you see here that Cannon needed
11 improvement in terms of attendance in January of 2017?
12      A  I see that.
13      Q  And Norise rated him as needing improvement
14 in his knowledge of the position in January of 2017?
15      A  I see that.
16      Q  And that he needed improvement in complying
17 with the rules, regulations and authority in
18 January 2017, correct?
19      A  Correct.  I see all of that.
20      Q  As well as supervisory performance.
21      A  Right.
22      Q  So you said that your practice is to talk to
23 the supervisor about -- the immediate supervisor about
24 somebody you're thinking about promoting.  Did you
25 talk to Norise about Cannon?

Page 167

1       A  I did not.
2       Q  Why not?
3       A  Probably because Norise is Norise, and just
4  like I'm looking at this evaluation and I bet this
5  evaluation is probably -- I bet Cannon would have
6  total objection.  This is the first time I've seen
7  this, and I'm sure Cannon would object to this
8  evaluation.  And I'm saying that this evaluation is
9  probably the way that it is not so much because of the
10 employee merits this, but because of the supervisor
11 grading him, and that's one reason why that supervisor
12 is no longer the supervisor.
13      Q  But, I mean, again, you're the sheriff, so
14 if you disagreed with this evaluation, you could have
15 overwritten it in January of 2017, correct?
16      A  What I'm saying to you, Lynette, is I never
17 got this evaluation.
18      Q  Anything else that factored into your
19 decision to promote Cannon to the sergeant's position
20 in transportation?
21      A  No.
22      Q  And again, if I'm understanding your
23 previous testimony, you never considered anybody else
24 for the first promotion other than Cannon, so you
25 didn't compare him to other candidates, correct?

Page 168

1       A  Correct.
2       Q  So I'm not going to ask you how you compared
3  them to other candidates, okay?
4       I know I asked you to describe your process
5  for promotions earlier and you outlined that
6  generally.  But in your answer to interrogatory 15 in
7  the state lawsuit, you said that you promote someone
8  on merit based on your personal knowledge, okay?
9       A  Okay.
10      Q  I can show you that interrogatory answer if
11 you want, but to save time, you can accept my
12 representation.
13      A  I go along with what you're saying.
14      Q  What I want to understand is when you say
15 you promote somebody based on merit, what does merit
16 mean to you?
17      A  Merit means to me, and we have said this
18 earlier in our conversation, merit means to me that
19 that person has conducted himself in a professional
20 way on the job, carried out the responsibilities of
21 the job, and conducts himself off the job, but
22 basically on the job conducts himself, carries out the
23 responsibility, communicates with his supervisor and
24 his employer, has done those things that we asked him
25 to do.  And when I say "those things," the

Page 169

1  responsibilities of his job based on as I communicate
2  with his supervisors.  Do I get any reflection on this
3  guy not doing what he's supposed to do?  And so the
4  reports that I get from supervision.
5       So when I say merit, this person has done
6  basically those things that I think are things that
7  would qualify him for being promoted or whatever.
8       Q  And if I'm understanding your testimony,
9  then, so merit is basically what -- when we were
10 talking about qualities before, merit is the quality
11 you identified before.
12      A  Sure.
13      Q  I've got you now.  When you say based on
14 your personal knowledge, how do you obtain personal
15 knowledge of these folks that you're considering for
16 promotion?
17      A  How do I obtain personal -- when I say I'm
18 promoting these people based on personal knowledge, my
19 knowledge of the skills that it takes to carry
20 yourself on a job.  And so I obtain that knowledge by
21 interviewing, talking to -- as we said, talking to
22 their supervisor, seeing what the person had done.  A
23 lot of these jobs, I've actually gone with the
24 employees to actually see what's done, know what's
25 going on.  I'm out on the floor, I'm not in the office

43  (Pages 166 to 169)

Sheriff Vernon Betts

Page 170

1  24/7 and all that kind of stuff, but I'm out on the
2  floor, watching and seeing. And so from my
3  observation, and then, like I said, from communicating
4  with the other supervisors, maybe not even his own
5  immediate supervisor.
6       Because people are going to make reports.
7  Maybe not technical or direct reports, but just by
8  verbally saying, hey, you know so on, you know that
9  Cannon did this, Cannon did that. So you take all of
10 that kind of information. To me, that's what I do,
11 and then I make my determinations as to whether or not
12 I want to promote a person or not.
13     Q   Now, you talked about doing interviewing.
14 What kind of interviewing do you do?
15     A   When we talk about interviewing, are we
16 talking about new employees or --
17     Q   You said that you interview the employee and
18 you talk to the supervisor.
19     A   Okay.
20     Q   You've already explained what you do in
21 terms of talking to the supervisor, so what do you do
22 in terms of interviewing when you're considering a
23 promotion?
24     A   I'll call that person into my office, or
25 maybe not. Maybe I'll just see him in the hallway and

Page 171

1  ask him, you know, what do you think you're going to
2  be doing as a supervisor. And I may -- and that's
3  kind of a rhetorical question, but let me tell you
4  what you're going to be doing. You're going to be
5  doing this, this and this. Can you adhere to that
6  responsibility?
7       Usually when I say I'm interviewing a
8  candidate, I'll talk to that person and kind of let
9  him know this ain't -- when I promote you, if you get
10 promoted, it ain't going to be no walk in the park.
11 We're talking about some responsibilities here.
12     And that's why I've had a few people say,
13 hey, no, I don't want to be a supervisor because I'm
14 going to have to come to work at times where I don't
15 want -- I don't want my family to be interrupted, my
16 family time to be interrupted, and that's the kind of
17 stuff when I say interview, I'll ask people about
18 those kinds of things.
19     We talk about pay. I've had one person to
20 turn down becoming a supervisor because the pay wasn't
21 what he thought it was going to be. But you talk
22 about pay, you talk about responsibility, you talk
23 about them having to work times. Right now with all
24 the stuff that's going on, I may get a call in the
25 next five minutes, we're going to have a protest

Page 172

1  downtown, and we have to -- we do the staging for the
2  police. What I mean by that, we provide the vans and
3  the vehicles for moving. If I call you today, I need
4  you to be on that crew. I need you to come to work.
5  I don't need you to tell me you're getting ready to
6  take the kids to the park to play ball.
7       So, Lynette, in my interview, we talk about
8  just in general a gamut of different things. And
9  that's how I kind of get an idea as to whether or not
10 I want that person to work for me as a supervisor, if
11 I'm going to promote that person.
12     Q   Let me ask you this: I know in the Cannon
13 promotion you only considered him, so that's how you
14 talked to him. Some of these other promotions when
15 you were considering several people as opposed to a
16 specific individual, do you talk to several people
17 about those things?
18     A   I'll talk to each person about those same
19 things.
20     Q   So, right. I don't know -- you know, let me
21 just randomly pick a promotion, and I'm not saying it
22 happened this time, but there's another promotion in
23 May of '17. So if you're considering three people for
24 that slot, you would bring each of those three people
25 in and have that kind of a conversation with them?

Page 173

1  A   Yes.
2  Q   It's not just who you're considering to be
3  your top candidate.
4  A   Yes. And like I said, when you say bring
5  them in, that may not have necessarily been a formal
6  process where I say, hey, I want you to come, I also
7  want to talk to you. I might have met that person in
8  the hallway somewhere and we just stop, standing off
9  to the side, talk about, you know.
10 Q   I understand. So it might not be a formal
11 interview. If they work in a certain area, you might
12 just pull them aside and talk to them in their area.
13 A   Right.
14 Q   My understanding is Cannon had been working
15 with the sheriff's department about three years when
16 you promoted him; is that correct?
17 A   I think so.
18 Q   Do you know what units he had worked in in
19 the sheriff's department when he was promoted to
20 sergeant?
21 A   I'm not sure. I kind of think he'd been in
22 transportation all the time.
23 Q   Maybe I didn't look at them closely enough.
24 Is there a documentation on the forms that say what
25 unit they're assigned to?

44  (Pages 170 to 173)

Sheriff Vernon Betts

---

Page 174

1    A  Yes.

2    Q  I see those employee forms.

3    A  Yes.

4    Q  On the form it actually says what unit

5 you're assigned to?

6    A  Yes.

7    Q  But you don't know if he had worked in

8 transportation the whole three years because you

9 weren't there for a good chunk of that.

10    A  Right.  I don't know exactly where he

11 worked.

12    Q  So with respect to Cannon, if I'm

13 understanding your testimony, you don't have a -- you

14 don't have a supervising sergeant you can talk to

15 because it's Norise, correct?

16    A  Correct.

17    Q  So do you talk to anybody else about Cannon

18 to get a sense of him other than your own perspective?

19    A  I'm sure that I probably talked to

20 Lester Stewart, who both Norise and Cannon reported

21 to.  He was the lieutenant.  I'm sure that in passing

22 the other supervisors in the office may have given me

23 their take.  If Cannon had been a terrible employee,

24 I'm sure Tim or Tammy or the major would have said,

25 no, wait a minute, that's who you're promoting?  It's

---

Page 175

1 terrible.  So we didn't get that reflection from

2 anybody.

3    Q  When you say "the major," which major would

4 it be if it's in transportation?

5    A  It would have been Major Lammert.

6    Q  So you talked to some individuals and it was

7 your personal observations, correct?

8    A  Correct.

9    Q  Anything else that factored in to the

10 decision to promote Cannon?

11    A  Well, his educational background really

12 impressed me.

13    Q  Anything else?

14    A  His character and demeanor.  Whenever I

15 would see him, it always seemed to be about the

16 business.  Pleasant.  Pleasant attitude.

17    Q  You stressed a couple of times communication

18 skills.  What did you know about his communication

19 skills, him being Cannon?

20    A  Well, I know he communicates.  He

21 communicated with me on a regular basis whenever I

22 would see him.  I'm a former schoolteacher, so I know

23 when you can put together a sentence.  His

24 communication skills were decent.  And always cordial.

25 And seemed to, from my observation, get along with all

---

Page 176

1 the other people that he had to interact with.

2    Q  When you promoted Cannon, did you know he

3 had received a written reprimand for professionalism

4 and a lack of common courtesy in his daily

5 performance?

6    A  I did not know that.

7    MS. LEWIS:  You did or did not?  I'm sorry.

8    THE WITNESS:  I did not know that.

9 BY MS. PETRUSKA:

10    Q  Would that have had any impact on your

11 decision?

12    A  Yes, it would have.

13    Q  If it was in his personnel file, why didn't

14 you know that?

15    A  Because it wasn't in my personnel file of

16 him.

17    Q  Did you ask anybody if he had any kind of

18 disciplinary history?

19    A  I don't think I did.

20    Q  I just want to be clear.  I want to see if

21 this refreshes your recollection in any way.  I'm

22 showing you now what's previously been marked as

23 Deposition Exhibit 17.  It's a memo dated December 11,

24 2014 produced to us by the City.  And I do understand

25 you are not on the sheriff's department at this point.

---

Page 177

1 Are you telling me that this is the first time you're

2 seeing this particular memo?

3    A  I am.

4    Q  And as we sit here today, you don't know the

5 specific facts set around that particular write-up; is

6 that correct?

7    A  That's correct.

8    Q  What conduct he engaged in that was found to

9 be uncourteous or lacked professionalism?

10    A  I have no idea.

11    Q  And my understanding is Cannon is no longer

12 with the sheriff's department; is that correct?

13    A  That's correct.

14    Q  Did he resign or was he fired?

15    A  He was fired.

16    Q  Why was he fired?

17    A  Because he went through a legal situation

18 that ended up causing him to have a felony, and you

19 can't work for the sheriff's department if you have a

20 felony on your record.

21    Q  He was actually charged with domestic

22 assault, correct?

23    A  Correct.

24    Q  Between the time he was charged and

25 convicted, what was his status with the sheriff's

---

45  (Pages 174 to 177)

Sheriff Vernon Betts

---

Page 178

```
 1    department?
 2        A   I believe he was suspended.
 3        Q   With or without pay?
 4        A   I think without pay.
 5        Q   So when he was charged with a crime, he was
 6    suspended without pay, and then when he was convicted,
 7    he was fired; is that how it works?
 8        A   That's how it works, yes.
 9        Q   Did you give him the opportunity to resign
10    in lieu of termination?
11        A   No, I didn't.  That's the process.  When
12    you're found guilty, then you're automatically
13    terminated.
14        Q   It's just an automatic, right?
15        A   Yes, yes.
16        Q   And you would agree, my understanding is the
17    specifics of that particular domestic assault was that
18    he handcuffed his mother-in-law and then forced her to
19    the ground and on a couch to prevent her from leaving
20    his apartment, correct?
21            MS. LEWIS:  Objection.  Relevance.
22            THE WITNESS:  I understand that.
23    BY MS. PETRUSKA:
24        Q   That's your understanding as well?
25        A   Yes.
```

Page 179

```
 1        Q   And you would agree that such conduct
 2    doesn't reflect professionalism on or off duty,
 3    correct?
 4        A   I agree.
 5        Q   And it doesn't reflect well on your
 6    department; is that true?
 7        A   I agree.
 8        Q   So I know that you have the automatic
 9    termination with a felony conviction, but if he hadn't
10    been convicted, would you have been looking at this as
11    conduct unbecoming and warranting its own disciplinary
12    action?
13        A   Without a doubt.  Yes.
14        Q   I'm going to move to the next promotion.  So
15    my understanding is the next promotions happen in May
16    of 2017, and they involve Timothy Haill and
17    Felicia Davis.
18        A   I guess, yes.
19        Q   Tell me first how did two sergeants'
20    positions open in May of 2017?
21        A   I think we said earlier the -- John Tower
22    was the name of the person I couldn't think of
23    earlier.  John Tower -- well, that was the lieutenant
24    spot.  Felicia was promoted to sergeant because she
25    had been the acting sergeant all the time, and that's
```

Page 180

```
 1    a position that I -- like I said earlier, I don't care
 2    nothing about what is an acting sergeant.  Either
 3    you're doing it or you're not.  And so she was given
 4    that position as sergeant, not acting sergeant.
 5        Q   She did mention -- Felicia Davis had been
 6    acting sergeant.  Did you increase your sergeant
 7    number at that time to make her a sergeant?
 8        A   No, I didn't increase the numbers to make
 9    her a sergeant because there was a sergeant spot
10    already open and she was the acting sergeant.
11            But that's the way the old regime used to
12    work.  They would have an opening, but then wouldn't
13    give you the position because they would make you
14    acting and you would work in the position and not get
15    the pay and all that stuff.  So she was -- there
16    wasn't an extra position made for her to become
17    sergeant.
18        Q   So are you saying that that sergeant spot
19    had been open since you became sheriff?
20        A   I believe so, yes.  I believe so.
21        Q   Why did you wait until May of 2017 to fill
22    it?
23        A   May of 2017?
24        Q   Yes.
25        A   I took office in January, February, March,
```

Page 181

```
 1    April, May.  Five months later?
 2        Q   Yes.
 3        A   I had so much going on, I guess that's when
 4    I got around to it.
 5        Q   And I'm assuming with that position as well,
 6    you didn't consider anybody other than Felicia Davis;
 7    is that correct?
 8        A   That's correct.
 9        Q   So Sergeant Haill gets promoted in the same
10    time frame, May of 2017, I think actually on the exact
11    same date.  What sergeant position was open for him to
12    be promoted into?
13        A   I don't know if I had a sergeant position
14    open.  I would have to ask Tammy Hogan did I have a
15    position.  But all I know is that I promoted Tim Haill
16    at that -- I may have had -- must have had a position
17    open.  And even if I didn't, I promoted Tim Haill
18    because of his work ethic and all that he had been
19    doing.
20        Q   Let me make sure I'm understanding again.
21    Felicia Davis gets promoted because there's an open
22    slot that had never been filled.  She's acting and you
23    make her permanent as opposed to acting, so there's an
24    open position there that keeps your sergeants
25    complement the same, correct?
```

46 (Pages 178 to 181)

Sheriff Vernon Betts

Page 182

1     A   Correct.
2     Q   With respect to Haill, you don't know if you
3  had an open position.  If you don't have an open
4  position, you have to create a new one, correct?
5     A   Correct.
6     Q   Do you know if you created a new position
7  for Haill?
8     A   I don't remember whether I created a new
9  position for him or not.
10    Q   A sergeant typically supervises other
11 people, correct?
12    A   Correct.
13    Q   Who does Haill supervise?
14    A   He doesn't supervise anybody directly, but
15 he's over HR in that position, and because he's over
16 HR, I guess indirectly, everybody that works for the
17 sheriff's department would -- I'll tell you how we
18 work it.  Everybody that works for the sheriff's
19 department will take some kind of instruction from the
20 HR guy.
21    Q   Did you consider anybody but Haill for that
22 particular promotion?
23    A   No, I did not.
24    Q   So you decide he's doing a good job and he
25 should be promoted; is that correct?

Page 183

1     A   That's correct.
2     Q   And he is promoted at that point and Felicia
3  is promoted.
4         Anything else that we haven't covered that
5  factors into the decision to promote?  Let's go first
6  with Davis.
7     Q   Anything else factor?
8     Q   Yes.
9     A   Other than the young lady has years and
10 years of experience and, like I said, I know she'd
11 been acting sergeant for a long time, I believe, so
12 nothing other than what we've already said.
13    Q   And then Haill was because he was doing a
14 good job, if I'm understanding correctly.
15    A   That's primarily -- yes, that's primarily,
16 yes.
17    Q   Did anybody recommend Haill for promotion to
18 you?
19    A   Did anybody recommend Tim Haill?
20    Q   Did anybody suggest that he should be
21 promoted?
22    A   No, but when I talked to my chief of
23 staff -- I may have talked to my chief of staff about
24 it and I may have even talked to Tammy Hogan about it,
25 and I can believe that there was a definitely yes.

Page 184

1  I'm almost sure I talked to Steve Roberts about
2  promoting Tim Haill.
3     Q   Do you remember what anybody told you about
4  Haill in terms of promoting him?
5     A   No, nobody needed to tell me anything.  I'm
6  working side by side with the guy every day.  I know
7  exactly what I see, and he's doing exactly what I
8  want.
9     Q   Let me ask you this.  And, again, I can pull
10 it up if you want.  But in your second answers to
11 interrogatories in the State case, interrogatory
12 number four, you said that Haill was specifically
13 recommended by a colleague.  What I'm trying to
14 understand is who is that colleague?
15    A   So I think we've got to make sure we get
16 this straight.  The colleague I mentioned earlier was
17 Wayne Brown.
18    Q   So that's Brown.
19    A   Wayne Brown is a retired sheriff deputy.
20 And he wanted to make sure that I kept him in that
21 spot.  So he didn't even work for the sheriff's
22 department, but he was going to bat for Tim.  So Tim
23 stayed in that spot.  When I got there to be sheriff,
24 he stayed in that spot as the HR guy, but -- not with
25 my total support, but as we went through those first

Page 185

1  several months and, I mean, the stuff that's hitting
2  me left and right, and Tim is doing everything I asked
3  him to do, he's doing it the correct way.  I mean,
4  everything I wanted in an HR person.  So boom, here we
5  are.
6     Q   And I do understand that you said Brown
7  previously recommended that you let him stay, but did
8  he also recommend that you promote him?
9     A   No, I don't think Wayne -- he might have.
10 But I don't recall him specifically saying, Vernon,
11 you ought to promote Tim Haill.  I don't recall that.
12    Q   How is Wayne Brown a colleague?
13    A   Wayne Brown is a former St. Louis sheriff
14 deputy, and when I got hired as a sheriff deputy,
15 Wayne Brown was one of the deputies that trained me,
16 and then he later retired.
17    Q   So the next promotion happens on August 7 of
18 2017.  Does that sound right?
19    A   I guess, yes, ma'am.
20    Q   And that's Mr. McGinnist?
21    A   Yes, ma'am.
22    Q   Let me ask you this.  I pulled up before
23 Exhibit 13 that showed that Cannon had been promoted
24 and Sergeant, was it Norise had been demoted?
25    A   Yes.

Sheriff Vernon Betts

Page 186

1      Q   Are those the kinds of announcements that go
2   into everybody's mailbox?
3      A   No.
4      Q   When you make a promotion or demotion
5   decision, who gets that particular document?
6      A   HR would get that and then probably --
7   definitely the majors would get that information and
8   whoever that person would be reporting to.
9      Q   So it goes to HR, the majors and whoever the
10  new supervisor is?
11     A   Yes, probably.
12     Q   So how is it that a sergeant's position was
13  open in August of '17?
14     A   I do not recall. And I would have to talk
15  to Tammy Hogan to see what happened to cause us to
16  have a sergeant's position open.
17     Q   Do you know in what unit the sergeant's
18  division was open?
19     A   Courts.
20     Q   Did anybody in particular apply for that
21  particular promotion?
22     A   I am not sure about that. But by that time,
23  I'm sure that words have circulated around that we
24  might have had -- and it all depends how that came
25  about. If Tammy Hogan can tell us that we had a

Page 187

1   vacant position, then everybody would know that, and
2   so that's probably how that transpired.
3      Q   Let me make sure. So in terms of the first
4   three promotions, which would have been Cannon, Davis
5   and Haill, you've got very specific people in mind
6   when you're doing all of that, and so you don't really
7   need to consider a broader pool, if I'm understanding
8   your previous testimony, correct?
9      A   You are right.
10     Q   By the time we get to August, are you
11  considering a broader pool, or do you already have
12  McGinnist in mind?
13     A   No. Probably the time we got to August, I'm
14  considering a broader pool. We probably had enough --
15  with the promotions of Cannon, with the promotions of
16  Felicia and -- who's the other person -- Tim Haill,
17  Tim Haill, I am sure that those promotions created
18  some kind of hubbub, some kind of conversation
19  throughout the shop. Now other people want
20  promotions. I'm pretty sure of that.
21     Q   So by August you were casting a wider net in
22  terms of who you were considering for promotions.
23     A   Yes.
24     Q   Who did you consider for the court sergeant
25  promotion that occurred in August of 2017?

Page 188

1      A   You know, I would have to go through my
2   drawer. I think I had several letters by then, and my
3   mind is kind of -- I know I had some other people
4   because I know I had people who had been there for a
5   while.
6      Q   Actually, let's do this, then, Sheriff,
7   because it should be something you already have in
8   front of you because it was longer and I sent it to
9   Korey. If you could find Exhibit 26.
10     A   I've got it.
11     Q   That would be what was produced to us as the
12  letters of people expressing interest in a promotion.
13     A   Right. Okay. All of these are letters?
14     Q   Yes. My understanding is those are all of
15  the letters you received about people that were
16  interested in promotions.
17         MS. PETRUSKA: Korey, I'm going to defer to
18  you. From the time he became sheriff to at least to
19  the time of whenever they were produced, right?
20         MS. LEWIS: I believe so.
21  BY MS. PETRUSKA:
22     Q   I know you're not necessarily accounting for
23  the fact that it's a full and complete list, but
24  that's what it is, it's every letter from January of
25  '17 to whatever the production date was, correct?

Page 189

1      A   Right.
2      Q   So I'm going to let you take your time to
3   look through Exhibit 26 and see if that refreshes your
4   recollection as to anybody else that you might have
5   considered for the August promotion.
6      A   Well, anybody that maybe gave me a letter
7   before that. And I don't know, do we have these in
8   some kind of chronological order? If they gave me a
9   letter before that promotion date, then they were
10  considered.
11     Q   There's a number that are undated. So if
12  they're undated, I'm assuming you don't know when you
13  got them, correct?
14     A   That's correct.
15     Q   There's not like some public entity, they'll
16  put a receipt stamp on it. Your office doesn't do a
17  receipt stamp, right?
18     A   No, ma'am.
19     Q   So the only ones that are dated before that
20  promotion would be Paris Mosely and Wayne Honer?
21     A   Wayne Honer, right.
22     Q   Must have dropped an R in that one.
23     A   Wayne Honer.
24     Q   So did you consider Paris Mosely or
25  Wayne Honer for that particular promotion?

48  (Pages 186 to 189)

Sheriff Vernon Betts

Page 190

1    A   I certainly did.
2    Q   You considered both of them?
3    A   Yes.
4    Q   And then there's a number that are undated,
5  but they have names attached to them.  Did you
6  consider Adam Burrow?
7    A   Yes.  Right off the bat, yes.
8    Q   Chapelle Norise?
9    A   Chapelle, I just looked at that.  Had I not
10  just taken his stripes from him?  Chapelle Norise.  I
11  just saw that.  Yes, yes.  On March the 17th.  I'm a
12  little confused.  Is this before I've taken his
13  stripes from him, January, February, March?
14    Q   Again, Sheriff, the only thing I can tell
15  you is a letter from him was produced that's undated
16  that asks for him to be considered for promotion to
17  sergeant, and I'm asking you if you considered him for
18  the August of 2017 promotion.
19    A   When we say -- in his case, when we say
20  consider, I don't know how deeply I considered, him
21  having already had stripes taken from him.
22    Q   Right.  What I'm asking, Sheriff, besides
23  McGinnist, who we know got the promotion, who else did
24  you seriously consider for this promotion?
25    A   Well, I can tell you who I seriously

Page 191

1  considered.  I did seriously consider Paris Mosely and
2  Wayne Honer.  Those were serious considerations.
3    Q   Did you consider John Castellano?
4    A   I don't think I even know he wanted to be
5  promoted at that point.
6    Q   When you promoted Davis and Haill and
7  Cannon, they hadn't submitted letters to you, correct?
8    A   They had.
9    Q   They had?
10    A   Well, I don't know.  I don't remember
11  whether they had or not.  Again, those people were
12  promoted because there was a situation -- like I said,
13  in Felicia's case, she was already working as the
14  sergeant, and I don't believe in acting sergeants, so
15  we made her a sergeant.
16      In Tim Haill's case, he was there doing that
17  job, and he was doing exactly what I wanted him to do,
18  displayed all of the characteristics and everything,
19  and so that's how he got promoted.
20      So it ain't like I even was considering
21  anybody else for those promotions.  Even with these
22  letters from Paris Mosely, and I don't know the
23  timing, again, on that, or the timing with
24  Wayne Honer, but I didn't consider neither one of them
25  people for those particular positions because those

Page 192

1  are like people already in the position doing the job.
2      Are you following me, Lynette?
3    Q   I understand what you're saying, yes.
4    A   So now with the Danny McGinnist, and I've
5  got to again see when did that come up and did I
6  actually have a position.  There might have been folks
7  by that time requesting promotions, and if the case
8  was that I had an open position, I would have been
9  considering other people.
10      Because I know about Wayne Honer and
11  Paris Moseley, both of those folks have in passing
12  said something to me.  I think, of course, they gave
13  me letters.
14      So that's the same way you asked me if
15  Castellano was considered.  Castellano never said
16  anything to me about promotion, so what am I supposed
17  to -- read his mind?  I had no idea the guy was
18  interested in any kind of promotion.
19    Q   But, again, you testified previously that
20  certain people are promoted because you see them and
21  you think they're doing a good job and they should be
22  promoted.  You're not saying that everybody you
23  promoted has asked to be promoted, correct?
24    A   Correct.
25    Q   So you can promote people because they give

Page 193

1  you a letter and they want to be considered, or you
2  promote people because you think they're a good person
3  for the job and you promote them, correct?
4    A   That's correct.
5    Q   Regardless of whether they've given you a
6  letter or not.
7    A   That's correct.
8    Q   Do you know how many people you've promoted
9  that have actually given you a letter to be
10  considered?
11    A   I think just about everybody except for
12  maybe one or two.  I don't know.
13    Q   So with the exception of maybe Davis and
14  Haill, you -- all the other people you've considered
15  for promotion is because they've said they were
16  interested, correct?
17    A   Correct.
18    Q   When I say they've told you that they're
19  interested, that's by letter because you want them to
20  let you know by letter because you want to have that
21  summary of their qualifications, et cetera.
22    A   Yes.
23    Q   Let me ask you.  You say you considered
24  Mosely and Honer for the promotion.  Were they part --
25  what I'm really interested in, was there a small group

49  (Pages 190 to 193)

Sheriff Vernon Betts

Page 198

1  him, I think he had been some kind of officer in other
2  aspects, in other places where he had worked.  I got
3  that information.
4      Q    Do you know where you got that information?
5      A    From him.
6      Q    Was that part of when you interviewed him,
7  whether it was in your office or somewhere else?
8      A    Sure.  Yeah, that was -- could have been.
9      Q    Has McGinnist incurred any discipline since
10 he was promoted to sergeant?
11     A    Yes, ma'am.
12     Q    And what has he been disciplined for?
13     A    I guess recently, just the other day, he
14 lost his stripes.
15     Q    So he's been demoted?
16     A    He's been demoted as of this past Friday.
17 He's been in my office a couple of times because he
18 had run-ins with his superiors.  There's been
19 discrepancies as to how things should run and who said
20 what and what was done that was right or wrong, and so
21 he's been in the office for that.
22     I think I suspended him before, too, I have
23 to look and see.  But just recently, he's been
24 suspended.  He was suspended last week and he lost his
25 stripes.  But he's had two incidents before this

Page 199

1  recent incident.
2      Q    Were you aware that in 2010 he was suspended
3  for two weeks and made to go to anger management
4  counseling?
5      A    In 2010?
6      Q    Because of a confrontation he had had at
7  Barnes Hospital where he threatened to blow somebody's
8  brains out?
9      A    I was not aware of that.
10     Q    Are you aware that that is in his
11 disciplinary file?
12         MS. LEWIS:  Objection.  Assumes facts not in
13 evidence.
14         THE WITNESS:  Do I have to answer that?
15         MS. LEWIS:  Yes, sir, if you know.
16         THE WITNESS:  I was not aware of that being
17 in his disciplinary file because, as I've said before,
18 I don't go perusing through the files when I'm making
19 these kind of decisions.
20     Q    Isn't that something you would want to know
21 before you promoted somebody to sergeant if in the
22 past they've gotten involved in a verbal confrontation
23 and threatened to blow somebody's brains out?
24     A    I would want to know that, yes.
25     Q    If it's in the personnel file in your

Page 200

1  office, there's nothing that keeps you from looking at
2  any file in your office, correct?
3      A    That's correct.
4      Q    So my question is, and I will represent that
5  the two-week suspension, anger management counseling
6  and two years of probation related to an incident at
7  Barnes Hospital is, in fact, part of the file that was
8  produced to us yesterday related to discipline on
9  McGinnist.  And so wouldn't you want to be reading
10 these files, these personnel files to make sure you
11 don't have these kinds of problems before you promote
12 somebody?
13         MS. LEWIS:  Objection.
14         THE WITNESS:  I guess from now on I will.
15         MS. PETRUSKA:  I'm sorry, Korey?
16         MS. LEWIS:  Objection.  Argumentative.
17         Go ahead, Vernon.
18 BY MS. PETRUSKA:
19     Q    I'm sorry, your answer was I guess from
20 now --
21     A    I'm pretty sure from now on I will.
22     Q    Would it concern you if a deputy gave one
23 account of an event that was contradicted by multiple
24 witnesses, would you be concerned about that deputy's
25 honesty?

Page 201

1      A    Most definitely, yes.
2      Q    I'm assuming because you hadn't seen the
3  McGinnist file, you weren't aware that he gave a
4  statement that was contradicted by numerous witnesses.
5      A    You're correct in that.
6      Q    If I'm understanding your testimony
7  correctly, McGinnist, who was promoted in August of
8  '17, wasn't one of the best picks you made because
9  you've since had to demote him; is that correct?
10         MS. LEWIS:  Objection.  Argumentative.
11         THE WITNESS:  You can say that.
12 BY MS. PETRUSKA:
13     Q    And you said he had some run-ins with his
14 supervisor.  What were the run-ins he had with his
15 supervisor?
16     A    I don't remember the exact gist of the
17 conversation, but I know a couple times he's been
18 in my office because he and Dawn Roop had some
19 question or some problems.
20     Q    So you interviewed McGinnist for this
21 position per what you described before.  Did you
22 interview anybody else for this particular position,
23 the August of 2017 promotion?
24     A    I'm sure I looked at -- if they gave me the
25 letters before I filled the position, I'm sure I

51  (Pages 198 to 201)

Sheriff Vernon Betts

Page 230

1  a list? No. But did I have guys? These guys, I knew
2  of their integrity, as you would say integrity.
3        Now, there again, all of that has got to be
4  qualified, but when you talk about them doing the job
5  and working as a deputy, I knew those guys had the
6  ability. I don't think anybody on that job, Lynette,
7  you're going to find didn't have some kind of some
8  skeletons in their closet. So I had to pick the best
9  that I had. When we say the best, and that's
10 relevant, but we had to pick from what we had.
11       Q   Let me go back. I told you I'd give you
12 some time to think about it and go back to it. What
13 would John Castellano have to do to be considered for
14 promotion in your sheriff's department?
15       MS. LEWIS: Object to the form. Improper
16 hypothetical.
17       Go right ahead, Vernon.
18       THE WITNESS: Yeah. John Castellano? I
19 don't know.
20 BY MS. PETRUSKA:
21       Q   I need to give you more time?
22       A   Probably several years, I don't know. I'm
23 not going to answer that question.
24       Q   You're refusing to answer that question?
25       A   I'm saying I can't answer that question.

Page 231

1        THE WITNESS: Korey, is there some kind of
2  penalty for not answering that question or what?
3        MS. LEWIS: You need to answer any question
4  to the best of your ability. So I think what Lynette
5  wants to figure out here is, is there something that
6  you're not understanding about the question or what
7  aspect are you struggling with to answer?
8        THE WITNESS: So the question is what would
9  it take for John Castellano for Vernon Betts -- what's
10 the question?
11 BY MS. PETRUSKA:
12       Q   What would John Castellano have to do to be
13 considered for promotion?
14       MS. LEWIS: Same objection.
15       THE WITNESS: John Castellano has got to
16 improve in every aspect of his person, personality,
17 work ethic. Like I said before, he doesn't do
18 anything to get himself in trouble, but he doesn't do
19 anything to stand out. He ain't hitting 300, if you
20 understand that analogy.
21 BY MS. PETRUSKA:
22       Q   I do. So are you saying that the people
23 that you promoted are hitting 300?
24       A   When I selected them they were. They were
25 doing just what I thought they should be doing. And I

Page 232

1  think that's the point, Lynette. It's my prerogative
2  to determine who I want to work for me, and those
3  people, I ain't saying that they were angels, I'm
4  saying that they were doing what I asked them to do at
5  the time.
6        Q   You said that he would have to improve his
7  personality. What about his personality is deficient
8  that he's not currently being considered for
9  promotion?
10       A   You've got to be able to communicate with
11 the people that you work with.
12       Q   How is he failing to communicate?
13       A   That's one of his flaws as far as I can see.
14       Q   And my question is, right: What have you
15 observed that shows that he fails to communicate with
16 people?
17       A   He's not a -- I don't see him cordially
18 communicating with anybody. He definitely doesn't
19 communicate with his sheriff. That's the first person
20 you've got to start off with.
21       Q   Anything else in terms of his communication
22 and personality?
23       A   His judgment. Judgment. To me he hasn't
24 used the best judgment. There's a couple different
25 situations, and I'm afraid that that will lead into --

Page 233

1  any time you -- he doesn't use good judgment. He
2  didn't use good judgment.
3        Q   You said there are specific situations.
4  What specific things has he done that you believe do
5  not show good judgment?
6        A   Well, I know that he had an altercation with
7  Antoine Cannon once. They went to move some
8  prisoners, pick up prisoners or whatever, and
9  Antoine Cannon was his supervisor. He tells
10 Antoine Cannon -- Antoine Cannon gives him the keys to
11 drive, and he tells Antoine Cannon that he ain't
12 driving. That was a no no. I'm not sure if -- I
13 think that was a write-up. I think that's in his
14 file.
15       Q   Anything else?
16       A   Yes. He -- I know one time his car wouldn't
17 start, and instead of him asking his supervisor or
18 calling me and asking me can he use one of the vans,
19 he spends the night sleeping on the floor of the
20 building or something to that effect, but he's staying
21 all night on the job. Judgment, judgment, judgment.
22       And then overall, I mean, if you wanted to
23 be promoted, how come you just didn't come to me
24 and -- or how come you just didn't write a letter and
25 say, hey, I would like to, like everybody else, like

59  (Pages 230 to 233)

Sheriff Vernon Betts

| Page 274 | Page 276 |
|---|---|

**Page 274**

1   who the rest of that jargon.  And that's another thing
2   that I've said to these guys.  You give me these forms
3   and stuff and I can't figure out who is the one doing
4   the writing.
5       Q    These were Meyer, Lalu -- never going to say
6   that name right, I'll let you say it.
7       A    Mark Lalumandire.  L-A-L-U-M-A-N-D-I-R-E.
8       Q    Thank you.  Evans, Friar, Borisch and
9   Hopgood were people that you were -- were they people
10  you were considering for sergeant?
11      A    No, these are people that they thought I
12  should consider.
13      Q    So this is some sergeant telling you who
14  they think you should consider, and they submit it
15  to you for your consideration.
16      A    Yes.
17      Q    Did you request this or did you -- did it
18  come to you unsolicited?
19      A    No.  I think this came up in a supervisor
20  meeting.  I might have said we've got some openings,
21  blah, blah.  Who do you think, or who should we
22  consider for -- I think that's how that came about.
23      Q    So this was something you requested and a
24  sergeant took you up on it and gave you a list of
25  people he thought was good with the pros and cons; is

**Page 275**

1   that correct?
2       A    That's correct.
3       Q    Have you received similar documents from any
4   of your other supervisors?
5       A    Yes.
6       Q    And who did you receive similar documents
7   from?
8       A    And I remember getting several different
9   pieces of paper from folks with something, not the
10  same format, but something with names and who they
11  thought.  Might have been just a single name, you
12  know, without explanation.  But, yeah, I remember
13  getting something from a couple of -- several of the
14  different supervisors.
15      Q    When you get recommendations like that,
16  where do you keep them?
17      A    When I get recommendations like this?
18      Q    Yes.
19      A    I usually just throw them in the drawer
20  along with the files where people have asked me for
21  promotion.
22      Q    So you keep this in what I'll call your
23  sheriff files as opposed to the department files; is
24  that correct?
25      A    Yeah.  I have a separate drawer for just

**Page 276**

1   those applications, people who are asking me about
2   promotions.  And I probably, if I don't throw it in
3   there, I'll throw it in my main drawer right in front
4   of me so that I can go back and look at those names
5   and massage those names in my mind.  And then -- in
6   this case, I don't consider that a formal write-up or
7   anything.  After I made my choice, I probably threw
8   that piece of paper in the trash can.
9       Q    Why would you do that?
10      A    Because I've made my selection.  I don't
11  count this -- I don't count this -- now that you're
12  using it for official document or something, I never
13  would count this as an official.  I just asked the
14  employees off-the-cuff to give me some names.  It
15  could have been on a piece of toilet paper, it
16  wouldn't have made me any difference.  But now, of
17  course, you see, everything comes into play these
18  days.
19      Q    Sheriff, the only thing I would ask is if
20  you would check your drawer to see if you have any
21  other documents like this beyond the one that was
22  produced, okay?
23      A    Okay.  And I think we might have done that
24  already.
25      Q    My understanding is your brother Howard is

**Page 277**

1   also a deputy in the sheriff's department, correct?
2       A    That's correct.
3       Q    Have you ever considered him for promotion?
4       A    Yes.
5       Q    And what positions have you considered him
6   for promotion to?
7       A    Next to mine, to be the top dog next to me.
8   No, I'm being a little facetious.  Lynette, I was
9   hoping before I came as sheriff that I could promote
10  my brother, but unfortunately, because of nepotism,
11  that was quickly squashed.  So, no, once we figured --
12  once we found out that he could not be promoted, then
13  that went by the wayside.
14      Q    And his current rank is deputy, he doesn't
15  hold a rank?
16      A    Right, he's just simply a deputy.
17      Q    But my understanding is in March of 2017, he
18  was given extra pay for extra duties; is that correct?
19      A    That is correct.
20      Q    What extra duties was he given?
21      A    He was given the responsibility for keeping
22  the time for payroll for the security unit.  That
23  became an issue early in my tenure that I had several
24  employees who came to me and said that their paycheck
25  was messed up, they didn't get paid for proper timing.

70  (Pages 274 to 277)

Sheriff Vernon Betts

Page 278

1  And so we went through a discovery to figure out why
2  they were not getting paid properly.
3         Come to find out that the lieutenant at that
4  time, I called his name earlier, it escapes me again,
5  but that lieutenant was not doing the job. He was
6  allowing other employees to do the time. That's a
7  no-no. That's supposed to be done by a supervisor,
8  not by employees.
9         And so we ended up figuring out that that
10 supervisor, John Tyra, he said he did not do the time,
11 that he didn't want to do the time because he didn't
12 deal with the computers, he didn't have that skill.
13 And so we had to find somebody that could do the time
14 in for those employees and do it properly. I'm not
15 going to be mispaying these people. I don't play that
16 either.
17        So we went down our seniority list for those
18 people that worked in security. Howard was like the
19 third person on the list. We got to him. He accepted
20 the responsibility. He did the job for about three
21 weeks, and all of a sudden my payroll clerk, I call --
22 Captain Hogan came to me and said, hey, you know that
23 if he's doing the response -- the work of the
24 lieutenant, that he's supposed to get extra pay. And
25 I said, who told you that? She said, that's what the

Page 279

1  pay bill says. I said, let me see the pay bill. She
2  showed it to me and, sure enough, the pay bill states
3  that if you're doing -- we talked about that earlier
4  in the conversation about the extra work, or something
5  like that -- that he's supposed to get this extra pay.
6         So by the book, he was given that
7  five percent -- that five percent stipend, and it just
8  so happened that that came along at about the same
9  time that his two percent raise was supposed to come.
10 And lo and behold, somebody got ahold of that and put
11 that in the newspaper that I was showing favoritism
12 and I gave my brother a seven percent raise.
13        Q   If your lieutenant was supposed to do
14 payroll and he wasn't doing the job, why didn't you
15 demote the lieutenant and get another lieutenant in to
16 do the job that the lieutenant was supposed to do?
17        A   That lieutenant eventually did get -- he
18 didn't get promoted, but he resigned, he retired.
19 That was one of the issues that kind of pushed him
20 into retiring.
21        And you say get another lieutenant. I
22 didn't have another lieutenant that I could have given
23 that, another lieutenant that worked in the security
24 unit. I didn't have another lieutenant in the
25 security unit, so we asked --

Page 280

1        Q   You're the sheriff, you can promote anybody
2  you want at any time to lieutenant, correct?
3        A   Are you telling me that I can now?
4        Q   I'm asking. So if you've got a lieutenant
5  in security that's not doing the job, you can get rid
6  of him and promote somebody else to lieutenant who is
7  going to do the job, correct?
8        A   I guess I could have.
9        Q   Yolanda Jones. She didn't make a claim
10 against you, she made it against Sheriff Murphy,
11 correct?
12        A   I don't know anything about that.
13        Q   So it sounds like you don't even know
14 Yolanda Jones, it sounds like.
15        A   I do know Yolanda Jones, that's one of my
16 employees.
17        Q   She's a current employee?
18        A   Yes.
19        Q   Do you know anything about a charge of
20 discrimination she made?
21        A   No, I don't.
22        Q   But Shamera Smith was an employee of the
23 sheriff's department; is that correct?
24        A   That's correct.
25        Q   How long did she work for the sheriff's

Page 281

1  department?
2        A   Not very long. I don't know if she worked a
3  year, maybe a little better than a year, I'm not sure.
4        Q   And did she quit or was she fired?
5        A   She was fired.
6        Q   Why was she fired?
7        A   For insubordination.
8        Q   And who was she insubordinate towards?
9        A   Me, the sheriff.
10        Q   And what did she do to you?
11        A   I gave her instructions to remain in my
12 office and she refused.
13        Q   Why did you want her to remain in your
14 office?
15        A   Because we were about to have a discussion,
16 a disciplinary discussion, and I wanted her to sit
17 there while I take care of some other stuff, and she
18 decided she didn't have time to just stick around
19 doing nothing. If I ask you to sit for eight hours,
20 just like you-all have requested that I sit here for
21 eight hours, then that's what you do. You sit for
22 eight hours. So I gave her a direct instruction and I
23 told her if you walk out of my office, you're going to
24 be fired. She told me --
25        Q   Why were you looking to discipline her

Sturm Reporting Services, Inc.
314.780.2816

Sheriff Vernon Betts

Page 282

```
 1    before she walked out of the office, because you said
 2    it was --
 3            MS. LEWIS:  I object as to the relevance.
 4    BY MS. PETRUSKA:
 5        Q   Go ahead.
 6            THE WITNESS:  Can I answer that question?
 7            MS. LEWIS:  Go ahead and answer the
 8    question.
 9            THE WITNESS:  I don't mind answering it.
10    She had been involved in another situation, Lynette,
11    with another employee.  She talked about it being
12    sexual harassment or sexual situation.  And we had had
13    a hearing.  We sat down and we talked about all of
14    that, and we thought we had cleared all of that stuff
15    up.  And we thought we had an understanding between
16    the two employees, okay, we're through with that,
17    we'll leave that alone, everybody going their way.
18            And that same day, that young lady actually
19    called -- at that time she called that employee's wife
20    on her job and then it caused that employee to just go
21    livid, who that evening then called -- so we get all
22    this hocus-pocus over nothing, over what should have
23    been settled.
24            So we called her in the office the next day,
25    trying to find out how come things were not settled
```

Page 283

```
 1    like we thought they were.  Go in the office and have
 2    a seat, and she decides, as she's done on several
 3    other occasions, that she don't have to adhere to any
 4    instructions by a supervisor.  This was not the first
 5    time that a supervisor had given her an instruction
 6    and she decided that she's going to -- or a supervisor
 7    wanted to actually sit down and have a conversation
 8    with her and she decided she wasn't going to listen to
 9    the supervisor, she didn't have time to listen to the
10    supervisor.  That was the second time or third time.
11            We called her in the office before and
12    actually warned her of doing that kind of thing.
13    Listen, you can't decide when you're going to listen
14    to a supervisor or not.  We had instructed her on that
15    just a few days before bringing her into my office,
16    and I'll be doggone if she don't tell me she ain't got
17    time for this.  Well, who are you, the sheriff or not,
18    or am I the sheriff?
19        Q   Have you seen her lawsuit against you and
20    the City?
21        A   I think I've looked at it.  I don't know.
22        Q   And you understand that she's accusing you
23    of retaliation, correct?
24        A   Yeah, I guess.
25        Q   Did you ever ask anybody -- again, I'm not
```

Page 284

```
 1    asking about communications with your lawyers -- but
 2    did you ever ask anybody to investigate her complaint?
 3        A   No.  Her complaint as it relates to the
 4    lawsuit?
 5        Q   Yes.
 6        A   No, I've not asked anybody.  I figure
 7    lawyers are going to take care of all that.
 8        Q   You understand in the lawsuit she alleges
 9    that you told her to come to work and keep her mouth
10    shut.  Did you ever say that?
11        A   I probably -- yeah.
12            MS. LEWIS:  Objection.
13            THE WITNESS:  I probably said that to most
14    of the employees.  Come to work, keep your mouth shut,
15    do your job, do it well, get your money and go home.
16    Yeah, that's a common phrase that I use because that
17    seems to be -- the running of the mouth seems to get a
18    lot of stuff stirred around the St. Louis sheriff's
19    department.  Just come to work and keep your mouth
20    closed.
21    BY MS. PETRUSKA:
22        Q   Does that mean that you don't want to hear
23    if deputies have complaints about your department?
24        A   Of course that does not.
25            MS. LEWIS:  Objection.  Misstates testimony.
```

Page 285

```
 1    BY MS. PETRUSKA:
 2        Q   So what does it mean?
 3        A   It means -- I mean, just -- everybody's --
 4    come to work and leave all the grapevine, the yada,
 5    yada, the bull crap, leave it at the door.  Come in,
 6    do your job.  You don't have to do a whole lot of
 7    hocus-pocus talking about who shot John and -- see, I
 8    got all this kind of stuff going on, sexual harassment
 9    and who's looking up someone's dress and blah -- that
10    stuff don't need to be talked about on the -- what you
11    did on Facebook last night.  They know what I'm
12    talking about.
13        Q   If a deputy thinks they've been sexually
14    harassed, though, you want to know about that,
15    correct?
16        A   You know I do, yes.
17        Q   And you want to investigate that, correct?
18        A   Yes.
19            MS. LEWIS:  I'm going to jump in and say
20    we're going over now.  I'll give you about a
21    five-minute grace period based on the numbers you gave
22    me.
23            MS. PETRUSKA:  Well, I would disagree with
24    the math, but I am almost done.
25
```

72 (Pages 282 to 285)

Sheriff Vernon Betts

Page 286

1  BY MS. PETRUSKA:
2      Q   Is John Mopkins also suing you for
3  retaliation?
4      A   That's what I understand.
5      Q   And he claims that he's been retaliated
6  against for testifying in the Johnny Chester case; is
7  that correct?
8      A   That's what he's saying.  It has no
9  validity, but that's what he's saying.
10     Q   And he's saying that he's not being promoted
11 because of his testimony in the Johnny Chester case,
12 correct?
13     A   And that's not true.
14     Q   I'm just asking what he's alleging; is that
15 correct?
16     A   Yeah, that's what he's alleging.
17     Q   Were you present at the Johnny Chester case?
18     A   Yes.
19     Q   Who did Deputy Mopkins testify for at the
20 Johnny Chester case, plaintiff or defendant?
21     A   He testified for the plaintiff.
22     Q   And did he testify that he believed
23 Johnny Chester was discriminated against?
24     A   I believe so, yes.
25     Q   And then Alfred Montgomery, he was also a

Page 287

1  deputy in the sheriff's department, correct?
2      A   Yes.
3      Q   And he was fired, correct?
4      A   Yes.
5      Q   And why was he fired?
6      A   Basically for the same thing,
7  insubordination.  I mean, just a total jackoff.  Can I
8  say that?  I mean just a terrible employee.
9  Insubordination and disruption of the workplace.  He,
10 too -- he, too came to my office and sat and was just
11 very, very insubordinate.
12     Q   He's African-American, correct, or black?
13     A   Yes, he's black.
14     Q   Did you ever call him a boy?
15     A   Yeah.  Not -- I don't think I called him a
16 boy.  As a matter of fact, I know not on the job.
17 That's what he is to me, a boy, 23 years old.  I'm
18 almost 70 years old.
19         MS. LEWIS:  Just try to answer the question
20 that she asked you, Sheriff.
21 BY MS. PETRUSKA:
22     Q   So when you called him a boy, it's an age
23 reference, it's not the derogatory racist reference.
24     A   How can it be?  He's black, I'm black.
25 You're right.

Page 288

1      Q   Some black people say derogatory things to
2  each other, as you know.
3      A   Sure.  No, not then.
4      Q   As we sit here today, do you know what
5  qualifications John Castellano has to be promoted to
6  sergeant?  What his performance evaluations look like,
7  what his past trainings and experience have been,
8  things like that?
9          MS. LEWIS:  Objection as asked and answered.
10 Go ahead.
11         THE WITNESS:  So do I have to answer that?
12         MS. LEWIS:  Yes, if you know, go right
13 ahead.
14         THE WITNESS:  I think during the course of
15 all of this we may have looked at some of
16 John Castellano's qualifications, background, and
17 nothing stands out to me.
18 BY MS. PETRUSKA:
19     Q   Have you looked at his performance
20 evaluations?
21     A   I think I have.
22     Q   And have you looked at his training record?
23     A   I believe so, yes.
24     Q   And you've looked at his disciplinary
25 record?

Page 289

1      A   Yes.
2      Q   And nothing stands out to you in terms
3  of his work history?
4      A   No.
5          MS. PETRUSKA:  Okay.  I believe that is all
6  the questions I have.  Sorry, Sheriff, that doesn't
7  necessarily mean you're done because Korey can ask you
8  questions.  I don't know if she will, though.
9          MS. LEWIS:  Korey has one question for you,
10 Sheriff.
11         This is the end of the deposition.  We might
12 have talked about this before, but it is your decision
13 if you would like to read the transcript for accuracy
14 or if you would like to waive and assume that Jo Ann's
15 done everything accurately and waive your signature.
16         THE WITNESS:  Yeah, let's waive the
17 signature.  I believe Jo Ann's done everything.
18         MS. LEWIS:  That's my only question for you.
19         MS. PETRUSKA:  I do not have any further
20 questions, with the caveat that I'm going to reserve
21 the right to petition the court for additional
22 questions if additional evaluations are found that
23 haven't been produced prior to the deposition.
24         Thank you, Sheriff.
25

73 (Pages 286 to 289)